IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BAR J SAND & GRAVEL, INC.,
a New Mexico corporation,

       Plaintiff,

v.                              No. CV-2015-00228 SCY/KK

FISHER SAND & GRAVEL CO.,
a North Dakota corporation, doing business
in New Mexico through its division
SOUTHWEST ASPHALT & PAVING,

       Defendant.

**BAR J SAND & GRAVEL, INC.'S MOTION FOR SANCTIONS FOR
FISHER SAND & GRAVEL CO.'S INSTRUCTIONS TO A CORPORATE
OFFICER NOT TO RESPOND TO QUESTIONS AT DEPOSITION**

     Fisher has made a mockery of the discovery process by having the company's Chief Administrative Office (CAO), its Secretary, and one of three Board of Directors members (Tim Priebe) avoid answering proper, appropriate, and relevant questions during his deposition simply because he also has a law degree and has acted as a Fisher attorney at some points in time. Fisher, having placed an attorney in those various roles, simply does not thereby protect all of his corporate knowledge, all of his actions, and any of his authorizations on behalf of the corporation from discovery. The trier of fact is entitled to know the truth regarding the Fisher corporate knowledge and its corporate actions, even though that knowledge and those actions are known to a corporate Officer who is also an attorney.

     Mr. Priebe refused to answer more than 100 questions based on improper objections in his 3 hour deposition. This requires significant sanctions. A corporation simply cannot avoid meaningful discovery in this fashion. Mr. Priebe would not answer even the simplest non-objectionable foundational questions such as "have you seen this document before," or "did you

author this document or any portions of it?" and/or "Did the Board of Directors of Fisher take certain actions."  Neither work product nor the attorney/client privilege protects such information from discovery.  Furthermore, Mr. Priebe's understanding, as a corporate Officer and Board member of the language of Fisher's contract with Bar J S&G (the Exclusive Supply Agreement (ESA)) is not protected or privileged nor is the question to him whether the words in the contract (that he was asked to read during the deposition) are susceptible to more than one meaning when asked of him **not as a lawyer** but as a corporate Officer and/or Board of Directors member.  These are all "fair game" questions of a corporate decision maker and the Plaintiff and the jury should have been allowed to hear the answers.  Now, having had one of their corporate Officers and Board of Directors member refuse to answer these questions, the jury should be made aware of how Fisher evaded answering the questions and attempted to prevent the jury from knowing the truth about Fisher's corporate knowledge and actions.  No lesser sanction will properly address Fisher's baseless attempt to subvert the discovery process.

## I.    LEGAL AUTHORITIES

### A. Fisher Has The Burden Of Proof To Prove The Answer Or Information Requested Was Work Product And/Or Attorney/Client Privileged.

The party asserting a work product objection as a bar to discovery must prove the doctrine is applicable.  *See Barclays American Corp. v. Kane*, 746 F.2d 653, 656 (10th Cir. 1984).  "A mere allegation that the work product doctrine applies is insufficient."  *See Resolution Trust v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995) (citing *Peat Marwick Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir. 1984)).  Similarly, the party asserting the attorney/client privilege must prove the applicability of the privilege, which is to be narrowly construed.  *See In the Matter of Grand Jury Subpoena Duces Tecum Issued on June 9, 1982*, 697 F.2d 277, 278 (10th Cir. 1983); *see also, Mackey v. Staples Office Superstore, LLC*, No. CV-09-0023 JCH/WPL, 2010 WL 9523829 at *7

(D.N.M. Feb. 12, 2010). In *Mackey v. Staples Office Superstore*, Staples contended that it was entitled to a protective order because the information requested by Mackey is protected by the attorney/client privilege and the work product doctrine and the court stated that "Staples has the burden of establishing that these protections apply." 2010 WL 9523829 at *7. The Tenth Circuit has condemned blanket assertions of privilege. *See In re Grand Jury Subpoena Duces Tecum*, 697 F.2d at 279, n. 1.

The work product doctrine only applies to documents, tangible things and mental impressions that are prepared in anticipation of litigation. *See* Rule 26(b)(3)(A); *Hickman v. Taylor*, 329 U.S. 495 (1947); *In re Grand Jury Proceedings*, 616 F.3d 1172, 1185 (10th Cir. 2010). Materials assembled or mental impressions formed in the ordinary course of business or pursuant to public requirements unrelated to litigation or for other non-litigation purposes are not under the qualified immunity, even if they are ultimately used in litigation. *Goosman v. A. Duie Pyle, Inc.*, 320 F.2d 45, 52 (4th Cir. 1963); *Trujillo v. Board of Education of the Albuquerque Public Schools*, 2007 WL 1306593 at *9 (D.N.M. Mar. 12, 2007). Furthermore, the threat of litigation must be more than a remote prospect. The mere fact that litigation does eventually ensue does not by itself cloak the materials prepared by an attorney with the protection of the work product privilege. *Trujillo*, 2007 WL 1306593 at *10. A "substantial and significant threat of litigation" must be present and that "requires a showing of objective facts establishing an identifiable resolve to litigate." *Id.* at *6. Once it is established that the material was not prepared and/or the mental impressions were not formed in anticipation of litigation, it is discoverable if relevant and not protected by an attorney/client privilege. Courts have clearly rejected the argument that it is a misconception that the **only** thing that can be work product is that which is prepared in anticipation of litigation. *See SEC v. R.J. Reynolds Tobacco Holdings*, Inc., 2004 WL 3168281, at *5 (D.D.C. 2004). The *R.J. Reynolds* case stated:

3

Furthermore, RJR contends that it is a "misconception that the only thing that can be work product is that which is prepared in anticipation of litigation." *Id.* at 49, 8-10. It is RJR's position, relying on the Eight Circuit's discussions and holding in *Simon v. G.D. Searle & Co.*, 816 F.2d 397 (8th Cir. 1987), that while ordinary work product must be prepared in anticipation of litigation, opinion work product is not subject to the same definitional requirement. *Id.*, ll. 22-25. No other support for this proposition is offered, and upon a careful review of *Simon*, the Court disagrees with RJR. The Eighth Circuit held in *Simon* that while certain documents were not themselves prepared in anticipation of litigation, information contained therein was privileged as opinion work product because the information, which the Court concluded revealed the mental impressions of its preparing attorney, was "by [its] very nature … prepared in anticipation of litigation." 816 F.2d at 401. The Eighth Circuit's holding distinguishes between *documents* prepared in anticipation of litigation and *information* prepared in anticipation of litigation; the court's reasoning, however, does not release the subject of opinion work product protection from the requirement of having been prepared in anticipation of litigation.

This principle is firmly rooted in the genesis of the work product doctrine in *Hickman v. Taylor*, which solely dealt with the discovery of materials and mental impressions formed in anticipation of litigation. 329 U.S. 495, 511. Thus, as applied to this case, to have made a proper objection on work product grounds, Fisher would have had to have objected because the questions asked related to either documents prepared or mental impressions formed "in anticipation of litigation." However, none of the questions asked would have required disclosing mental impressions formed in anticipation of litigation and no document was asked about that was not already in Bar J S&G's possession. Fisher, thus, had no basis to object or to refuse to answer.

Nor does the work product doctrine protect how a document was created or the facts contained within a document, even if the document is later determined to be protected. "Because the work product doctrine is intended only to guard against divulging the attorney's strategies and legal impressions, it does not protect the facts concerning the creation of work product or facts contained within work product." *Resolution Trust Corp.*, 73 F.3d at 266.

Similarly, the attorney/client privilege does not extend to information the attorney learns from an unprivileged source. *In re Grand Jury Proceedings*, 616 F.3d at 1183. Thus, if the

information is obtained from an employee or other witness who has no connection to the litigation other than as a witness, it is not protected. *Alpha Beta Co. v. Superior Court*, 157 Cal. App. 3d 818, 827 (Cal. Ct. App. 1984). And the privilege does not protect the general nature of the work performed by the attorney. *In re Grand Jury Subpoena*, 246 F.R.D. 673, 679 (D. Kan. 2007) (citing cases). "Likewise, acts or services performed by an attorney during the course of the representation are not within the privilege because they are not communications." *Id.* "Further, the subject matter of a meeting with an attorney, the persons present, the location of the meetings, or the persons arranging the meetings are also not protected by the privilege." *Id.* Finally, the privilege only covers confidential communications made seeking legal advice made from a legal advisor. *Id.* at 678. The privilege adheres "only if [the communications] constitute legal advice or tend directly or indirectly to reveal the substance of a client confidence." *In re Grand Jury Proceedings*, 616 F.3d at 1185. The attorney/client privilege only shields communications that were intended to be confidential, so communications made to an attorney in the presence of a third party or made with the intent that they will be disclosed to a third party are not privileged. *Id.* at 1183; *United States v. Evans*, 113 F.3d 1457, 1462 (7th Cir. 1997). The reason for all these caveats is so that the privilege can be narrowly construed and so that courts apply the privilege only when it is proven, by the proponent, to be applicable. *Id.* Numerous questions posed to Mr. Priebe were foundational or did not involve privileged matters and most were clearly phrased to avoid infringing on confidential communications wherein legal advice was being sought.

### B. Neither Work Product Nor Attorney/Client Privilege Are Proper Bases To Object To Foundational Questions.

Since the work product doctrine does not protect facts regarding the creation of the document or facts contained within any document, foundational questions about documents are entirely appropriate. Without the foundational questions, one could never find out if there is any

basis to proceed with an examination of the witness or whether the asserted protection does not apply. As the court in *In re Grand Jury Proceedings*, 616 F.3d at 1185 indicated:

> Appellant has failed to establish that any of the same nine questions request protected work product. The majority of questions focus on the government's attempt to elicit whether the Appellant's attorneys passed on certain information to Appellant. The questions do not seek any legal advice nor do the questions delve into the attorney's impressions about the facts that might have been conveyed to Appellant. The questions do not seek legal conclusions, opinion or legal theories created in anticipation of litigation. *See Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 668 (10th Cir. 2006) ("Work product protection only applies to attorneys or legal representatives' mental impressions, conclusions, opinions or legal theories authored in anticipation of litigation."). The questions seek only factual confirmation concerning events the attorney personally witnessed (either as receiver or giver of information). *See Resolution Trust Corp. v. Dabney*, 73 F.2d 262, 266 (10th Cir. 1995) ("The work product doctrine is intended only to guard against divulging the attorney's strategies and legal impressions: it does not protect facts concerning the creation of work product or facts contained within work product."). Therefore, these questions do not ask for protected attorney work product because they do not seek the attorney's mental impressions – the questions only ask for the attorney's testimony regarding facts they observed first hand.

Thus, whether an attorney reviewed a particular document or for that matter, authored a particular document that has already been disclosed, cannot be subject to a proper work product objection. It simply asks the attorney to confirm whether or not he had involvement in the particular document. Since the document has already been produced to the extent there is any protected mental impressions within the document, any arguable protections have already been waived by producing the document. Similarly, since not all knowledge gained by an attorney was obtained as a part of giving legal advice based on client confidences as opposed to facts, the foundational questions are used to determine whether the witness has any knowledge and can be used to determine whether any protection applies to that knowledge. A privilege log would contain the same foundational information and is not protected.

In light of these axiomatic principles, questions regarding whether an attorney reviewed a particular document or whether in fact the attorney prepared portions or the entirety of documents

that have been produced are all fair game.  As the court in *Alpha Beta Co.*, 157 Cal.App.3d at 829, indicated examples of questions such as: "Have you ever been advised as to who filled out that document?", "When did you first see that document?", "Did you receive a copy of this document from Mr. Gladden?" and "Mr. Kanode, did you read Exhibit 2?", do not call for the disclosure of privileged information and thus, are not objectionable and must be answered.  All are preliminary and foundational in nature and most can be answered by a "yes" or "no" response.  This analysis makes logical sense since in most cases the document itself is already in existence and in the hands of the person taking the deposition and, therefore, the document itself could not have been intended to be privileged.  Thus, whether or not the witness has seen a document and whether the witness authored it or parts of it cannot be privileged, even if the witness is a lawyer, since it was intended to be viewed by third persons.  Similarly, what a witness meant by using certain phrases is not privileged such as, asking an attorney what was "meant" by an affirmative defense.  *See id.* at 828. The reason for these rules is that the privilege adheres only if the communications constitute legal advice or tend directly or indirectly to reveal the substance of a client confidence.  *In re Grand Jury Proceedings*, 616 F.3d at 1182, 1183.  If the document was given to the other side in the form of a letter, contract, answer, or counterclaim it was not intended to be confidential.

Mr. Priebe violated these very axiomatic principles (that all lawyers, including Mr. Priebe, should be aware of) by refusing to answer numerous foundational questions.

### C.  No Protection Or Privilege Adheres To A Witness Who Performs Corporate Roles But Is Also A Lawyer.

While the attorney/client privilege and the work product doctrine may protect corporate clients and counsel communications that were intended to be confidential and/or in anticipation of litigation, those are limited to situations in which the attorney is acting **only** as a legal advisor. Business and financial advice is not protected.  *See Burden-Meeks v. Welch*, 319 F.3d 897, 899

(7th Cir. 2003). The benefit of using an attorney in other roles such as corporate secretary, Board of Directors member, or otherwise, is an expanded use of the lawyers which may be of benefit to the corporation but, however, it comes at a cost. The cost is that the corporation must explicitly differentiate the lawyers legal and business work or, if they do not, no privilege or protection applies to any of it. This is because the privilege is only designed to protect communications seeking and rendering legal services and the corporations could otherwise use it to prevent legitimate discovery, as Fisher is using it here.

The overlap between business role and counsel does not make all communications with corporate counsel privileged. A prudent corporation will seek legal advice with respect to most corporate decisions, but the inclusion of general counsel does not transform all business discussions into privileged attorney/client communications. *See Great Plains Mutual Ins. Co. v. Mutual Reinsurance Bureau*, 150 F.R.D. 193, 197 (D. Kan. 1993). Thus, the mere fact that an attorney was present during a Board of Directors meeting does not shield disclosure. Moreover, communications by a corporation with an attorney who at the time is acting in an unclear capacity or as business advisor or corporate Officer or Board of Directors member would not be privileged.

An essential element of the attorney/client privilege is that the attorney is acting in the appropriate role during the communication with the client. Attorneys in diverse positions do not occupy the role of attorney for privilege purposes, unless the communications were clearly delineated and the attorney was clearly dealing with an attorney/client privileged matter. Since the party asserting the privilege has the burden to show the protection is applicable and privileges are to be construed narrowly, *In re Grand Jury Proceedings*, 616 F.3d at 1183, the corporation must first prove that some knowledge or opinion the lawyer has was obtained only from a client communication in confidence wherein legal advice was being sought. If the lawyer's knowledge is not solely gleaned in that capacity, then no protection applies to that witness being deposed as a

corporate Officer. *See United States v. Evans*, 113 F.3d 1457, 1463 (7th Cir. 1997) (explaining that proponent must prove that the attorney was "acting in his capacity as a professional legal advisor" because "[t]he privilege extends only to communications between a client and a professional legal advisor '*in his capacity as such*'", so the fact that communications were made to one who "happens to be a lawyer" is insufficient, even if the speaker intends for the communications to be confidential). "When lawyers are consulted as . . . business advisors, or [some other capacity], the privilege is inapplicable." *Id.*

Often, establishing the privilege requires an in-camera review, otherwise, no privilege can apply. *Great Plains Mutual Ins. Co.*, 150 F.R.D. at 197. After an in-camera review, the Court can determine if a privilege applies and to what extent. Furthermore, factual knowledge is not protected, only client confidences are. Thus, it is irrelevant in what role Mr. Priebe is in when he learned something. What matters is, does the question require him to disclose client confidences or legal advice he gave? If not, the question is fair game. Since Mr. Priebe cannot distinguish between the roles he played at any particular time and cannot distinguish and clearly state he was only acting in an attorney/client privileged setting, Fisher cannot meet the burden of proving that a privilege or protection applies.[1]

Furthermore, numerous of the questions were posed (to avoid any problem with any protection or privilege) to him as a Board member, Secretary and/or CAO, such as, is there anything about a sentence in a contract he doesn't understand. Mr. Priebe simply refused to answer these questions in those other capacities. (*See*, for example, T. Priebe Depo. at 124:7-125:7,

---

[1] Mr. Priebe was both Secretary to the corporation, CAO and a Board of Directors member who testified that he could not distinguish between those roles and his role as a corporate attorney. (*See*, for example, T. Priebe Depo. at 96:3-15, 102:14-20, 106:17-35, 112:13-16, and 124:7-125:7, **Exhibit 1**). These are obvious examples where Fisher could never meet its burden yet, Mr. Priebe refused to answer numerous questions because he could not say which role he may have been in when he learned certain information.

**Exhibit 1**).  Mr. Priebe did so even to the extent there were Minutes that he would have signed as Secretary relating to decisions he made as a Board of Directors member.  (*See* T. Priebe Depo. at 15:4-16:18 and 17:3-7, **Exhibit 1**).  Since many, if not all, of the substantive questions posed to Mr. Priebe were posed to him as an Officer or Director, his refusals to answer were entirely inappropriate.

### D.  Waiver.

In addition to all of the above, any work product protection and/or attorney/client privilege can be waived.  *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006).  Certainly, if a document, mental impression, or attorney/client communication was intended to be protected or privileged, the client can make an informed decision to waive the protection or privilege and produce the information to the other side.  One of the most flagrant examples of the misuse of this principle is that even after Fisher waived by producing internal emails regarding Fisher's April 12, 2012 "Notice of Intent to Extend Supply Agreement" and allowed Fisher's 30(b)(6) deponent to testify that both Mr. Priebe and Mr. Fisher authorized it to be sent, Mr. Priebe refused to answer questions purportedly based on a reinvoking of the waived privilege, if any privilege ever existed.  He refused to answer whether he had seen it, reviewed it and/or authorized the sending of the Notice of Intent to extend the supply agreement in this deposition.  (*See* T. Priebe Depo. at pp. 70-83, **Exhibit 1**).  Not only was there no litigation anticipated back in that timeframe (April 2012), no legal was advice being sought in the emails or with regard to the letter.  Thus, no protection or privilege could apply to them.  Furthermore, the questions didn't seek to elicit any legal advice.  Had there ever been any protection or privilege that applied to the Notice of Intent to extend the supply agreement, Mr. Moehn (as a 30(b)(6) witness) waived it by testifying about it.  (*See* M. Moehn 30(b)(6) Depo. at pp. 86-87, **Exhibit 2**).  The gamesmanship that Mr. Priebe employed during this deposition in order to obstruct Bar J S&G from obtaining fair discovery included

refusals to answer questions where there was a clear waiver, even if somehow the documents being asked about were previously (which is hard to envision) protected.

## II.    ARGUMENT

Fisher's continual breach throughout the deposition of each of the above-stated legal principles and requirements in refusing to answer questions posed to Mr. Priebe as the Secretary, CAO and member of Fisher's Board of Directors is obvious.  The sheer volume and frequency of the objections, instructions, and refusals suggests an improper purpose.  Other than exploring Mr. Priebe's background in the first 20 to 30 pages, there is hardly a page that went by that did not contain an objection, an instruction not to answer, a refusal to answer and discussion between counsel attempting to obtain simple answers to what should have been unobjectionable permissible discovery.  Fisher seemed to ignore the requirements necessary to properly invoke protection at every turn.  In fact, Fisher, seemed to turn the burden regarding assertions of privilege and/or protection on its head by requiring Bar J S&G to prove each question was not protected or privileged as opposed to Fisher proving it was subject to some privilege or protection.  Good examples of the improper lengths Mr. Priebe went to to refuse to answer can be seen by his refusal to answer whether or when he first reviewed the ESA and then building on that refusal, he refused to read the contract provisions during the deposition, as an Officer and Board member of the corporation and state whether the contract explicitly provided for minimums during the option period (*see* T. Priebe Depo. at 12:6-20, **Exhibit 1**), and he also refused to answer the question as to whether there was anything about certain provisions in the ESA he did not understand as a corporate Officer and Board member.  (*See*, for example, T. Priebe Depo. at 124:1-20, 125:22-126:12, and 126:18-127:2, **Exhibit 1**).  From the outset of the deposition, Fisher attempted to subvert the process by contending that if Mr. Priebe knew of facts, he could refuse to answer questions, even though he could not say he learned the facts during an attorney/client privileged

communication.  Fisher incorrectly suggests it is sufficient to state that Mr. Priebe was an attorney and although he is unable to differentiate his knowledge learned in that capacity from other roles, he can refuse to answer.  (*See*, for example, T. Priebe Depo. 15:4-16:18, **Exhibit 1**).  However, the analysis is wrong for multiple reasons.  First, and foremost, facts are not privileged or protected, however they are learned, unless they are client confidences.  Second, when he becomes called upon to use the knowledge as Secretary, CAO or Board member, he is no longer being just a corporate counsel and no privilege or protection can apply at that time.

The violations by Fisher cannot be grouped easily, however, Bar J Sand & Gravel attempts to group them in four distinct areas so that the Court can have a better understanding of how the questions were proper and appropriate and the refusals to answer were baseless with regard to information that is relevant and material or could lead to the discovery of admissible evidence.

### A. Foundational Questions.

As indicated above, there is no proper legal basis to object on attorney work product or attorney/client privilege grounds to foundational questions.  However, that is precisely what Fisher did on numerous occasions.  These objections obstruct the ability to find out whether relevant and admissible evidence even exists.  That is why these questions are so important.  Objections to them can only be interposed for delaying the fair and efficient discovery of evidence.  Fisher's continual objections and instructions regarding foundational questions has made it impossible for Bar J Sand & Gravel to find out critical relevant evidence.[2]  Bar J Sand & Gravel will provide the Court with a few examples of how the failure to respond to foundational questions prevented a meaningful deposition and prevented Bar J S&G from obtaining the factual information and answers it is entitled to through this proper discovery mechanism.

---

[2] **Exhibit 1** contains the numerous pages of the deposition in which each of the refusals to answer and the concomitant instructions not to answer occur.  These include more than 75 examples of foundational questions.  (*See* **Exhibit 4** for the page and line numbers)

1. <u>**Emails leading up to and the Notice of Intent to extend the supply agreement.**</u>

A significant amount of this case deals with whether or not Fisher did in fact provide the required notice such that Fisher exercised the option to renew the ESA and thus was bound to the terms of the ESA for the conclusion of the 2012 year, 2013, 2014 and up to January 17, 2015. *Exhibits 1* through *4* (to the Priebe deposition) are pertinent to this issue and are attached as **Exhibit 3**. Pages 70 through 80 of Mr. Priebe's deposition attempted to elicit information as to Mr. Priebe's involvement in the emails that went back and forth, including emails sent to Mr. Priebe that were already discussed in the 30(b)(6) deposition of Fisher's designated representative. In that 30(b)(6) deposition, Mr. Moehn specifically indicated that Mr. Priebe had authorized the sending of the Notice of Intent to extend the supply agreement. (*See* M. Moehn 30(b)(6) Depo. at pp. 67-68, **Exhibit 2**). However, when Mr. Priebe was asked even the most foundational of questions: "whether he had seen the Notice before it was sent," Mr. Priebe refused to answer. (*See* T. Priebe Depo. at 81, **Exhibit 1**). When asked if he knew anything about the sentence in the Notice pertaining to a discussion between Fisher and Bar J S&G referenced in the Notice Fisher sent (the sentence was, "Per earlier conversations regarding this notice, it is agreed that we will continue to try and best address the issues regarding the royalty and volume as we move forward to the maximum benefit of both parties"), again, Mr. Priebe refused to answer. The question was foundational calling for a yes or no response and a precursor to eliciting facts about an unprivileged alleged conversation between the two companies. (*See* T. Priebe Depo. at pp. 84 and 85, **Exhibit 1**). No lawyer could reasonably believe that question was privileged or protected. Fisher was simply obstructing discovery.

Similarly, Mr. Priebe was asked whether he has an understanding of the term "to the maximum benefit of both parties" and again, he refused to answer. This is an important phrase as

Fisher contends that Bar J S&G did not continue to negotiate to reach a "maximum benefit" to both parties. In order to properly defend this contention, Bar J S&G has to first find out what Fisher meant by the phrase. Presumably, Mr. Priebe, as an Officer, CAO, and Director would know. Again, this was a precursor foundational question. Again, Fisher improperly prevented discovery. (*See* T. Priebe Depo. at p. 86, **Exhibit 1**).

Also, with regard to the "Notice," Mr. Priebe was asked whether he could confirm that he had authorized the Notice to be sent. Once again, Mr. Priebe refused to answer. (*See* T. Priebe Depo. at 80, **Exhibit 1**). Clearly, there could be no work product associated with the Notice as there was no litigation that was anticipated back in April of 2012. Importantly, the question also only attempted to ascertain action taken by Mr. Priebe (which is not privileged) and did not seek disclosure of any mental impressions. Further, there could not be any attorney/client privilege applicable to the emails or the Notice. First, the documents were produced. Thus, to the extent the emails are the alleged attorney/client communication, any privilege was waived. Secondly, a simple review of the emails disclose no request for legal advice, but is instead merely asking for a business decision as to whether Mr. Moehn should just send the Notice, even though it was late. (*See* T. Priebe Depo. at pp. 91-93, **Exhibit 1**). The business decisions were, should we (Fisher) renew the ESA and should we do so by sending the required Notice, albeit technically late. Bar J S&G was entitled to question Mr. Priebe as to the reasons Fisher sent this Notice because Fisher now contends in this lawsuit that the ESA was not extended into the option period. Was Fisher trying to mislead Bar J S&G? If not, what was the purpose of sending that document? If Mr. Priebe authorized it to be sent, he would know what Fisher was intending to do by sending the letter. Again, valid permissible discovery was obfuscated. What Fisher's business reasons were for sending a Notice extending the ESA are material relevant issues to which no protection applies.

Fisher most likely did not want Mr. Priebe to answer these questions because if he told the truth, it would defeat most, if not all, of Fisher's defenses and counterclaims in the case.

## 2. The Exclusive Supply Agreement, Fisher's claims and Fisher's defenses.

Mr. Priebe also refused to answer questions about whether and to what extent he reviewed the ESA. The ESA is at the center of this controversy. Mr. Priebe's knowledge (as CAO, Secretary and Board member) of the ESA, when he gained that knowledge, and whether he understands what the ESA contractually required Fisher to do and not do, is not and could not be privileged or protected. His understanding is a corporate understanding because of his positions in the corporation. Further, those are foundational questions which are subject to no proper protection or privilege.

Mr. Priebe, as it turns out, was involved in the negotiation of the ESA. However, when that question was asked, objection was made and instruction was given not to answer. It took over a page of argument to obtain an answer to the question (*see* T. Priebe Depo. at pp. 60-61, **Exhibit 1**). It took another two pages to get him to answer whether any of his involvement in the negotiations of the Agreement (the ESA) were prior to the time he was hired by Fisher to go in-house (*see* T. Priebe Depo. at pp. 62-63, **Exhibit 1**). When Mr. Priebe was shown a document (produced by Fisher to Bar J S&G) indicating Fisher's comments to a draft of the ESA which provides comments by Fisher's attorneys. Mr. Priebe again refused to answer. (T. Priebe Depo. at pp. 65-66, **Exhibit 1**). To the extent that Mr. Priebe was the lawyer making those comments, there could be no work product protection (since there was no anticipated litigation) and no attorney/client privilege to that matter since the document was clearly prepared to be given to Bar J S&G in hopes that an acceptable ESA could be reached. If both sides know about it, it was not intended to be confidential or privileged. Mr. Priebe's knowledge of the areas of agreement during the ESA negotiations between the two sides based on his own participation is in no way protected

and may be highly probative of the issues in this case. *See Tilley v. Equifax Info. Servs., LLC*, No. 06-2304-JAR, 2007 WL 3120447, at *3 (D. Kan. Oct. 24, 2007) (explaining that the defendant's in-house counsel was "directly involved in the events underlying plaintiff's claims" and thus "obviously possesses relevant and nonprivileged information" and concluding that the defendant's "very aggressive litigation position" that the deponent's position as in-house means "he need not answer any questions that go one millimeter past his discussions with plaintiff . . . is simply not the law"). For example, if Fisher drafted or agreed with "the no direct contact with the Pueblo" clause (in 2006 or 2007), that will likely be highly probative to a jury in deciding whether Fisher's breach of that provision (in 2014) was willful, wanton, malicious, and intentional.

Mr. Priebe's knowledge of the ESA, whenever he obtained it, is also important as he was a Board of Directors member, the Secretary of the corporation and the CAO when the Complaint, Answer and Counterclaims were filed. Mr. Priebe refused to answer whether he read the ESA. (T. Priebe Depo. at 67:19-68:4, **Exhibit 1**). He also refused to answer whether he reviewed the Complaint, the Counterclaim and/or the Amended Counterclaim. (T. Priebe Depo. at 98:21-99:9, **Exhibit 1**). These refusals prevented any further questioning of Mr. Priebe in his official capacities to find out what the factual basis for the assertions in the Counterclaim or Amended Counterclaim were with regard to the ESA. Furthermore, it prevented questions such as, who on behalf of the corporation authorized such claims to be filed.

Mr. Priebe's knowledge of the factual basis for any of the positions or allegations in the Counterclaim is certainly not privileged. Furthermore, if he authorized a Counterclaim containing knowingly false or unsupportable allegations could not be privileged or protected. Instead, it may show a culpable state of mind of the corporation. For example, the Counterclaim asserts that the Notice of Intent to extend the supply agreement did not renew the ESA for the optional five-year renewal period. The Counterclaim also asserts that some new and different (different than the

ESA) agreement was formed by the parties. The factual basis for such claims are fair game from this corporate official. If Mr. Priebe knows that Fisher intended to extend the ESA in 2012 and knows of no alternate agreement and so testifies truthfully (instead of refusing to testify), a good part of the lawsuit will be dismissed. Bar J Sand & Gravel was prevented from even getting into the topics by Fisher's obstruction of even the most basic foundational questions for which there is or could be no protection or privilege. (*See* T. Priebe Depo. at pp. 96-98, **Exhibit 1**).

### B. Conflated Corporate Roles.

As the law set forth above indicates, a corporation that places one of its lawyers in different roles in the corporate structure, must be very careful to delineate and differentiate the roles so that the courts and parties can determine when a matter is privileged. The deposition of Mr. Priebe indicates that there was absolutely no differentiation of roles and even he, in his own mind, can't testify as an Officer or Board member because he cannot separate his knowledge in the performance of his corporate non-lawyer roles. (*See* fn. 1). This is precisely why the case law requires differentiation of the roles. Otherwise, a corporation could always hide its corporate knowledge and block discovery simply by having general counsel present or by copying the attorney on every email. To the extent that Fisher cannot differentiate the roles, Fisher could never meet its burden of proving a protection or privilege applies. Fisher attempts to turn the relevant burden on its head. Instead of identifying each time the corporate counsel was contacted as to a particular issue and may have learned client confidences in order to give legal advice, Fisher instead has refused to answer all questions about whether Mr. Priebe knows anything about numerous topics, whether he learned them in a confidential communication in which he was asked to give legal advice or not. As such, no protection applies. Mr. Priebe was asked and refused to answer such questions as:

- Do you know as Secretary and Board of Directors member whether Fisher renewed the ESA?

- As Secretary and Board of Directors member, is it common for Fisher to send out notices of intent to extend a supply agreement when they don't mean to extend it? (T. Priebe Depo. at pp. 82-83, **Exhibit 1**)

- As Secretary can the April 12, 2012 letter be anything other than a notice of intent to extend the supply agreement? (T. Priebe Depo. at p. 82, **Exhibit 1**)

- As Secretary and Board of Directors member, do you know what it means to be "for the maximum benefit of both parties?" (T. Priebe Depo. at p. 86, **Exhibit 1**)

- As Secretary and Board member, are you aware of the Exclusive Supply Agreement? (T. Priebe Depo. at p. 96, **Exhibit 1**)

- Do you have any knowledge as a Board member that Fisher was attempting to get an arrangement or agreement directly with the Pueblo between October and December of 2014? (T. Priebe Depo. at p. 106, **Exhibit 1**)

Mr. Priebe's knowledge, no matter when it was gained, is his knowledge when he acts as a Board of Directors member, CAO and/or as Secretary because if he knows, for example, that it would be a violation of the ESA to contact the Pueblo and he, as a Board of Directors member, did not stop those contacts, he would be knowingly allowing the corporation to violate a contract (an act by the corporation) which may give rise to punitive damages. This is precisely why Mr. Priebe is such an important witness. The jury should be able to hear directly from this corporate Officer what Fisher knew, when it knew it, its understanding of the ESA and how Fisher conducted itself with regard to the ESA's provisions. If that testimony shows that Fisher willfully, intentionally and with reckless indifference violated the ESA, so be it. The jury is entitled to know that.

Questions such as the following were geared to obtain the knowledge of the corporation without implicating any privilege:

- Have you read the no direct contact clause in the contract?  (T. Priebe Depo. at p. 99, **Exhibit 1**)

- Are you aware that Fisher violated that clause?  (T. Priebe Depo. at p. 99, **Exhibit 1**)

- Do you have any knowledge of contacts by Fisher with the Pueblo?  (T. Priebe Depo. at p. 100, **Exhibit 1**)

- Have you seen Exhibit 15 (a proposal to enter into an agreement directly with the Pueblo) which was provided to the Pueblo before it was provided to the Pueblo?  (T. Priebe Depo at p. 101, **Exhibit 1**)

- As a Board member and Secretary, are you aware that Fisher took the position, in seeking an agreement with the Pueblo, that "our existing supply agreement" had been in effect over the last seven years? (T. Priebe Depo. at p. 105, **Exhibit 1**)

- Is there any knowledge he has as a Board of Directors member that Fisher was attempting to get an arrangement with the Pueblo between October and December 2014?  (T. Priebe Depo. at p. 106, **Exhibit 1**)

- Is there any basis he has to believe that contacts with the Pueblo between October and December of 2014 was not a violation of the Exclusive Supply Agreement?  (T. Priebe Depo. at p. 107, **Exhibit 1**)

- As CAO, Board of Directors member and Secretary, is there any reason to believe it is not a violation of the Exclusive Supply Agreement to have given Exhibit 15 to the Pueblo when it was given to the Pueblo?  (T. Priebe Depo. at p. 107, **Exhibit 1**)

- Has he seen a proposed exclusive supply agreement that was given to the Pueblo on or about October 20, 2014 (Exhibit 16)?  (T. Priebe Depo. at pp. 108-109, **Exhibit 1**)

- Did you approve Exhibit 16 to be sent to the Pueblo? (T. Priebe Depo. at p. 109, **Exhibit 1**)

- Is there anything in Exhibit 16 that is inaccurate? (T. Priebe Depo. at p. 109, **Exhibit 1**)

- Is there anything as a Board member that he believes is inaccurate in Exhibit 16? (T. Priebe Depo. at p. 109, **Exhibit 1**)

- As a Board member, Secretary and CAO, is there anything inaccurate in paragraph 1 of the background section of Exhibit 16? (T. Priebe Depo. at p. 110, **Exhibit 1**)

- Can you tell by reading paragraph 3 of the ESA whether the ESA provides the minimum tonnages that Fisher was to purchase during the renewal term? (T. Priebe Depo. at p. 121, **Exhibit 1**)

- Does Fisher recognize an obligation under the ESA to reclaim the property? (T. Priebe Depo. at p. 134, **Exhibit 1**)

- As a Board of Directors member, Secretary and CAO of Fisher, is there anything about Section 12.B. of the ESA he does not understand? (T. Priebe Depo. at pp. 125-126, **Exhibit 1**)

- Is there anything about Section 17 of the ESA that he does not understand? (T. Priebe Depo. at p. 124, **Exhibit 1**)

These are all relevant and material questions that a party should be able to ask whichever Officer and/or Board of Directors member of the opposing corporation it wants. These are all questions that he can answer without invading any work product or attorney/client privilege, even if any existed. Most, if not all, can be answered with a yes or no.

In addition, it is Fisher's position in the lawsuit that there was a downturn in the economy in 2012 and that its inability to sell the mined product was not caused by the FNF lawsuit and

damage to Fisher's reputation suffered as a result of FNF's conduct.  Mr. Priebe is knowledgeable about the FNF case.  He was deposed in the FNF case.  He was on the Board of Directors of Fisher when the settlement of the FNF case occurred.  He also knew the types of damages being requested by Fisher in the FNF case.  However, when asked these questions which he would clearly know the answer to as a Board of Directors member and as Secretary of the corporation, Mr. Priebe refused to answer:

- Whether he had any involvement in the FNF case?  (T. Priebe Depo. at p. 52, **Exhibit 1**)

- Did the Board of the Directors of Fisher approve the settlement of that case?  (T. Priebe Depo. at p. 52, **Exhibit 1**)

- Did you have any involvement as a Board of Directors member in the decision to settle the case?  (T. Priebe Depo. at p. 52, **Exhibit 1**)

- What was the basis for his decision to settle?  (T. Priebe Depo. at pp. 53-54, **Exhibit 1**)

- Did Mr. Fisher or Mr. Moehn say anything at the Board meeting at which it was decided to approve the settlement?  (T. Priebe Depo. at pp. 54-55, **Exhibit 1**)

Similarly, issues within his control as CAO were clearly also not privileged or protected.  Mr. Priebe admits that he is, as CAO, in charge of the accounting department.  Yet, when he was asked whether he had anything to do with putting in the computation of damages in the Initial Disclosures, he refused to answer the following questions:

- Where did the damages numbers come from?  (T. Priebe Depo. at p. 44, **Exhibit 1**)

- Where did the average market value come from?  (T. Priebe Depo. at p. 44, **Exhibit 1**)

This is complete obfuscation. The CAO ought to know if he or persons under him put together damages calculations and/or who might have made those calculations so that Bar J S&G could find out how they were calculated.

**C.  Waiver.**

As indicated above, the legal authorities clearly indicate that a party cannot maintain an attorney/client privilege or work product protection if the client has already waived the privilege or protection. The most clear example in this case of Fisher's abuse of this legal principle relates to the corporate decision to renew the ESA. If there were any privilege or protection to these communications (which there aren't because they were not made in anticipation of litigation or in a confidential setting), Mr. Moehn clearly waived any such protection or privilege when he was deposed as the 30(b)(6) corporate representative. (*See* M. Moehn 30(b)(6) Depo., **Exhibit 2**). Furthermore, the emails regarding that issue were produced. Certainly, the Notice of Intent to extend the supply agreement was produced and was never intended to be a confidential communication between a lawyer and a client in the first place. It was, in fact, intended to be given to the other side. Fisher was clearly obfuscating discovery when Mr. Priebe refused to answer questions on this topic.

**III.    SANCTIONS**

The problem here is that the Fisher refusals to answer and the objections were far too pervasive to allow Fisher, through Mr. Priebe or some other witness, to cure the prejudice. The deposition appears to have been an intentional obfuscation of the discovery process. The result is that the deposition cannot be used to support the summary judgment motions, to provide information to experts, or to do further discovery of other witnesses. Further, Bar J S&G cannot utilize the deposition offensively or defensively to support Bar J's positions or to refute Fisher's positions at trial. All aspects of Bar J Sand & Gravel's preparation have been thwarted. The jury

should be informed of this obfuscation and should be able to consider it in assessing the bona fides of Fisher and the positions Fisher is taking in the lawsuit.

There is no basis to believe that an additional 8 hours of deposition (of this party witness) will not be obfuscated in the same or some other fashion, even with clear guidance from the Court. Some well-crafted sanction needs to be molded. At a minimum, during the presentation of evidence (at trial), the fact that Mr. Priebe improperly refused to answer questions put to him of the nature set forth above should be made known to the jury and Bar J S&G should be able to argue the implications of that obfuscation in its closing statements, not only on liability but also as to punitive damages. The extent to which Fisher has gone about hiding the corporate understanding and knowledge of facts and its intentional, reckless, willful, wanton violations of the contract all should be made known to the trier of fact.

In addition, any new deposition of Mr. Priebe should not be limited in time and before the taking of the deposition, Fisher should be required to indicate each time it **specifically** sought advice from Mr. Priebe as corporate counsel as opposed to in one of his other roles, Fisher should identify the topic area of each alleged attorney/client communication, the persons involved and the date of the alleged request for legal advice so that the Court can assess whether a privilege exists. Further, the Court should review, in-camera, Mr. Priebe's notes of any such alleged privileged communication. At that point, the Court can identify any issue that is not "fair game" for Bar J S&G to inquire about. Finally, Fisher should be sanctioned in the amount of Bar J Sand & Gravel's attorney's time and efforts in preparing for the initial deposition, for any follow-up deposition, and for having to brief this issue.

## IV.     CONCLUSION

For all of the reasons set forth above, there was no valid basis for Fisher to refuse to answer the foundational questions and the questions addressed to him as a corporate Officer, corporate

representative, Board of Directors member and CAO. The Court should find that Fisher's conduct was obstructionist in this deposition and should craft a remedy that does not allow Fisher to get away with these abuses of the discovery process.

Respectfully submitted,

ATKINSON, BAKER & RODRIGUEZ, P.C.

*/s/ Douglas A. Baker*
Douglas A. Baker
201 Third Street NW, Suite 1850
Albuquerque, NM 87102
Tel: (505) 764-8111
Fax: (505) 764-8374
dbaker@abrfirm.com

*Attorneys for Plaintiff/Counterclaim Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June, 22, 2017, I filed the foregoing *Motion for Sanctions for Fisher Sand & Gravel Co.'s Instructions to a Corporate Officer Not to Respond to Questions at Deposition* electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Timothy C. Holm
Jeremy K. Harrison
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
P.O. Box 2168
500 Fourth St. NW, Suite 1000
Albuquerque, NM 87103-2168
Tel:  (505) 848-1800
Fax: (505) 848-9710
tch@modrall.com
jkh@modrall.com

*Attorneys for Defendant/Counterclaim Plaintiff*


ATKINSON, BAKER & RODRIGUEZ, P.C.

 */s/ Douglas A. Baker*
Douglas A. Baker