Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

No. CV-2015-00228-SCY/KK

BAR J SAND & GRAVEL, INC.,
a New Mexico corporation,

      Plaintiff,

    vs.

FISHER SAND & GRAVEL CO.,
a North Dakota corporation, doing business
in New Mexico through its division
SOUTHWEST ASPHALT & PAVING,

      Defendant.

VIDEOTAPED DEPOSITION OF TIM PRIEBE

May 8, 2017
8:57 a.m.
201 Third Street, Northwest, Suite 1850
Albuquerque, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE,
this deposition was:

TAKEN BY:        DOUGLAS A. BAKER
                 ATTORNEY FOR PLAINTIFF

REPORTED BY:     CHERYL ARREGUIN, RPR, NM CCR No. 21
                 Hughes Southwest Court Reporters
                 110 2nd Street, Southwest, Suite 602
                 Albuquerque, New Mexico  87102

**EXHIBIT 1**

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

---

Page 2

A P P E A R A N C E S
1
2  For the Plaintiff:
3     DOUGLAS A. BAKER
      ATKINSON, BAKER & RODRIGUEZ, PC
4     Attorneys at Law
      201 Third Street, Northwest
5     Suite 1850
      Albuquerque, New Mexico  87102
6     (505) 764-8111
      dbaker@abrfirm.com
7
      CLAUDINE MARTINEZ
8     President
      MCT Industries, Inc.
9     7451 Pan American Freeway, Northeast
      Albuquerque, New Mexico  87109
10    (505) 867-6045
      cmartinez@mct-ind.com
11
    For the Defendant:
12    JEREMY K. HARRISON
13    MODRALL, SPERLING, ROEHL, HARRIS & SISK, PA
14    Attorneys at Law
      500 Fourth Street, Northwest
15    Suite 1000
      Albuquerque, New Mexico  87102
16    (505) 848-1817
      jkh@modrall.com
17
    The Videographer:
18
19    JOSEPH CASALNUOVO
      MOIR LITIGATION VIDEO
20    12 Monticello Drive
      Albuquerque, New Mexico  87123
21    (505) 292-7659
      canyongods@comcast.net
22
23  Also Present:
24    DAVID OLSON
25

---

Page 3

I N D E X
1
2                              PAGE
3  TIM PRIEBE
4     Examination by Mr. Baker          5
5  REPORTER'S CERTIFICATE              141
6  DEPONENT SIGNATURE/CORRECTION PAGE  143
7
8              E X H I B I T S
9                              PAGE
10 Exhibit 81.  Fisher's Initial Disclosures    41
11 Exhibit 82.  Documents Titled Fisher Sand &
12    Gravel Co. Stock Status Reports by Part
13    Number                             47
14 Exhibit 83.  David Olson E-mail, with
15    Attachment                        131
16
17
18
19
20
21
22
23
24
25

---

Page 4

1        THE VIDEOGRAPHER:  We are now on the record.
2        Today is Monday, the 8th of May, 2017.  The
3  time is 8:57 a.m.
4        The videographer is Joseph Casalnuovo from
5  Moir Litigation Video.
6        The court reporter is Cheryl Arreguin for
7  Hughes Southwest Court Reporters.
8        We are here for the deposition of Tim Priebe
9  in the case of Bar J Sand & Gravel, Incorporated, versus
10 Fisher Sand & Gravel Company, et al., filed in the
11 United States District Court for the District of New
12 Mexico, Case Number CV-2015-0028 SCY/KK -- zero -- my
13 apologies -- it's 00228 SCY/KK.
14       This deposition is being held at the law
15 offices of Atkinson, Baker & Rodriguez, located at 201
16 Third Street, Northwest, Suite 1850, Albuquerque, New
17 Mexico, ZIP 87102.
18       Counsel will please state their appearances.
19       MR. BAKER:  Doug Baker for Bar J Sand &
20 Gravel.
21       MR. HARRISON:  Jeremy Harrison for Fisher.
22       THE VIDEOGRAPHER:  All right.
23       The court reporter will now please swear in
24 the witness.
25

---

Page 5

1                    TIM PRIEBE
2  having been first duly sworn, was examined and
3  testified as follows:
4                   EXAMINATION
5  BY MR. BAKER:
6     Q.  Would you state your full name for the record,
7  please?
8     A.  Timothy Alan Priebe.
9     Q.  And you go by Tim Priebe?
10    A.  Yes.
11    Q.  How long have you worked for Fisher?
12    A.  Just about 10 years.
13    Q.  Do you know your start date, or can you give
14 me an approximate start date?
15    A.  I can give you approximate.  I started the
16 last part of June in 2007, within the last two weeks of
17 June, it was 20 -- between 20 and 24th, around that
18 time.
19    Q.  Tell me about your educational background
20 before hiring on with Fisher.
21    A.  Starting with college?
22    Q.  Sure.
23    A.  Yeah.  I went to North Dakota State University
24 in Fargo, North Dakota, and got a bachelor's degree in
25 agricultural economics, graduated in 1983.

HUGHES SOUTHWEST COURT REPORTERS
110 2nd Street, SW, Suite 602

505-843-8211
Albuquerque, New Mexico 87102

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

---

Page 14

1    2009.
2        Q.  Do you know how that came about, that he
3    became the vice-president?
4        A.  We had some vacancies on the board, and I
5    think Mike was selected by Tommy Fisher to fill a board
6    seat.
7        Q.  And by the board, you mean the Board of
8    Directors --
9        A.  Yes.
10       Q.  -- of Fisher?
11           And at the time you came to Fisher, how many
12   persons were on the board, directors?
13       A.  When I first came to Fisher?
14       Q.  Yes.
15       A.  I believe there may have been six.
16       Q.  And who were the members?
17       A.  To the best of my recollection, it was Tommy
18   Fisher, his brother, Mike Fisher, Suzanne Medley, Amiel
19   Schaff, Clyde Frank and Dennis Lardy.
20       Q.  And who was -- I didn't get her last name --
21   Suzanne?
22       A.  Medley, M-E-D-L-E-Y.
23       Q.  Who is she?
24       A.  That is a sister of Tommy Fisher.
25       Q.  Okay.

---

Page 15

1            And Amiel Schaff was the chief financial
2    officer at the time?
3        A.  Yes.
4        Q.  And what -- what happened with Amiel Schaff?
5    Why is he no longer the chief financial officer?
6           MR. HARRISON:  I'm going to object on the
7    basis of privilege with respect to anything that
8    Mr. Priebe learned as in-house counsel.
9           MR. BAKER:  Well, I'm just asking him what --
10       Q.  What happened, if you know?
11       A.  He was terminated.
12       Q.  Why was he terminated?
13          MR. HARRISON:  Same objection.
14          I'll instruct you not to answer to the extent
15   your knowledge regarding the reasons for his termination
16   are based on what you learned as in-house counsel for
17   the corporation.
18       Q.  (BY MR. BAKER)  Well, did you learn it after
19   you became secretary of the corporation?
20       A.  Be around the same time.
21       Q.  All right.  Tell me, as secretary of the
22   corporation, the reasons he was terminated.
23       A.  I don't know if I can differentiate that.  I
24   think any knowledge I would have on the termination
25   would be related to the facts I learned --

---

Page 16

1        Q.  All right.
2        A.  -- as in-house counsel for Fisher Sand &
3    Gravel and --
4        Q.  Well, I am ask -- I am asking you now as
5    secretary, please tell me your knowledge of why he was
6    terminated.
7           MR. HARRISON:  Same objection, as calls for
8    privileged communications with Mr. Priebe's client,
9    instruct him not to answer.
10          MR. BAKER:  All right.
11       Q.  So you're -- are you going to take that
12   instruction?
13       A.  Yes, sir.
14       Q.  So you are refusing to answer my question as
15   the secretary of the corporation; is that correct?
16          MR. HARRISON:  Object -- object to form.
17       Q.  (BY MR. BAKER)  Is that correct?
18       A.  I am refusing to answer the question.
19       Q.  As the secretary of the corporation.
20       A.  I'm refusing to answer as Tim Priebe, the
21   secretary and the general counsel of Fisher Sand &
22   Gravel Company.
23       Q.  And you can't differentiate your knowledge as
24   between the two; is that correct?
25       A.  I think any knowledge I would have to answer

---

Page 17

1    your question would be gained in my role as general
2    counsel.  So I think that's correct.
3        Q.  Well, would it have been put in any minutes or
4    any kind of anything else that you were the secretary
5    regarding?
6        A.  I don't recall if it was memorialized in the
7    minutes.
8        Q.  Do you think that the CFO would have been
9    fired without any indication in any kind of minutes or
10   any other corporate documents?
11       A.  I don't recall.
12       Q.  Are you privy to all of the corporate
13   documents as secretary?
14       A.  Yes.
15       Q.  All right.
16          Are you telling us there is no corporate
17   document that would indicate the reasons he was
18   terminated?
19       A.  I'm not telling you that.
20       Q.  All right.
21       A.  I --
22       Q.  So you believe there are?
23       A.  I'm telling you I don't remember.
24       Q.  Is Fisher the kind of company that might
25   terminate its CFO without any corporate documentation?

---

HUGHES SOUTHWEST COURT REPORTERS          505-843-8211
110 2nd Street, SW, Suite 602     Albuquerque, New Mexico 87102

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

---

Page 38

1   Q.  It could be just a whole list with --
2   A.  Sure.
3   Q.  -- each of the states?
4   A.  Yes, yes.
5   Q.  All right.
6   A.  But I believe that's consistent from 2007 to
7  the present.
8   Q.  All right.
9       Does Fisher keep projects that it bids on
10  where it is unsuccessful?  Does it keep track of those?
11   A.  I'm not certain how much information is kept
12  on those.  A lot of the projects that are bid, Mike is
13  in charge, and he does the bid, and what document he
14  keeps after that I don't know.  You know, I don't
15  believe it's opened up as a file on our accounting
16  system if we're unsuccessful.  So --
17   Q.  All right.
18   A.  -- to the best of my recollection or
19  knowledge, there would not be anything on our accounting
20  system.
21   Q.  What is the interaction between Mike Moehn, if
22  he is the estimator, for example, on a New Mexico job,
23  and the accounting department, if you know?
24   A.  Prior to the time of the bid, I don't know
25  there's a lot of interaction.  I think between Mike,

---

Page 39

1  Tommy and Dave, they probably talk about the project,
2  whether they want to bid it, put the bid together, and
3  so forth.  If there's questions on getting the bond or
4  other things that would be required for the bid, they
5  may talk to the North Dakota office to assist with that.
6   Q.  Is -- in the bid, is there any type of
7  analysis of what the corporate overhead would be, and
8  how is that factored into a bid?
9   A.  I believe there is.  I think Mike does all of
10  that.
11   Q.  Do you know whether there's some formula for
12  doing that or not?
13   A.  I assume there is.  That's not something I get
14  into.
15   Q.  All right.
16       Is there a breakdown of revenue or gross
17  income for sales in New Mexico?
18   A.  I believe there is.
19   Q.  Is it -- is that done by year?
20   A.  I believe so.
21   Q.  Does Fisher have pricing schedules for
22  products and commodities sold out of the -- or have them
23  in the past for the Pueblo of San Felipe sand and gravel
24  pit?
25   A.  I assume so.  I don't know for certain.

---

Page 40

1   Q.  Would that -- would that be something that the
2  accounting department would know about?
3   A.  They may.  I think the pricing would be we
4  would put Mike and Dave in responsible -- be in -- be in
5  charge of the pricing for that.  So I think they would
6  be the ones primarily responsible.  I assume the
7  accounting department would have knowledge of the
8  pricing for accounts receivable, whatever they needed to
9  do with the accounting for the pit.
10   Q.  And -- and this may be a product of my lack of
11  understanding, and you may not know either, but for
12  example, if Mike Moehn was bidding a job out at a pit,
13  would he -- or bidding a job, leave the pit out of it --
14   A.  Okay.
15   Q.  -- but would he put a certain price for
16  three-quarter-inch gravel that may be used on the
17  project?
18       MR. HARRISON:  Object to foundation.
19       THE WITNESS:  That's my understanding as how a
20  process is done.  Yes.
21       MR. BAKER:  Okay.
22   Q.  And would he use the same price for every
23  project, or would he differentiate prices per project?
24       MR. HARRISON:  Object to foundation.
25   Q.  (BY MR. BAKER)  If you know.

---

Page 41

1   A.  That's a question for Mike.
2   Q.  All right.
3       How we doing on time?  Up to eight hours yet?
4       MR. HARRISON:  Four.  That's all we get.
5       MR. BAKER:  Well, it's a good thing I'm on
6  page 2, then.
7       MR. HARRISON:  Yeah.
8       It's 9:50 approximately.
9       MR. BAKER:  All right.  I think we started
10  right about 9:00.
11       Do you have some -- do you remember what the
12  last exhibit was?
13       MR. HARRISON:  I can tell you.  80.
14       MR. BAKER:  All right.  I'll start at 81,
15  then.
16       And this may already have been marked as an
17  exhibit, but --
18       (Exhibit 81 marked.)
19       MR. BAKER:  I figure we'll have some
20  duplication.
21   Q.  Showing you what's been marked as Exhibit 81.
22       These are the Fisher's initial disclosures in
23  this case.
24       Do you recognize those?
25   A.  Yes.

---

11 (Pages 38 to 41)

Tim Priebe                                          Bar J Sand & Gravel vs.
5/8/2017                                                      Fisher Sand

Page 42

1        Q.  Did you have any involvement in the
2    preparation of these?
3        A.  Any involvement I would have had would have
4    been in my capacity as general counsel for Fisher Sand &
5    Gravel.
6        Q.  Okay.
7        Did you have any involvement --
8        A.  I --
9        Q.  -- in the preparation of these?
10        MR. HARRISON:  Going to object on work product
11    basis on that.
12        MR. BAKER:  Okay.
13        Q.  Go ahead and answer.
14        A.  I assume that I did.
15        Q.  What type of involvement would you have had in
16    the preparation of this document?
17        MR. HARRISON:  Object and instruct the witness
18    not to answer on the basis of the attorney-client
19    privilege and the attorney work product doctrines.
20        MR. BAKER:  This is something that was given
21    to us.  I want to find out what input he had in what was
22    given to us.
23        MR. HARRISON:  Right.  And he's Fisher's
24    in-house counsel, general counsel, so what his
25    involvement was or wasn't is attorney work product,

Page 43

1    protected by the privilege.
2        MR. BAKER:  It's not work product if you've
3    given it to me.
4        MR. HARRISON:  Well, what -- what --
5        MR. BAKER:  That's the problem I'm having.  It
6    can't be privileged if you've given it to me.
7        MR. HARRISON:  What -- what he did --
8        MR. BAKER:  So I -- I'm asking the question.
9    Are you going to instruct him not to answer?
10        MR. HARRISON:  What he did --
11        MR. BAKER:  I want to know what he put in
12    here.
13        MR. HARRISON:  Right.  What --
14        MR. BAKER:  That's -- that's what I want to
15    know.
16        MR. HARRISON:  What he put in is work product.
17        MR. BAKER:  All right.  I disagree with you.
18        MR. HARRISON:  And I'm instructing him --
19        MR. BAKER:  This is something that was given
20    to us.
21        MR. HARRISON:  -- not to answer.
22        MR. BAKER:  All right.  You've instructed him.
23        MR. HARRISON:  Yes, sir.
24        Q.  (BY MR. BAKER)  All right.  Looking at the
25    last page.

Page 44

1        Did you have anything to do with the putting
2    in the computation of damages?
3        MR. HARRISON:  Same objection.  I will
4    instruct the witness not to answer.
5        Q.  (BY MR. BAKER)  Do you know where the number
6    $8.64 of cost of aggregate --
7        MR. HARRISON:  Same objection.
8        Q.  (BY MR. BAKER)  -- per ton -- do you know
9    where that came from, where the number came from?
10        MR. HARRISON:  Same objection and instruct the
11    witness not to answer any questions regarding the
12    computation of damages.
13        MR. BAKER:  All right.
14        Q.  Do you know where the average market value of
15    aggregate comes from?
16        MR. HARRISON:  Same objection, instruct not to
17    answer.
18        Q.  (BY MR. BAKER)  I'm asking you as the
19    corporate secretary, an officer of the corporation.
20        Are you taking that -- those instructions?
21        A.  I am taking the instructions of my attorney.
22        Q.  All right.
23        Do you know where the number 3,094,964.08
24    comes from?
25        MR. HARRISON:  Same objections, instruct the

Page 45

1    witness not to answer.
2        Q.  (BY MR. BAKER)  Do you know where the number
3    2,551,573.44 comes from?
4        MR. HARRISON:  Same objection, instruct not to
5    answer.
6        Q.  (BY MR. BAKER)  I assume you're taking those
7    instructions; is that true?
8        A.  Yes, sir.
9        Q.  All right.
10        It says on here, on page 2, that Dave Olson is
11    vice-president of operations of Fisher Sand & Gravel -
12    New Mexico, Inc.
13        Is that something different than Fisher Sand &
14    Gravel - New Mexico, Inc., that you told me about?
15        MR. HARRISON:  Object to form.
16        THE WITNESS:  No.  I think that's talking
17    about the same thing.
18        MR. BAKER:  Okay.
19        Q.  Is he a vice-president of operations for
20    Fisher Sand & Gravel?
21        A.  Fisher Sand & Gravel Company, the corporate
22    entity?
23        Q.  Correct.
24        A.  David is not.
25        Q.  All right.

HUGHES SOUTHWEST COURT REPORTERS                    505-843-8211
110 2nd Street, SW, Suite 602            Albuquerque, New Mexico 87102

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

**Page 50**

1  question, I would go to Mike Moehn.
2      Q.  Okay.
3          Would Carol know the answer to that?
4      A.  I would think she probably would.
5      Q.  All right.
6          Do you know what the components of the average
7  cost on these sheets are?
8      A.  I assume the components are what's listed on
9  the document.  That would be my only knowledge.
10     Q.  Well, it says Average Cost 6.32.
11         Do you know how that -- what factors go into
12  that cost number?
13     A.  No.
14     Q.  Do you review, as a corporate officer or chief
15  administrative officer, the stockpiling at any pit for
16  any purpose?
17     A.  Do I go to the pit and review or --
18     Q.  No.  No.
19         Analyze it in your office for any purpose.
20     A.  Not routinely.
21     Q.  If there was an option to renew a particular
22  lease, would you look at the amount of stockpiling for
23  that purpose?
24         MR. HARRISON:  Object to form.
25         THE WITNESS:  Probably not, unless the

**Page 51**

1  operations people requested me to.
2      Q.  (BY MR. BAKER)  As chief administrative
3  officer, would you get involved in whether to renew an
4  option or not?
5      A.  Depends on the circumstance.  If the
6  operations people feel they're capable of handling it,
7  they would just do so.
8      Q.  Okay.
9          Have you ever gotten involved in a renewal of
10  an option?
11         MR. HARRISON:  Object to form.
12         THE WITNESS:  I don't recall any.
13     Q.  (BY MR. BAKER)  Have you ever gotten involved
14  at -- looking at and making a decision whether to
15  increase the stockpiling or decrease the stockpiling at
16  any pit?
17     A.  No.  They would not want me involved with
18  that.
19     Q.  Well, we'll leave that as the indefinite they
20  and take a break.
21     A.  Okay.
22         THE VIDEOGRAPHER:  The time is 10:00.  We are
23  now off the record.
24         (Proceedings in recess.)
25         THE VIDEOGRAPHER:  We are now on the record.

**Page 52**

1  The time is 10:11 a.m.
2      Q.  (BY MR. BAKER)  Mr. Priebe, did you have any
3  involvement in the Fisher case against F & F?
4          MR. HARRISON:  I'm going to object and
5  instruct the witness not to answer on the basis of the
6  attorney-client privilege and work product doctrine.
7      Q.  (BY MR. BAKER)  Did the Board of Directors of
8  Fisher approve the settlement in that case?
9          MR. HARRISON:  Same objection, instruct not to
10  answer.
11     Q.  (BY MR. BAKER)  While you were on the Board of
12  Directors, did you have any involvement in any decision
13  with regard to settling -- settling that case?
14         MR. HARRISON:  Same objection.
15     Q.  (BY MR. BAKER)  Go ahead and answer.  He
16  didn't instruct --
17         MR. HARRISON:  And I'm going to instruct
18  you -- the witness not to answer.
19         MR. BAKER:  What's the basis for your
20  instruction?
21         MR. HARRISON:  You asked him if he had any
22  involvement while he was on the Board of Directors.
23  That involvement would include his involvement as
24  general counsel.
25         MR. BAKER:  No.  I'm -- I'm asking him as a

**Page 53**

1  Board of Directors member.
2      Q.  Did you -- were you involved in any
3  discussions in the Board of Directors of that lawsuit
4  and the settlement of that lawsuit --
5          MR. HARRISON:  To the --
6      Q.  (BY MR. BAKER)  -- at any point in time?
7          MR. HARRISON:  To the extent you can answer
8  that without implicating your role as an attorney for
9  the company, that's okay to answer.
10         THE WITNESS:  Any involvement I would have had
11  with the F & F litigation would have been in my role as
12  general counsel for Fisher Sand & Gravel Company.
13     Q.  (BY MR. BAKER)  Were there any presentations
14  to the Board of Directors about that lawsuit?
15     A.  Not that I recall.
16     Q.  Did the Board of Directors approve the
17  settlement of that case?
18     A.  Yes, I believe so.
19     Q.  Did you as a Board of Directors member vote on
20  that settlement?
21     A.  I believe so.
22     Q.  Tell me the basis for your decision to approve
23  that settlement --
24         MR. HARRISON:  Object --
25     Q.  (BY MR. BAKER)  -- as a Board of Directors

14 (Pages 50 to 53)

HUGHES SOUTHWEST COURT REPORTERS
110 2nd Street, SW, Suite 602

505-843-8211
Albuquerque, New Mexico 87102

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

---

Page 54

```
1   member.
2       MR. HARRISON:  I'm going to object and
3   instruct the witness not to answer except to the extent
4   that any decision was based on things he did not learn
5   as general counsel or did not become aware of as general
6   counsel.
7       THE WITNESS:  I think the basis for my vote as
8   a member of the Board of Directors would have been based
9   exclusively on the information I learned as general
10  counsel of the company.
11      MR. BAKER:  Okay.
12   Q.  So tell me.  Tell me what that was, the basis
13  of your decision.
14      MR. HARRISON:  Object and instruct the witness
15  not to answer on the basis of the attorney-client
16  privilege.
17   Q.  (BY MR. BAKER)  Did Mr. Tommy Fisher or did
18  Mr. Mike Moehn say anything during the board meetings
19  when that vote was taken on the settlement of the case?
20      MR. HARRISON:  I'm going to object on the
21  basis of attorney-client privilege to the extent that
22  there was any counsel involved in any board meetings
23  where that was discussed.
24   Q.  (BY MR. BAKER)  I'm asking about the board
25  meetings.
```

---

Page 55

```
1       As a Board of Directors member, did Tommy
2   Fisher or Mike Moehn say anything about the lawsuit
3   during those meetings?
4       MR. HARRISON:  And again I'm going to instruct
5   you not to answer to the extent that there was an
6   attorney present, including yourself acting as general
7   counsel.
8       THE WITNESS:  I don't recall any comments from
9   either Tommy or Mike, other than comments and discussions
10  that would have involved me as general counsel.
11   Q.  (BY MR. BAKER)  How do you differentiate
12  between you as general counsel and you as a board member
13  in those meetings?
14   A.  It's sometimes difficult.
15   Q.  All right.
16      Is there any way we can distinguish between
17  the two?
18   A.  Not in that circumstance, I don't think.
19   Q.  So basically your involvement is to make
20  privileged every single communication of the Board of
21  Directors?
22   A.  No.
23      MR. HARRISON:  Object to form.
24   Q.  (BY MR. BAKER)  Will there be a minute of
25  the -- minutes of the meeting of the Board of Directors?
```

---

Page 56

```
1       MR. HARRISON:  Object to form.
2       THE WITNESS:  There may be.  We do a lot of
3   our minutes by written consent.
4       MR. BAKER:  Okay.
5    Q.  Do you recall whether the settlement of that
6   lawsuit was done by consent or done in an actual
7   meeting?
8    A.  I do not recall.
9    Q.  Did you review the F & F -- Fisher versus
10  F & F case -- complaint before it was filed?
11      MR. HARRISON:  I'm going to object and
12  instruct the witness not to answer on the basis of the
13  attorney-client privilege and the attorney work product
14  doctrine.
15      MR. BAKER:  I didn't ask him if he did
16  anything.  I just asked him if he reviewed it.
17      MR. HARRISON:  I understand.  And I think
18  whether or not an attorney did or did not review
19  something falls within the scope of the attorney work
20  product doctrine.
21   Q.  (BY MR. BAKER)  Are you aware what the lawsuit
22  contended were Fisher's damages?
23      MR. HARRISON:  Same objections, instruct the
24  witness not to answer.
25   Q.  (BY MR. BAKER)  Did the lawsuit include
```

---

Page 57

```
1   compensatory and punitive damages for defamation and
2   interference with existing and prospective
3   relationships?
4       MR. HARRISON:  Same objections.
5       Instruct you not to answer.
6    Q.  (BY MR. BAKER)  Did the lawsuit claim that the
7   defendants had hurt business relations here in New
8   Mexico?
9       MR. HARRISON:  Same objections, instruction
10  not to answer.
11   Q.  (BY MR. BAKER)  Was there any -- ever a point
12  in time when as damages an expert for F & F -- I mean
13  for Fisher indicated that they could not keep the Pueblo
14  of Santa Fe pit (sic) operating because of the damage
15  done by F & F and others?
16      MR. HARRISON:  Object to form, object on the
17  basis of the attorney-client privilege and the attorney
18  work product doctrine.  I'm going to instruct Mr. Priebe
19  to not answer that question.
20   Q.  (BY MR. BAKER)  Did the Fisher lawsuit claim
21  that the -- that F & F had harmed the business
22  reputation and goodwill of Fisher --
23      MR. HARRISON:  Same --
24   Q.  (BY MR. BAKER)  -- in New Mexico?
25      MR. HARRISON:  Same three objections, instruct
```

---

15 (Pages 54 to 57)

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

Page 58

1    him not to answer.
2        Q.  (BY MR. BAKER) I assume you're taking all of
3    those instructions --
4        A.  Yes, sir.
5        Q.  -- by your silence --
6        A.  Yes.
7        Q.  -- if nothing else.
8        How much was the settlement for that you
9    approved as a Board of Directors member?
10        MR. HARRISON:  Same objections, also object on
11    the basis that that's a confidential settlement
12    agreement.
13        Q.  (BY MR. BAKER) Go ahead and answer.
14        MR. HARRISON:  Instruct the witness not to
15    answer.
16        MR. BAKER:  We have a confidentiality order,
17    which we'll abide by with that answer.
18        MR. HARRISON:  Understood.  Same objection,
19    same instruction.
20        MR. BAKER:  Do you instruct him?
21        Q.  Did that lawsuit involve damages for the same
22    period of time that Bar J Sand & Gravel was requesting
23    that minimums be paid?
24        MR. HARRISON:  Object to form, object on the
25    basis of attorney-client privilege and attorney work

Page 59

1    product doctrine, instruct the witness not to answer.
2        Q.  (BY MR. BAKER) I take it you'll take that
3    instruction?
4        A.  Yes.
5        Q.  As a Board of Directors member, were you kept
6    apprised of what was happening in the F & F -- Fisher
7    versus F & F case?
8        A.  Yes.
9        Q.  If I ask you what you were kept apprised of,
10    will you tell me the answer to that?
11        A.  No.
12        Q.  And why won't you?
13        A.  Because of the objections of Mr. -- that
14    Jeremy has made.  I will not violate the attorney-client
15    privilege or disclose work product information.
16        Q.  Did you review any expert reports that were
17    produced to the other side in the Fisher versus F & F
18    case?
19        MR. HARRISON:  Object on the basis of the
20    attorney work product doctrine, instruct Mr. Priebe to
21    not answer that question.
22        Q.  (BY MR. BAKER) I take it you'll take that
23    instruction?
24        A.  I will take that instruction.  Yes, sir.
25        Q.  So you would know the answer to what damages

Page 60

1    were being asked for in the F & F case, is that
2    correct --
3        MR. HARRISON:  Object --
4        Q.  (BY MR. BAKER) -- by Fisher?
5        MR. HARRISON:  Objection on the basis of the
6    attorney work product doctrine.  I'm going to instruct
7    the witness not to answer that question.
8        Q.  (BY MR. BAKER) Is that a fair statement?
9        MR. HARRISON:  Same instructions.
10        THE WITNESS:  I'll take the instruction.
11        MR. BAKER:  All right.
12        THE VIDEOGRAPHER:  I'm sorry.  Mr. Harrison,
13    there's some interference coming through on your
14    microphone.
15        Is it possible there's a cell phone in a
16    breast pocket?
17        MR. HARRISON:  It's very possible.
18        THE VIDEOGRAPHER:  Thank you.
19        MR. BAKER:  I'd say extremely likely.
20        MR. HARRISON:  Is that better?
21        THE VIDEOGRAPHER:  All better.  Thank you.
22    yeah.
23        MR. HARRISON:  All right.
24        Q.  (BY MR. BAKER) Were you involved in any of
25    the negotiations regarding the Exclusive Supply

Page 61

1    Agreement in this case?
2        MR. HARRISON:  I'm going to object and
3    instruct the witness not to answer to the extent he was
4    involved as general counsel or as outside counsel for
5    Fisher Sand & Gravel.
6        MR. BAKER:  I'm just trying to find out if he
7    had any involvement first before I ask a whole bunch of
8    questions.
9        MR. HARRISON:  Understood.
10        MR. BAKER:  It -- it does not go to any
11    attorney-client privileged matter --
12        MR. HARRISON:  With the --
13        MR. BAKER:  -- or work product.  I'm just
14    asking him if he was there at the time and did anything.
15        MR. HARRISON:  If you will stipulate that it
16    won't constitute a waiver of the attorney work product
17    privilege --
18        MR. BAKER:  I will agree that does not -- an
19    answer to that question does not constitute a waiver of
20    any privilege, because I don't think there's been much
21    of a privilege that you've been objecting to.
22        Q.  But in spite of that, go ahead and answer if
23    you can.
24        A.  I believe I may have had some involvement --
25    you're talking about back in 2007?

16  (Pages 58 to 61)

Tim Priebe                                              Bar J Sand & Gravel vs.
5/8/2017                                                      Fisher Sand

---

Page 62

1      Q.  Correct.
2      A.  -- around the time I came over to Fisher.
3      Q.  I -- I think the date of the agreement -- or
4  the effective date is June 28th, 2007, and that seemed
5  to be right about the time you told me you came on board
6  at -- which is the reason for my question.
7      A.  Yes.  I think that would have been days after
8  I started at Fisher Sand & Gravel Company.
9      Q.  All right.
10      Did you have any involvement with regard to
11  negotiations or an understanding of what was being
12  negotiated prior to your going to Fisher Sand & Gravel?
13      MR. HARRISON:  I'm going to object.
14      And instruct you not to answer.  I think now
15  we're getting into the substance of what your
16  involvement would have been --
17      MR. BAKER:  I said prior to -- I said prior to
18  his going to.
19      THE WITNESS:  Well, I think I can answer.  My
20  only involvement prior to would have been as an outside
21  attorney for Fisher Sand & Gravel Company, and I think
22  that would be protected by the attorney-client
23  privilege, and I don't think I could answer that.
24      Q.  (BY MR. BAKER)  Well, what you did may be
25  protected --

---

Page 63

1      A.  Okay.
2      Q.  -- but whether you did I don't think is
3  protected.  Will you tell me the answer to that.
4      So that we don't take an unnecessary motion up
5  to the Court.
6      MR. HARRISON:  I -- same objection and
7  instruction not to answer.  I think your -- your
8  question included some substance.
9      MR. BAKER:  No.  I'm not.  I'm --
10      Q.  I said, did you have any involvement prior to
11  your going on board with Fisher?
12      A.  I think I likely did.
13      Q.  And would it be fair to say that your only
14  involvement would have been as an attorney?
15      A.  Yes.
16      Q.  Let me show you what's been previously marked
17  as Exhibit 73.
18      MR. HARRISON:  Thank you.
19      Q.  (BY MR. BAKER)  And you'll note it's a -- what
20  appears to be an E-mail from Mike Moehn to Frank Duran
21  of May 25th, 2007, and it says "Comments on Draft#1 of
22  Bar J Lease."
23      Do you see that?
24      A.  Yes.
25      Q.  All right.

---

Page 64

1      And looking at the attachment, it -- there are
2  several -- or a couple at least indications that say
3  "Our lawyer thought this paragraph may be redundant" or
4  "Our lawyer would like the provision regarding" --
5  something.
6      Would that have been you?
7      MR. HARRISON:  I'm going to object on the
8  basis of the attorney work product doctrine and instruct
9  the witness not to answer.
10      MR. BAKER:  This has been provided to us.
11      MR. HARRISON:  Understood.  But what he did or
12  did not do for his client is protected.
13      MR. BAKER:  Well, not if it has already been
14  told to the other side.  That would be clearly not
15  privileged any longer.  It was done not in the terms of
16  litigation, it was done to develop a contract, and there
17  is no privilege to that.
18      MR. HARRISON:  Sure.  The attorney-client
19  privilege attaches to any work that an attorney does,
20  whether it's litigation or not, if he was assisting with
21  the preparation of a contract.
22      MR. BAKER:  I think you're wrong.
23      Would you like to go out and discuss that with
24  Mr. Priebe?
25      MR. HARRISON:  No.

---

Page 65

1      Unless --
2      Q.  (BY MR. BAKER)  So looking at paragraph 16,
3  "Our lower thought this paragraph may be redundant based
4  on the information in paragraph 19C."
5      Did you provide that information?
6      MR. HARRISON:  Instruct the witness not to
7  answer on the basis of the attorney-client privilege and
8  the attorney work product doctrine.
9      Q.  (BY MR. BAKER)  If it was not you, can you
10  identify a lawyer who may have provided such indications
11  to Fisher that were shared with Bar J Sand & Gravel?
12      MR. HARRISON:  Object to form.
13      Q.  (BY MR. BAKER)  Go ahead.
14      A.  I would have no idea.
15      Q.  Do you know whether it was you that is being
16  referred to in paragraphs 8 and 10?
17      MR. HARRISON:  Object to foundation.
18      THE WITNESS:  I don't know.
19      Q.  (BY MR. BAKER)  You don't recall?
20      MR. HARRISON:  Object to foundation.
21      THE WITNESS:  On my document, I -- it's their
22  words.
23      Q.  (BY MR. BAKER)  Yes, it is their words.
24      Have you ever seen this before?
25      MR. HARRISON:  I'm going to instruct the

---

17 (Pages 62 to 65)

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

---

Page 66

1  witness not to answer that question on the basis of the
2  attorney work product doctrine and the attorney-client
3  privilege.
4      Q.  (BY MR. BAKER)  I'm just asking if you've ever
5  seen this document before.
6          MR. HARRISON:  Understand.
7      Q.  (BY MR. BAKER)  Are you going to take that
8  instruction?
9      A.  Yes.
10     Q.  Were you aware that the -- or that a contract
11 was being negotiated between Bar J Sand & Gravel and
12 Fisher prior to the time that you went to Fisher?
13         MR. HARRISON:  Same objections, instruct the
14 witness not to answer.  His knowledge of contract issues
15 as outside or inside counsel is protected from
16 disclosure by the work product doctrine.
17     Q.  (BY MR. BAKER)  Looking at Exhibit 70.
18         MR. HARRISON:  Thank you, Doug.
19     Q.  (BY MR. BAKER)  Did you review this document
20 before it was sent to Bar J Sand & Gravel?
21         MR. HARRISON:  Same objection, instruct the
22 witness not to answer.
23     Q.  (BY MR. BAKER)  Are you going to take that
24 instruction?
25     A.  Yes.

---

Page 67

1      Q.  Looking at Exhibit 72.
2          Did you review this document before it was
3  sent to Bar J Sand & Gravel?
4          MR. HARRISON:  Same objections, instruct
5  Mr. Priebe to not answer the question on the basis of
6  the attorney-client privilege and the attorney work
7  product doctrine.
8      Q.  (BY MR. BAKER)  All I'm asking is if you
9  reviewed it.
10         MR. HARRISON:  I understand.  Same objections,
11 instruct not to answer.
12         THE WITNESS:  I'll take the instruction.
13     Q.  (BY MR. BAKER)  Looking at Exhibit 71, did you
14 review this prior to it being sent to Bar J Sand &
15 Gravel?
16         MR. HARRISON:  Same objections, same
17 instruction.
18         THE WITNESS:  I'll take the instruction.
19     Q.  (BY MR. BAKER)  Did you review the Exclusive
20 Supply Agreement before it was entered into?
21         MR. HARRISON:  Same objections, same
22 instruction.
23     Q.  (BY MR. BAKER)  Have you ever reviewed the
24 Exclusive Supply Agreement?
25         MR. HARRISON:  Same objections, same

---

Page 68

1  instruction.
2      Q.  (BY MR. BAKER)  Are you going to take those
3  instructions?
4      A.  Yes.
5      Q.  Do you know who is the president of Bar J Sand
6  & Gravel?
7      A.  No.
8      Q.  Do you know who is vice-president of Bar J
9  Sand & Gravel?
10         MR. HARRISON:  I'm going to actually instruct
11 you not to answer to the extent anything you know or do
12 not know about Bar J would have been learned in your
13 capacity as general counsel.
14         THE WITNESS:  I'd say anything I would have
15 learned would have been in that capacity.  So I will
16 take my attorney's instruction.
17     Q.  (BY MR. BAKER)  Were you aware that Fisher
18 started operating out at the pit prior to the agreement
19 being signed?
20     A.  No.
21     Q.  All right.  Let me show you what's been
22 previously marked as Exhibit 1.
23         And ask if you can identify any of those
24 E-mails.
25         MR. HARRISON:  Thank you.

---

Page 69

1          THE WITNESS:  Looks like the last E-mail sent
2  was from me to Mike Moehn.
3      Q.  (BY MR. BAKER)  The -- that would be the top
4  one on the --
5      A.  Top of the chain.  Yes.
6      Q.  Yes.  On the first page.
7      A.  Yes, sir.
8      Q.  Okay.
9          And you are responding to a Mike Moehn to --
10 E-mail to yourself and Tommy Fisher and Mr. Olson.
11     A.  Yes, appears so.
12     Q.  And there's a prior one in the chain from Mike
13 Moehn to T. Priebe -- I assume that's you?
14     A.  Yes.
15     Q.  -- Tommy Fisher and Dave Olson.
16     A.  Yes.
17     Q.  And you say "I saw this when I was in Reno."
18 And you say "Do you have this taken care of?"
19         What did you mean by that?
20     A.  I think what I meant is do you need me to look
21 into this or take any action --
22     Q.  Yeah.
23     A.  -- to assist you.
24     Q.  Look into it from what perspective?
25     A.  Legal perspective.

---

HUGHES SOUTHWEST COURT REPORTERS          505-843-8211
110 2nd Street, SW, Suite 602      Albuquerque, New Mexico 87102

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

---

Page 70

1    Q.  All right.
2        Did they ask you to look at anything?
3    A.  I don't recall.
4    Q.  It says "Let me know if you need me to look at
5    anything."
6        Just from that perspective -- well, what were
7    you thinking might be a legal perspective that you need
8    to be involved in?
9        MR. HARRISON:  I'm going to object and
10   instruct the witness not to answer.  That gets into
11   mental impressions of Fisher's general counsel.
12       MR. BAKER:  I'm just asking him what he was
13   thinking at the time.
14       MR. HARRISON:  And what he's thinking is his
15   mental impressions as counsel for Fisher.  I'm going to
16   instruct the witness not to answer.
17   Q.  (BY MR. BAKER)  Well, would there have been
18   anything other than whether the 120-day option period
19   not having been met for you to look at?
20       MR. HARRISON:  Same objection and instruct the
21   witness not to answer.
22   Q.  (BY MR. BAKER)  Is there anything other than
23   that that you would have looked at?
24       MR. HARRISON:  Same objection, instruct the
25   witness not to answer.

---

Page 71

1    Q.  (BY MR. BAKER)  You understand from this
2    chain, do you not, that Mr. Moehn was going -- was
3    telling you -- or telling everyone that there was a
4    term, that written notice had to be given 120 days prior
5    to expiration, correct?
6    A.  I'm not disputing what the E-mail says.
7    Q.  Well, answer my question, then.
8        You knew --
9    A.  Repeat your --
10   Q.  -- from this E-mail chain that -- and did you
11   have a copy of the lease at that time, or what he refers
12   to as the lease?
13   A.  I don't recall.
14   Q.  It says "Per the attached lease."
15   A.  Then I would assume it was attached.
16       MR. HARRISON:  I'm going to object to form.
17       MR. BAKER:  All right.
18   Q.  And would you have read it when you received
19   this E-mail before responding?
20   A.  In look --
21       MR. HARRISON:  I'm going to instruct the
22   witness not to answer on the basis of attorney-client
23   privilege and attorney work product doctrine.  Whether
24   or not Fisher's general counsel did or did not read the
25   lease is protected.

---

Page 72

1        MR. BAKER:  I don't believe so, but you're
2    instructing him not to answer?
3        MR. HARRISON:  Yes, sir.
4    Q.  (BY MR. BAKER)  And I assume you're taking
5    that instruction?
6    A.  Yes.
7    Q.  All right.
8        It says on the top of page 2 of this, which
9    was the first E-mail to you in the chain -- correct?
10   A.  Yes.
11   Q.  It says "We are to send written notice to Bar
12   J at least 120 days prior to expiration."
13       Do you see that?
14   A.  Yes.
15   Q.  Did you confirm that?
16       MR. HARRISON:  Same objection, same
17   instruction.
18       MR. BAKER:  All right.
19   Q.  It says "Dave talked to Louie a little bit ago
20   and he said to get with Frank (Ted's CFO) on what to put
21   in the notice."
22       Did you provide any information on what was to
23   go in the notice?
24       MR. HARRISON:  Same objection, same
25   instruction.

---

Page 73

1    Q.  (BY MR. BAKER)  Did you review what was to go
2    into the notice?
3        MR. HARRISON:  Same instruction, same
4    objection.
5    Q.  (BY MR. BAKER)  Are you going to take those
6    instructions?
7    A.  I think that's clearly attorney-client.  So
8    yes, I'm taking the instruction.
9    Q.  (BY MR. BAKER)  "Dave just talked to Frank and
10   he said he had to get with Louie and Ted to see if they
11   wanted to renegotiate anything to do with Minimums and
12   Royalty (those are both too high)."
13       Did you do anything with regard to that
14   comment?
15       MR. HARRISON:  Same objections, same
16   instruction.
17   Q.  (BY MR. BAKER)  It says "Technically, both of
18   those are still spelled out through 2015 in the lease."
19       Do you see that?
20   A.  Yes.
21   Q.  Did you confirm that?
22       MR. HARRISON:  Same objections, same
23   instruction.
24   Q.  (BY MR. BAKER)  It says "Should we just send a
25   notice over that we intend to renew anyway?"

---

HUGHES SOUTHWEST COURT REPORTERS
110 2nd Street, SW, Suite 602

505-843-8211
Albuquerque, New Mexico 87102

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

---

Page 74

1    Do you see that question?
2    A.  Yes.
3    Q.  Did you -- did you answer that question?
4    MR. HARRISON:  Same objections, same
5    instruction.
6    Q.  (BY MR. BAKER)  Mr. Moehn has indicated that
7    you approved the letter that he wrote to be sent.
8    Did you?
9    MR. HARRISON:  Object to form, also object on
10   the basis of the attorney-client privilege and the
11   attorney work product doctrine, instruct the witness not
12   to answer.
13   Q.  (BY MR. BAKER)  Are you going to take that
14   instruction?
15   A.  Yes.
16   Q.  Do you know Mr. Moehn to be a truthful man --
17   MR. HARRISON:  Object --
18   Q.  (BY MR. BAKER)  -- or an untruthful man?
19   A.  Truthful.
20   Q.  So if he said that, would you be inclined to
21   believe him?  If he said that you had reviewed it and
22   approved it, to go to Bar J Sand & Gravel, would that be
23   a truthful comment?
24   A.  I have no reason sitting here today to believe
25   that Mike would not tell the truth.

---

Page 75

1    Q.  Next said -- it says "They have never screwed
2    with us before."
3    What did you take that to mean?
4    MR. HARRISON:  Object to form, object to --
5    I'm sorry.  Object on the basis of attorney-client
6    privilege and attorney work product doctrine.  This gets
7    into his mental impressions as an attorney for the
8    company.  I'm going to instruct him not to answer.
9    Q.  (BY MR. BAKER)  Did you understand that there
10   was -- but it goes on, "but technically we are only 90
11   days out from expiration."
12   Did you understand that to mean that
13   technically the notice would be late?
14   MR. HARRISON:  Same objections, same
15   instruction.
16   Q.  (BY MR. BAKER)  Did you have an understanding
17   of this E-mail when you read it?
18   A.  I assume that I did.
19   Q.  All right.
20   Can you think of any other interpretation of
21   this E-mail that means anything other than the notice
22   would be late if we gave it now?
23   MR. HARRISON:  Object to form, instruct the
24   witness not to answer on the basis of the attorney work
25   product doctrines, clearly calls for mental impressions.

---

Page 76

1    MR. BAKER:  I'm asking if there's any other
2    interpretation he can think of.
3    MR. HARRISON:  Right.
4    MR. BAKER:  I'm not asking him for what he
5    thought.  I'm asking if there's any other interpretation
6    he can think of.
7    MR. HARRISON:  And I'm instructing him not to
8    answer that question.
9    MR. BAKER:  All right.
10   Q.  Was there anything about these two E-mails
11   that led you to believe anything other than late notice
12   was being requested of you to approve?
13   MR. HARRISON:  Object to form, also object on
14   the basis of the attorney-client privilege and attorney
15   work product doctrine, instruct Mr. Priebe to not answer
16   the question.
17   MR. BAKER:  We believe it's been waived by
18   Mr. Moehn's testimony.
19   Does that change your instruction?
20   MR. HARRISON:  It does not.  If you could
21   point me to the testimony, I can take a look at that.  I
22   don't recall Mr. Moehn testifying that Mr. Priebe had
23   approved this.
24   MR. BAKER:  All right.
25   MR. HARRISON:  But I have his deposition here

---

Page 77

1    if you'd like to --
2    MR. BAKER:  You can -- you can look at it
3    at -- at your leisure.
4    MR. HARRISON:  Okay.
5    MR. BAKER:  And I'm -- I've got the
6    instruction not to answer.  I've told you it's in there.
7    MR. HARRISON:  I'm just asking, I mean, if you
8    think there's something in Mr. Moehn's deposition that
9    would -- or should alter my instructions, I'd be happy
10   to look at it.  I'm not going to spend the morning
11   rereading the deposition transcript, so I --
12   MR. BAKER:  Yeah.  No.  It -- it specifically
13   asked him -- I asked him if Mr. Priebe approved the
14   sending of the letter.
15   MR. HARRISON:  Okay.  Give me the line and
16   page, and I'll take a look right now.
17   MR. BAKER:  Okay.  I don't think that's my
18   obligation.  You're supposed to know what -- what would
19   be privileged and what would not be.  And you should
20   have looked --
21   MR. HARRISON:  Mr. Baker, you're telling me
22   there's something in the transcript that should impact
23   this issue.
24   I'm asking you to tell me where that is.  It's
25   a 300-plus -- I think it's 360-some pages.

---

HUGHES SOUTHWEST COURT REPORTERS                    505-843-8211
110 2nd Street, SW, Suite 602        Albuquerque, New Mexico 87102

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

Page 78

1      MR. BAKER:  Well, why don't you look at Mr. --
2  up under the definition of Priebe, and we'll see where
3  it is.
4      MR. HARRISON:  I don't --
5      MR. BAKER:  You can probably find it in a
6  couple of seconds.
7      MR. HARRISON:  I don't have a word index with
8  me.  I only bring the transcript.
9      MR. BAKER:  All right.  Well, you should call
10  your office then and find that.
11      MR. HARRISON:  Oh, you can -- you're at
12  your -- we're at your office.  You're the one --
13      MR. BAKER:  You're at -- you're at my office,
14  and I expected you to be prepared for this deposition.
15  If you're not, that's fine.
16      MR. HARRISON:  I'm not the deponent.  If you
17  have something in Mr. Moehn's deposition that you
18  believe I should consider, I will look at it.
19      MR. BAKER:  All right.
20      MR. HARRISON:  I'm not going to reread a
21  nearly 400-page transcript.
22      MR. BAKER:  I'm not asking you to do anything
23  other than to take my word for it, and based on that,
24  you can instruct him or not instruct him.
25      MR. HARRISON:  Based on that, I will

Page 79

1  absolutely instruct him.
2      MR. BAKER:  All right.
3      Q.  Were you provided a copy of the letter --
4      MR. HARRISON:  Object --
5      Q.  (BY MR. BAKER) -- that ultimately went out to
6  Bar J Sand & Gravel?
7      MR. HARRISON:  Object to form, and also
8  instruct the witness not to answer to the extent you're
9  referring to letters that are at issue in this case.
10      THE WITNESS:  I'm not sure which letter you're
11  referring to, Mr. Baker.
12      Q.  (BY MR. BAKER)  You don't know in this case --
13      A.  In your --
14      Q.  -- what the April 12th letter said?
15      A.  You didn't say April 12th, I don't believe, in
16  the question.
17      Q.  I -- I did, but --
18      A.  I thought you said let -- the letter that
19  went, and there may be more than one letter.
20      All I'm saying is --
21      Q.  Could be.
22      A.  -- tell me which specific letter --
23      Q.  I will.  I will tell you.
24      A.  Okay.
25      Q.  Looking at Exhibit 3.

Page 80

1      Did you receive this E-mail?
2      A.  It appears that I did.
3      Q.  All right.
4      And it clearly indicates that it is an E-mail
5  from Mike Moehn to you and Tommy Fisher, correct?
6      A.  Yes.
7      Q.  And what he says is "Let me know what you guys
8  think.  If it is OK, I will email to Frank and send it
9  over to Bar J via certified mail as required in our
10  lease."
11      Do you see that?
12      A.  Yes.
13      Q.  All right.
14      Did you approve it for sending?
15      MR. HARRISON:  I'm going to object and
16  instruct the witness not to answer on the basis of the
17  attorney-client privilege and attorney work product
18  doctrine.
19      Q.  (BY MR. BAKER) If you had objected to his
20  sending it, would he have sent it?
21      MR. HARRISON:  Same objections, instruct the
22  witness not to answer.
23      MR. BAKER:  What's the basis for that?
24      MR. HARRISON:  You're asking what his client
25  would have done if he had objected.  You're -- you're

Page 81

1  trying to back-door in the attorney-client privileged
2  information.
3      MR. BAKER:  All I'm asking --
4      Q.  Let me show you what the letter said first.
5      Take a look at Exhibit 4.
6      Have you ever seen it?
7      A.  I am sure I have.
8      Q.  Did you see it before it was sent?
9      MR. HARRISON:  Same objections.  Whether or
10  not Fisher's in-house counsel reviewed a letter before
11  it was sent is work product, mental impressions and
12  protected by the attorney-client privilege.  Instruct
13  the witness not to answer.
14      Q.  (BY MR. BAKER)  Are you going to take that
15  instruction?
16      A.  Yes.
17      Q.  All right.
18      So it is Fisher's position that if you saw
19  this based on an E-mail from Mike Moehn giving it to you
20  and asking for your okay before he sent it, you will not
21  respond to any of my questions about whether you looked
22  at it and approved it before it was sent; is that
23  correct?
24      A.  Yes.
25      Q.  And you're doing that based on what?

21  (Pages 78 to 81)

Tim Priebe                                                    Bar J Sand & Gravel vs.
5/8/2017                                                                  Fisher Sand

Page 82

1        A.  My attorney's advice.
2        Q.  Looking at Exhibit 4, as a Board of Directors
3    member of Fisher Sand & Gravel, do you believe this is
4    anything other than a notice of intent to extend the
5    supply agreement?
6        MR. HARRISON:  I'm going to object and
7    instruct the witness not to answer unless he can
8    segregate out his role as general counsel from his role
9    as a member of the Board of Directors.
10       Q.  (BY MR. BAKER)  With respect to your -- are
11   you going to take that instruction?
12       A.  Yes.
13       Q.  With respect to your position as secretary of
14   Fisher Sand & Gravel, can you understand this letter to
15   be anything other than a notice of intent to extend the
16   supply agreement?
17       MR. HARRISON:  Same objections, same
18   instruction.
19       Q.  (BY MR. BAKER)  Do you know, as secretary
20   and/or a Board of Directors member, whether Fisher Sand
21   & Gravel did renew the lease --
22       MR. HARRISON:  Same objection --
23       Q.  (BY MR. BAKER)  -- or Exclusive Supply
24   Agreement in 2012?
25       MR. HARRISON:  Same objections, same

Page 83

1    instruction.
2        THE WITNESS:  I'll take the instruction.
3        Q.  (BY MR. BAKER)  Are you going to take that
4    instruction?
5        A.  Yes.  Yes.
6        And just to clarify, I was not a Board of
7    Directors member back then.
8        Q.  All right.  Well, you didn't know earlier.
9    You said 2012 or 2013.  You said you couldn't figure
10   that out.
11       A.  Okay.  Right.
12       Q.  I'm just asking.
13       A.  Okay.
14       Q.  But I think I said either as secretary or
15   Board of Directors member.
16       But you're taking the instruction in any
17   event?
18       A.  Exactly.
19       Q.  All right.
20       From your experience as secretary and Board of
21   Directors member, is it common for Fisher Sand & Gravel
22   and Mr. Mike Moehn to send notices of intent to extend
23   the supply agreement when it really doesn't mean to
24   extend the supply agreement?
25       MR. HARRISON:  Object to the form of the

Page 84

1    question.
2        And same instruction with respect to if you
3    can answer it without implicating your work as general
4    counsel, you can answer.  Otherwise, I instruct you not
5    to answer.
6        THE WITNESS:  I cannot answer that without
7    implicating my role as general counsel for Fisher Sand &
8    Gravel Company.  So I will heed the instruction.
9        Q.  (BY MR. BAKER)  Looking at the Exhibit 4, it
10   says "This letter is to provide written documentation of
11   Fisher's intent to extend the agreement as you have
12   requested."
13       Do you see that?
14       A.  Yes.
15       Q.  Do you know anything about the conversations
16   that went on between Mr. Moehn and -- and/or Dave Olson
17   and Bar J Sand & Gravel?
18       MR. HARRISON:  Instruct the witness not to
19   answer to the extent any knowledge he has was learned as
20   general counsel for Fisher.
21       THE WITNESS:  I'll just answer no.  I --
22       MR. BAKER:  Okay.
23       Q.  Do you know anything about the next sentence,
24   "Per earlier conversations regarding this notice, it is
25   agreed that we will continue to try and best address the

Page 85

1    issues regarding royalty and volume as we move forward
2    to the maximum benefit of both parties"?  Do you know
3    anything about the conversations between Mr. Olson and
4    anyone at Bar J Sand & Gravel or Mr. Moehn and anyone at
5    Bar J Sand & Gravel?
6        MR. HARRISON:  Same objections, same
7    instruction.
8        THE WITNESS:  I will take the instruction.
9        Q.  (BY MR. BAKER)  It's -- in the first sentence,
10   it says "Per earlier conversations between Fisher Sand &
11   Gravel and Bar J Sand & Gravel personnel, Fisher has
12   notified Bar J of its intent to extend the current
13   supply agreement between Fisher and Bar J."
14       Do you know anything about those
15   conversations?
16       MR. HARRISON:  Same objections, same
17   instruction.
18       THE WITNESS:  I'll take the instruction.
19       Q.  (BY MR. BAKER)  Did you ever review the supply
20   agreement to see whether this notice would be consistent
21   with the notification provisions?
22       MR. HARRISON:  Object on the basis of the
23   attorney work product doctrine and instruct Mr. Priebe
24   to not answer the question.
25       Q.  (BY MR. BAKER)  Are you going to take that

22 (Pages 82 to 85)

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

Page 86

1    instruction?
2         A.   Yes.
3         Q.   Looking at -- continuing looking at Exhibit 4,
4    can you tell me if you have any understanding of the
5    term "to the maximum benefit of both parties"?
6         MR. HARRISON:  Object and instruct the witness
7    not to answer on the basis of the attorney-client
8    privilege and the attorney work product doctrine.
9         Q.   (BY MR. BAKER)  Go ahead and answer.
10        MR. HARRISON:  Same objection, same
11   instruction.
12        Q.   (BY MR. BAKER)  Are you going to take that
13   instruction?
14        A.   Yes.
15        Q.   As a Board of Directors member now, do you
16   know what it means when someone says "to the maximum
17   benefit of both parties"?
18        MR. HARRISON:  Same objection, same
19   instruction.
20        Q.   (BY MR. BAKER)  Are you going to take that --
21        A.   Yes.
22        Q.   -- instruction?
23        As the secretary of the corporation, do you
24   know -- have an understanding of what it means to say
25   "to the maximum benefit of both parties"?

Page 87

1         MR. HARRISON:  Same objection, same
2    instruction.
3         THE WITNESS:  Take the instruction.
4         Q.   (BY MR. BAKER)  Did you testify in the F & F
5    case?
6         A.   You mean at a deposition?
7         Q.   Correct.
8         A.   Yes.
9         Q.   And in what capacity were you deposed?
10        A.   I'm not certain.
11        Q.   Did you invoke the attorney-client privilege
12   as to all of your answers?
13        MR. HARRISON:  Object to form.
14        THE WITNESS:  I don't recall.
15        MR. BAKER:  We would request a copy of that
16   deposition.  I'll put it in writing.
17        MR. HARRISON:  So noted.
18        Q.   (BY MR. BAKER)  Were you asked questions about
19   the damages that F & F was seeking in that deposition?
20        A.   I don't recall.
21        Q.   Were you asked questions about the operations
22   in New Mexico that you were aware of with -- in that
23   deposition?
24        A.   I assume I was.
25        Q.   Do you recall taking -- objecting on the

Page 88

1    basis -- and refusing to answer the questions based on
2    the attorney-client privilege?
3         MR. HARRISON:  Object to form.
4         THE WITNESS:  I don't recall.  I'm confident
5    that if there were things that we felt would invoke the
6    attorney-client privilege, that the appropriate
7    objections were made.
8         Q.   (BY MR. BAKER)  As -- in any of your roles
9    as -- for Fisher Sand & Gravel, would you typically be
10   involved in decisions with regard to amendments of a
11   contract?
12        MR. HARRISON:  Object to form.
13        THE WITNESS:  I think my only role would be
14   from a legal perspective.
15        Q.   (BY MR. BAKER)  If the topic area were
16   amendments with regard to royalties and minimums, would
17   you be involved in those discussions --
18        MR. HARRISON:  Object --
19        Q.   (BY MR. BAKER)  -- in any of your roles as --
20   for Fisher Sand & Gravel?
21        MR. HARRISON:  Object on the basis of the
22   attorney-client privilege and work product doctrine and
23   instruct Mr. Priebe to not answer that question.
24        Q.   (BY MR. BAKER)  Are you going to take that
25   instruction?

Page 89

1         A.   Yes.
2         Q.   I'm not asking you what your advice was or --
3         A.   Um-hum.
4         Q.   -- what involvement you would even have now.
5         I'm just asking you if you would have any.
6         You're going to take that instruction?
7         A.   Yes, because my only role would be as an
8    attorney for Fisher Sand & Gravel Company.
9         Q.   Well, as secretary you might sign amendments.
10        Couldn't you?
11        A.   Could.
12        Q.   Are you authorized to sign on behalf of the
13   corporation?
14        A.   Yes.
15        Q.   So you would have other capacities that you
16   could be signing amendments on behalf of the
17   corporation; is that fair?
18        A.   I could sign amendments on behalf of the
19   corporation.  Yes.
20        Q.   In fact, you have signed documents on behalf
21   of the corporation, correct?
22        A.   Yes.
23        Q.   And do you consider those to be privileged,
24   when you sign documents on behalf of the corporation and
25   give them to the other side?

HUGHES SOUTHWEST COURT REPORTERS          505-843-8211
110 2nd Street, SW, Suite 602      Albuquerque, New Mexico 87102

Tim Priebe                                                    Bar J Sand & Gravel vs.
5/8/2017                                                              Fisher Sand

Page 90

1      A.  Not -- no.
2      Q.  Would you like to change any of your
3  nonanswers based on instructions?
4      A.  No.
5      Q.  All right.
6          Do you know why Mr. Moehn would have been
7  asking you to take a look at the letter of April 12th,
8  2012?
9          MR. HARRISON:  Object to foundation.
10         THE WITNESS:  You'd have to ask Mr. Moehn.
11     Q.  (BY MR. BAKER)  You don't know?  You don't
12  know if he was approaching you in your capacity as chief
13  administrative officer or as legal counsel, correct?
14     A.  My understanding, he would have been
15  approaching me as the legal officer, but you'd have to
16  ask Mr. Moehn.
17     Q.  Well, why would that be your understanding --
18     A.  Because that was --
19     Q.  -- that he would be approaching you in that
20  capacity?
21     A.  Because for New Mexico operations, that is
22  pretty much the extent of why Mike asks for my input
23  on --
24     Q.  All right.
25         So it would be your understanding that he

Page 91

1  was -- when he was sending it -- the letter to you and
2  asking you whether he could approve it -- whether he
3  could send it or not, he was asking you to give your
4  legal opinion on whether he could send it or not; is
5  that fair?
6      A.  Oh, I don't think that's fair.
7      Q.  Well, then what capacity was he asking you in?
8      A.  He was giving it to me -- I think what the
9  E-mail says, he was copying Tommy Fisher and myself.
10  I -- my answer is I assume he was sending it to me in my
11  legal capacity, and if I reviewed it, it would be in
12  that capacity.
13     Q.  All right.
14         And if you were to -- if he were to send it,
15  then you would have reviewed it in your legal capacity;
16  is that a fair statement?
17     A.  I'm not going to get into any advice or
18  anything that would be beyond the --
19     Q.  I'm not asking you for any advice.
20     A.  I -- I think you are, Mr. Baker.  I think
21  you're asking whether I would have approved it, whether
22  it went out.  I think that's protected --
23     Q.  I --
24     A.  -- by the attorney-client privilege.  So I'm
25  not going to answer that --

Page 92

1      Q.  I -- I am not asking you that.
2          I am asking you if it's your understanding,
3  because you have several different hats --
4      A.  Sure.
5      Q.  -- whether he was seeking your approval as a
6  lawyer to send it out, or in some other capacity in the
7  company.
8          MR. HARRISON:  Object to form.
9          THE WITNESS:  I think I've answered that.  I
10  think I said my assumption was that, but to get Mike's
11  intention, you'd have to talk to Mike.
12         MR. BAKER:  All right.
13     Q.  You understood it to be in your legal
14  capacity.
15     A.  Yes.
16     Q.  Is that fair?
17     A.  Yes.
18     Q.  He was asking for your approval as the lawyer,
19  correct?
20         MR. HARRISON:  Object -- object to --
21     Q.  (BY MR. BAKER)  That's how you understood --
22         MR. HARRISON:  Object to form or --
23     Q.  (BY MR. BAKER)  -- that E-mail?
24         MR. HARRISON:  Object to form and instruct him
25  not to answer on the basis of the attorney-client

Page 93

1  privilege and work product doctrine.
2          MR. BAKER:  I'm just --
3          MR. HARRISON:  You're now asking specifically
4  about approval.
5          MR. BAKER:  No.  I'm asking him about when he
6  received it what -- what capacity he received it in and
7  whether that was a request for approval of him as legal
8  counsel or as chief administrative officer.
9          MR. HARRISON:  And again I'm going to object
10  to the form.
11         THE WITNESS:  We've clarified that it was in
12  my legal capacity.
13         MR. BAKER:  All right.
14     Q.  So he was asking for your approval as a
15  lawyer --
16         MR. HARRISON:  Object to form.
17     Q.  -- right?  And no other capacity?
18     A.  I'm not going to get into that, Mr. Baker,
19  because you're asking for the approval, and that's
20  clearly attorney-client privilege.  So I'm not answering
21  that portion of the question.  He was contacting me in
22  my legal capacity, but beyond that, I'm not answering.
23     Q.  If Mr. Moehn said that you did approve it,
24  would you have any reason to dispute that?
25     A.  No.

HUGHES SOUTHWEST COURT REPORTERS                         505-843-8211
110 2nd Street, SW, Suite 602              Albuquerque, New Mexico 87102

Tim Priebe                                      Bar J Sand & Gravel vs.
5/8/2017                                                    Fisher Sand

Page 94

1    Q.  Were you ever told that Fisher -- did -- were
2    you ever told that Bar J Sand & Gravel did not accept
3    the Exhibit 4 as a notice of intent to renew?
4        MR. HARRISON:  Object on the basis of
5    attorney-client privilege and instruct the witness not
6    to answer.
7        THE WITNESS:  I'll take the instruction.
8        Q.  (BY MR. BAKER)  Were you ever asked to look at
9    that issue in any capacity for Fisher Sand & Gravel?
10       MR. HARRISON:  Same objection, same
11   instruction.
12       Q.  (BY MR. BAKER)  Will you take that
13   instruction?
14       A.  Yes.
15       MR. BAKER:  Let's go ahead and take a break.
16       MR. HARRISON:  Thank you, Doug.
17       THE WITNESS:  Okay.
18       THE VIDEOGRAPHER:  The time is 10:59.  We are
19   now off the record.
20       (Proceedings in recess.)
21       THE VIDEOGRAPHER:  We are now on the record.
22   The time is 11:09 a.m.
23       Q.  (BY MR. BAKER)  Showing you what's been
24   previously marked as Exhibit 10.
25       Do you recognize that as an Exclusive Supply

Page 95

1    Agreement between Fisher Sand & Gravel and Bar J Sand &
2    Gravel?
3        A.  Yes.
4        Q.  Do you recognize that Mr. Louie R. Jacques was
5    indicated as the president of Bar J Sand & Gravel, Inc.,
6    on that?
7        A.  Yes.
8        Q.  Is there any confusion in your mind about
9    that?
10       A.  Document speaks for itself, I guess.
11       Q.  Ted R. Martinez was indicated as
12   vice-president, correct?
13       A.  Yes.
14       Q.  What is Southwest Asphalt Paving?
15       A.  It's an internal division of Fisher Sand &
16   Gravel Company.
17       Q.  Are there officers of that?
18       A.  No.  It's not a separate entity.
19       Q.  What is Fisher Industries?
20       A.  Trade name for the Fisher group of companies.
21       Q.  Does it have officers?
22       A.  No.  It's not a separate entity.
23       Q.  Have you reviewed this Exclusive Supply
24   Agreement?
25       MR. HARRISON:  Object and instruct the witness

Page 96

1    not to answer on the basis of the attorney work product
2    doctrine and the attorney-client privilege.
3        Q.  (BY MR. BAKER)  As a Board of Directors
4    member, chief administrative officer and secretary --
5    and/or secretary of the corporation, are you aware that
6    there is an Exclusive Supply Agreement dated June 28,
7    2007, between Fisher Sand & Gravel and Bar J Sand &
8    Gravel?
9        MR. HARRISON:  Same objection, same
10   instruction.
11       And if you can answer it without implicating
12   what you've learned as general counsel, go ahead.
13       THE WITNESS:  I cannot answer without
14   implicating what I've learned as general counsel.  So I
15   will follow my attorney's instruction.
16       Q.  (BY MR. BAKER)  As a Board of Directors
17   member, are you aware that there's a lawsuit between Bar
18   J Sand & Gravel and Fisher Sand & Gravel?
19       A.  I'm aware there's a lawsuit.
20       Q.  All right.
21       And I'm asking you as a Board of Directors
22   member and secretary, are you aware of that lawsuit?
23       A.  I'm not sure how you differentiate my
24   knowledge between what I know as attorney and Board of
25   Directors member and a secretary.

Page 97

1        Q.  Would you agree with me that you know it as a
2    Board of Directors member?
3        A.  I think that's fair.
4        Q.  All right.
5        And knowing that there is such a lawsuit, have
6    you looked at any of the terms --
7        MR. HARRISON:  Object --
8        Q.  (BY MR. BAKER)  -- as a Board of Directors
9    member?
10       THE WITNESS:  My review of the terms or the
11   lawsuit would all be in my capacity as general counsel
12   for Fisher Sand & Gravel --
13       MR. BAKER:  All right.
14       THE WITNESS:  -- and I can't differentiate
15   with what I would know as a board member.
16       MR. BAKER:  All right.
17       THE WITNESS:  So I'm not going to be able to
18   answer.
19       Q.  (BY MR. BAKER)  So because Fisher has put you
20   in two different roles, all of your knowledge gained as
21   an attorney for Fisher internal -- attorney, general
22   counsel, you also have that same knowledge as board
23   member; is that fair?
24       MR. HARRISON:  Object to form.
25       THE WITNESS:  I'm the same person.  I've got

25 (Pages 94 to 97)

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

Page 98

1    that knowledge.
2        Q.  (BY MR. BAKER)  So you'd agree with me,
3    wouldn't you -- wouldn't you?
4        A.  Can you repeat the question?
5        Q.  Yes.
6           So because Fisher decided to have you in two
7    different roles --
8        A.  Okay.
9        Q.  -- any knowledge you gained as Fisher's
10   general counsel, you also have the same knowledge as a
11   Board of Directors member?
12          MR. HARRISON:  Object to form.
13          THE WITNESS:  I think that would be fair.
14          MR. BAKER:  All right.
15       Q.   And the same question with regard to your role
16   as secretary, because they have put you in those two
17   different positions, all knowledge you have as general
18   counsel is also your knowledge as secretary?
19       A.  Yes.  I think that would be fair.
20       Q.  All right.
21          And it's fair to say you have reviewed the
22   complaint that is filed against Fisher?
23          MR. HARRISON:  Object and instruct the witness
24   not to answer on the basis of the work product doctrine.
25       Q.  (BY MR. BAKER)  Is it fair to say you have

Page 99

1    reviewed the counterclaim --
2          MR. HARRISON:  Same --
3        Q.  (BY MR. BAKER)  -- or the amended counterclaim
4    against Bar J Sand & Gravel by Fisher?
5          MR. HARRISON:  Same objection, same
6    instruction.
7        Q.  (BY MR. BAKER)  And you take those
8    instructions?
9        A.  Yes.
10       Q.  All right.
11          Looking at Exhibit 10, and page 4, there's a
12   paragraph Supplier To Have No Direct Contacts or Other
13   Agreements.
14          Have you read that provision?
15          MR. HARRISON:  Same objection, same
16   instruction.
17       Q.  (BY MR. BAKER)  Are you going to take that
18   instruction?
19       A.  Yes.
20       Q.  All right.
21          Are you aware that Fisher Sand & Gravel has
22   violated that provision?
23          MR. HARRISON:  Same objection, same
24   instruction, and objection to form.
25          And if it will make it easier, Doug, we can

Page 100

1    just object to any questions about the ESA or what it
2    says, we're going to have the same objection, same
3    instruction.
4          MR. BAKER:  Yeah.  I -- I think I need to go
5    through some --
6          MR. HARRISON:  Yeah.  If you could just
7    understand, please --
8          MR. BAKER:  Because as a board member, he may
9    need to be made aware of what the company is doing, that
10   he may not be aware of, and I think I'm entitled to find
11   out.
12          MR. HARRISON:  Go for it.
13          MR. BAKER:  All right.
14       Q.   Well, looking at that provision, are -- do you
15   have any knowledge of any contacts by Fisher to the
16   Pueblo of San Felipe regarding a potential agreement or
17   lease with the -- directly with the pueblo?
18          MR. HARRISON:  Same objection, same
19   instruction.
20       Q.  (BY MR. BAKER)  Are you going to -- are you
21   going to take that instruction?
22       A.  Yes.
23       Q.  Looking at what's previously been -- keep that
24   in front of you --
25       A.  Okay.

Page 101

1        Q.  -- and -- keep Exhibit 10 in front of you, and
2    looking at Exhibit 15, are -- have you seen this exhibit
3    before?
4          MR. HARRISON:  Same objection, same
5    instruction.
6          MR. BAKER:  What's the instruction now?  Have
7    you see in before.
8          MR. HARRISON:  I'm instructing him not -- I'm
9    instructing him not to answer on the basis of the work
10   product doctrine.  What he has or has not reviewed as
11   the general --
12          MR. BAKER:  I --
13          MR. HARRISON:  -- counsel for Fisher --
14          MR. BAKER:  I --
15          MR. HARRISON:  -- is subject to the work --
16          MR. BAKER:  I'm just asking what he's seen.
17          MR. HARRISON:  Understand, and that -- that is
18   subject to the work product --
19       Q.  (BY MR. BAKER)  Did you see this document
20   before it was provided to the pueblo?
21          MR. HARRISON:  Same objection, same
22   instruction and instruct -- and objection to form.
23          MR. BAKER:  What's the objection to form?
24          MR. HARRISON:  That this document was provided
25   to the pueblo.  I don't know that there's any record of

HUGHES SOUTHWEST COURT REPORTERS
110 2nd Street, SW, Suite 602

505-843-8211
Albuquerque, New Mexico 87102

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

Page 102

1  it that it was provided.
2      MR. BAKER:  Well, I refer you back to
3  Mr. Moehn's deposition for that.  Perhaps you haven't
4  read it.
5      MR. HARRISON:  I've read it.  I was here.
6      I think the testimony was that there was a
7  presentation.  I don't know that the hard-copy document
8  was given to the pueblo.
9      MR. BAKER:  I think he said he gave a copy to
10  them.
11      MR. HARRISON:  Okay.
12      MR. BAKER:  I may be wrong.  I doubt it, but I
13  may be.
14      Q.  Do you have any knowledge of contacts with the
15  pueblo as a -- as a chief administrative officer?
16      A.  I don't think I can differentiate any
17  knowledge I would have as chief administrative officer
18  from knowledge as general counsel.  So I think any
19  knowledge I would have would be protected by
20  attorney-client.
21      Q.  So you're going to not answer my question?
22      A.  Yes.  Yes, sir.
23      Q.  Okay.
24      And same question about as Board of Directors
25  member.

Page 103

1      A.  Would be the same answer.
2      Q.  All right.
3      And your same -- you're going to refuse to
4  answer the question?
5      A.  Yes.
6      Q.  All right.
7      Looking at the page that's got the Bates stamp
8  0169.
9      A.  Okay.
10      Q.  It first says "It is our understanding that
11  the Tribe is not happy with the terms of the previous
12  agreement."
13      Do you know what the previous agreement is?
14      MR. HARRISON:  Same objections, same
15  instruction.
16      Q.  (BY MR. BAKER)  You're going to take that
17  instruction?
18      A.  Yes.
19      Q.  Did you approve this to be sent to the -- or
20  given to the pueblo?
21      MR. HARRISON:  Same objections, same
22  instruction.
23      Q.  (BY MR. BAKER)  Did you review it at any point
24  in time?
25      MR. HARRISON:  Same objections, same

Page 104

1  instruction.
2      Q.  (BY MR. BAKER)  Going to take those
3  instructions?
4      A.  Yes.
5      Q.  Looking at the page that's 0163.
6      Was Fisher originally founded as an aggregate
7  production company over 60 years ago in Dickinson, North
8  Dakota?
9      A.  The best of my knowledge, yes.
10      Q.  All right.
11      Is that privileged, for you to give that
12  answer?
13      A.  No.  I would -- I don't think so.
14      Q.  All right.  I'm trying to figure out what
15  differentiates your knowledge on some things versus
16  knowledge on other things --
17      A.  Okay.
18      Q.  -- as a --
19      Looking at page 0166.
20      As a secretary and -- and board member of
21  Fisher Sand & Gravel, the first part says, "Over the
22  last 7 years, we have always tried to address any
23  concern presented to us.  Unfortunately, our existing
24  supply agreement prohibited us from having direct
25  contact with the Pueblo."

Page 105

1      To your knowledge, is -- as a board member
2  and/or secretary, is there anything wrong with that
3  statement?
4      MR. HARRISON:  Object and instruct the witness
5  to only answer to the extent he can without implicating
6  what he has learned as general counsel.
7      MR. BAKER:  I'm asking with all his knowledge
8  as Board of Directors and secretary, is there anything
9  wrong with that.
10      THE WITNESS:  I can't differentiate between
11  the information I received as general counsel.  So I
12  would heed my counsel's recommendation and not answer.
13      Q.  (BY MR. BAKER)  That's not a recommendation.
14  I think it was an instruction.
15      A.  Instruction.
16      Q.  Are you going to take that instruction?
17      A.  Yes.
18      Q.  All right.
19      Is -- is Mr. Harrison your counsel?
20      A.  For Fisher Sand & Gravel Company, yes.
21      Q.  He's Fisher's.
22      A.  Yes.
23      Q.  All right.
24      A.  Oh, I've been referring to as my as the
25  company.

27 (Pages 102 to 105)

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

---

Page 106

1    Q.  That's what you meant.  Okay.
2    A.  Yes, exactly.
3    Q.  That's fine.  That's what I'm trying to figure
4  out.
5    A.  Yes.  Yes.
6    Q.  Second paragraph says "Despite this inability
7  to communicate directly, we believe we have been
8  operating in a professional and conscientious manner."
9    Do you see anything wrong with that in your
10 capacity as a Board of Directors member and/or secretary
11 of the corporation?
12    MR. HARRISON:  Same objections, same
13 instruction.
14    THE WITNESS:  I will follow that instruction.
15    Q.  (BY MR. BAKER)  Looking at the next -- at page
16 0167.
17    Do you have any knowledge, as a Board of
18 Directors member or secretary, that Fisher was, during
19 the time period between October and December of 2014,
20 attempting to gain an agreement with the Pueblo of San
21 Felipe?
22    A.  Any information I would have gotten would have
23 been in any capacity as general counsel.  I don't know
24 that I could differentiate that.  So I will invoke the
25 attorney-client privilege and not answer that question.

---

Page 107

1    Q.  If -- if Mike Moehn says that he provided this
2  presentation on behalf of Fisher Sand & Gravel, would
3  you have any basis to refute that as a Board of
4  Directors member or a secretary?
5    A.  No.
6    Q.  And as a Board of Directors member and/or
7  secretary, then, if Mr. Moehn provided this -- says he
8  provided this to the Pueblo of San Felipe, would that be
9  a violation of the paragraph 3 of Exhibit 10?
10    MR. HARRISON:  I'm going to object and
11 instruct the witness not to answer on the basis of the
12 attorney work product doctrine.
13    Q.  Would you have any basis to believe, as a
14 Board of Directors member or secretary, that that was
15 not a violation -- that it was not a violation of
16 paragraph 3 of the lease -- of the Exclusive Supply
17 Agreement to provide this to the Pueblo of Santa Fe if
18 it was provided between October and December of 2014?
19    MR. HARRISON:  Same objection, same
20 instructions.  To the extent you're limited only to the
21 Board of Directors position, I also object on the basis
22 of foundation.
23    Q.  (BY MR. BAKER)  And based on your
24 participation in the Board of Directors -- well, first
25 of all, are you going to take that instruction?

---

Page 108

1    A.  Yes.
2    Q.  All right.
3    Based upon your position as a Board of
4  Directors member, chief administrative officer and
5  secretary of the corporation, if Mr. Moehn provided this
6  to the Pueblo of San Felipe between October 1st, 2014,
7  and December 31st, December 14 (sic), would you have any
8  reason to believe that's not a violation of paragraph 3
9  of the Exclusive Supply Agreement?
10    MR. HARRISON:  Same objection, same
11 instruction, instruct Mr. Priebe to not answer.
12    Q.  (BY MR. BAKER)  Are you going to take that
13 instruction?
14    A.  Yes.
15    Q.  Showing you what we'll mark -- what has been
16 previously marked -- I'm sorry -- as Exhibit 16.
17    MR. HARRISON:  Thank you.
18    Q.  (BY MR. BAKER)  Can you identify this as a
19 Proposed Exclusive Aggregate Lease Agreement Exclusive
20 Sales Agreement between -- submitted to the Pueblo of
21 San Felipe by Mike Moehn on or about October 20th, 2014?
22    A.  That is what the document says.
23    Q.  Have you seen this document before?
24    MR. HARRISON:  Same objection, instruct
25 Mr. Priebe not to answer on the basis of the attorney

---

Page 109

1  work product doctrine.
2    Q.  (BY MR. BAKER)  Did you approve it to be sent
3  to the Pueblo of San Felipe?
4    MR. HARRISON:  I'm going to object on the
5  basis of the attorney-client privilege and the attorney
6  work product doctrine, instruct Mr. Priebe to not answer
7  this question.
8    Q.  Is there anything in this document that you
9  believe is inaccurate?
10    MR. HARRISON:  Same objections, same
11 instruction.
12    Q.  (BY MR. BAKER)  Is there anything in this
13 document, as a board member and secretary, that you
14 believe -- in this document that you believe is
15 inaccurate?
16    MR. HARRISON:  Same objections, same
17 instruction, also object on foundation.
18    Q.  (BY MR. BAKER)  Go ahead and answer.
19    A.  I'll take the instruction from Mr. Harrison.
20    Q.  Okay.
21    You better keep it in front of you.  We may
22 have --
23    A.  Okay.
24    Q.  I think there's -- yeah.  On the second page
25 of the document, which is, I believe, Bates number 0184.

28 (Pages 106 to 109)

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

Page 110

1      A.  Yes.
2      Q.  All right.
3          As a Board of Directors member and secretary
4  of the corporation and chief administrative officer, I
5  want you to read the first paragraph under Background
6  and tell me if there's anything in that paragraph that
7  you believe is untrue.
8          MR. HARRISON:  I'm going to object on the
9  basis of the attorney work product doctrine and instruct
10 Mr. Priebe to not answer that question.
11     Q.  (BY MR. BAKER)  Do you see the words that --
12 are you going to take that instruction?
13     A.  Yes.  Yes, sir.
14     Q.  All right.
15         It says "In 2007, Fish -- Fisher Sand & Gravel
16 (Fisher) entered into an agreement with Bar J to mine
17 and sell materials from the subject sand and gravel pit,
18 located on the lands of San Felipe, east of I-25.  That
19 agreement did not allow Fisher to have direct
20 communication with the Pueblo.  As a result, all
21 communications were through Bar J.  Other than this
22 agreement, which is set to expire upon the termination
23 of the Bar J lease with the Pueblo, Fisher has no
24 business affiliation with Bar J."
25         As a Board of Directors member, secretary

Page 111

1  and/or chief administrative officer, are you aware of
2  any other agreement between Fisher Sand & Gravel and Bar
3  J other than the one that was entered into in 2007?
4          MR. HARRISON:  Same objections, same
5  instruction.
6      Q.  (BY MR. BAKER)  Are you going to take that
7  instruction?
8      A.  Yes.
9      Q.  Would you have been involved at all in any of
10 your capacities with regard to projected reserves with
11 regard to the San Felipe Pueblo?
12     A.  Probably not.
13     Q.  Was the Board of Directors of Fisher Sand &
14 Gravel ever asked whether it would approve a lease
15 between the Pueblo of San Felipe and Fisher?
16     A.  I don't recall.
17     Q.  One way or the other?
18     A.  No.  No.
19     Q.  Is that correct?
20     A.  Yes.
21     Q.  You don't remember one way -- or don't recall
22 one way or the other whether the board was ever asked?
23     A.  That's correct.
24     Q.  All right.
25         If the Board of Directors had been asked, what

Page 112

1  would your position have been?
2          MR. HARRISON:  Object to form.
3          THE WITNESS:  Hypothetical.  I don't think I
4  could answer without knowing what specifically was
5  asked.
6      Q.  (BY MR. BAKER)  Well, knowing that there's
7  a -- there was a probe -- a paragraph in the Exclusive
8  Supply Agreement that indicated you weren't to directly
9  contact them, what would your vote be?
10         MR. HARRISON:  Object to form.
11     Q.  (BY MR. BAKER)  As a Board of Directors
12 member.
13     A.  I don't think I can differentiate my Board of
14 Directors role with my attorney role.  So I think any
15 thoughts I'd have on that would be protected by the
16 attorney-client privilege.
17     Q.  Because any thoughts that you would have as a
18 Board of Directors member would be guided by your
19 background as an attorney, correct?
20     A.  I don't know if that's accurate.
21     Q.  Well, I'm trying to understand your answer,
22 and that's the way I understood it.
23     A.  Okay.
24     Q.  So tell me how I'm wrong.
25     A.  I have a role at Fisher Sand & Gravel Company

Page 113

1  as their general counsel.
2      Q.  Sure.
3      A.  Things that I do for them as general counsel
4  are protected by the attorney-client privilege.
5      Q.  Sure.
6      A.  What I'm saying in response to your question
7  is I would have to get information that I obtained or
8  thoughts I had as the attorney to answer your question,
9  and I can't do that because it's protected by the
10 privilege.
11     Q.  Well, certainly, if the Board of Directors
12 had -- was asked to give a position on something, you,
13 as the attorney, would provided all of your guidance as
14 an attorney; correct?
15     A.  Yes.
16     Q.  Before it would vote?
17     A.  Yes.
18     Q.  So is that any different from having the
19 knowledge as the attorney and then being asked as a
20 Board of Directors member to vote on that?
21     A.  I'm not sure I understand the distinction
22 you're trying to make.
23     Q.  I'm not trying to make a distinction.
24         I'm trying to say that if you would have
25 provided every other independent Board of Directors

29  (Pages 110 to 113)

Tim Priebe                                    Bar J Sand & Gravel vs.
5/8/2017                                                    Fisher Sand

| Page 114 |
| --- |

1  member your advice as counsel --
2      A.  Right.
3      Q.  -- on it, you would have that same advice as a
4  Board of Directors member because you've gained that
5  knowledge as the attorney.  So, of course, your vote
6  would be guided by legal counsel --
7      A.  Sure.
8      Q.  -- in part.
9        So I'm asking you again, as a Board of
10 Directors member, if you had been asked to agree to a
11 proposal between the Pueblo of San Felipe and Fisher,
12 would you have voted yes or no?
13     A.  I can't say without knowing the details.
14     Q.  What details do you need to know?
15     A.  You're asking a hypothetical, if something --
16 if I would have been asked something as a Board of
17 Directors member.
18     Q.  All right.  Let's look at Exhibit -- the one
19 that's right in front of you.
20       If that was the proposal, would you have voted
21 yes or no?
22       MR. HARRISON:  Object to form.
23       THE WITNESS:  I don't know that this would
24 even go to the board.
25     Q.  (BY MR. BAKER)  That's not my question.

| Page 115 |
| --- |

1  Please answer it.
2      A.  Well, if it doesn't go to the board, I
3  wouldn't have to vote yes or no.  My role as a general
4  counsel --
5      Q.  You said you didn't remember.
6        So I'm asking you if this is the proposal that
7  went to the board.
8        Now, would you please answer?
9        MR. HARRISON:  Object to form.
10       THE WITNESS:  If this was the proposal that
11 went to the board --
12     Q.  (BY MR. BAKER)  Yes.
13       Would you have voted yea or nay?
14     A.  On what?  Whether to send it?
15     Q.  No.  Whether to accept it.  If the pueblo was
16 agreeable, would you have done it?
17       MR. HARRISON:  Object to form.
18       THE WITNESS:  I would have relied on what Mike
19 Moehn would have told me.  And I don't recall any
20 discussions on that.  And that would have guided me, I
21 believe.  It Mike -- if Mike was okay with it, I would
22 have been okay with it, because he's the operations guy.
23     Q.  (BY MR. BAKER)  And the advice that Mr. Moehn
24 would have given you would have been whether the terms
25 are good or bad; is that a fair statement?

| Page 116 |
| --- |

1      A.  Yeah.  He would have given me the business
2  advice as to whether --
3      Q.  Sure.
4      A.  -- this was good for Fisher.  Yes.
5      Q.  Sure.
6        Looking at paragraph 1 of the -- of
7  Exhibit 10, if you would.
8        There is an Exclusive Sale Agreement with
9  certain minimums of purchase.
10       Do you see that?
11     A.  Yes.
12     Q.  All right.  Some of the things are -- are
13 blanked out.  I'm not sure exactly why, but they were.
14     Do you understand that there are certain
15 agreements where Fisher has agreed to do certain minimum
16 productions or -- or purchases in a particular year in
17 order to gain an exclusive sale agreement?
18     MR. HARRISON:  I'm going to object and
19 instruct the witness not to answer on the basis of the
20 attorney work product doctrine and the attorney-client
21 privilege.
22     Q.  (BY MR. BAKER)  Do you have any understanding
23 that Fisher has such agreements?
24       MR. HARRISON:  Same -- same objection, same
25 instruction.

| Page 117 |
| --- |

1      Q.  (BY MR. BAKER)  Are you going to take those
2  instructions?
3      A.  Yes.
4      Q.  Do you understand the purpose of having
5  minimums coincident with an exclusive sale agreement?
6        MR. HARRISON:  Same objection, same
7  instruction.
8      Q.  (BY MR. BAKER)  Are you going to take that
9  instruction?
10     A.  Yes.
11     Q.  So as a Board of Directors member, you really
12 don't know anything about the contracts that Fisher Sand
13 & Gravel has with people?
14       MR. HARRISON:  Object to form.
15     Q.  (BY MR. BAKER)  Is that fair?
16     A.  No.
17     Q.  All right.
18     A.  I don't think that's fair.
19     Q.  So at -- does Fisher have any other exclusive
20 sales agreements with minimums in it?
21     A.  They may have.
22     Q.  Are you aware of any?
23       MR. HARRISON:  Object and instruct the witness
24 not to answer unless he can answer that without relying
25 on information he learned as Fisher's general counsel.

HUGHES SOUTHWEST COURT REPORTERS                    505-843-8211
110 2nd Street, SW, Suite 602          Albuquerque, New Mexico 87102

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

---

Page 118

1    Q.  (BY MR. BAKER)  Do you know whether it's
2  been -- oh, go ahead.
3    A.  I -- I think Fisher has had those in the past.
4  I'm not aware of any current ones.
5    Q.  Was there a decision by the board or
6  management of the company to not do that anymore?
7    A.  Not to my knowledge.
8    Q.  Do you know in general the business reasons
9  why someone would want -- someone like Fisher would want
10  an exclusive right to operate and purchase from a
11  particular supplier?
12       MR. HARRISON:  Instruct the witness not to
13  answer unless he can do that without implicating his
14  knowledge as general counsel.
15       MR. BAKER:  I'm asking him if he knows the
16  business reasons, not -- not -- nothing about legal
17  reasons.  Business reasons.  Does he understand it as a
18  Board of Directors member, secretary and chief
19  administrative officer.
20       THE WITNESS:  Yes.
21    Q.  (BY MR. BAKER)  What are those benefits, as
22  you understand it?
23    A.  The benefits to having --
24    Q.  An exclusive --
25    A.  -- minimums --

---

Page 119

1    Q.  An exclusive sales -- exclusive purchase
2  agreements.
3    A.  Well, from both sides, from the owner of the
4  pit, you're giving up the right to have somebody else
5  come in there, but in return for that, you're
6  guaranteeing a minimum.  That's the general concept, I
7  think, besides the business reasons.
8    Q.  Yes.  Okay.  Thank you.
9       Looking at paragraph 4.
10       From a business perspective, is it a normal
11  option type of term?
12       MR. HARRISON:  Object to form.
13       THE WITNESS:  Excuse me.  You're referring
14  to -- you said paragraph 4 or paragraph 4?
15    Q.  (BY MR. BAKER)  Paragraph -- I -- I'm sorry.
16  Paragraph 4 on page 4.
17    A.  Paragraph 4.  Okay.
18       Excuse me, Mr. Baker.  What was your question?
19  I'm trying --
20    Q.  My question was, does this appear to be from a
21  business perspective a normal option term?
22       MR. HARRISON:  Object to form again.
23       THE WITNESS:  I would say the first part is
24  probably normal.
25    Q.  (BY MR. BAKER)  Where does the first part go

---

Page 120

1  up to?
2    A.  Well, the fact you usually have a specified
3  term of years, you have some information on what the
4  renewal term is and so forth.  The means by which you
5  exercise the renewal, that is not uncommon.
6    Q.  Okay.
7    A.  I think this sentence, "In all matters
8  relating to the renewal Customer will contact and
9  negotiate exclusively with Supplier," (as read) that --
10  that's a little unusual in this situation, I think.
11    Q.  Fair enough.
12       How about the last --
13    A.  Yeah.  I think that -- I don't think that's
14  out of the ordinary, the last one.  Basically the
15  renewal would be subject to the same terms except if you
16  renegotiate other terms.  That seems reasonable to me.
17    Q.  All right.  All right.
18       As -- in -- in any of your capacities, are you
19  aware of any other option to renew that Fisher has not
20  exercised in a timely fashion but yet continued to
21  operate?
22       MR. HARRISON:  Object and instruct the witness
23  not to answer unless he can do that without implicating
24  knowledge as general counsel.
25    Q.  (BY MR. BAKER)  Are you going to take that

---

Page 121

1  instruction?
2    A.  I'm trying to think if there's anything that I
3  would know outside of my capacity as general counsel,
4  and I can't think of any information that I would have.
5  So I will take the instruction.
6    Q.  Can you tell by looking at page 2 -- at pages
7  2 and 3 whether the minimums were specified for the
8  renewal term of -- of the option?
9       MR. HARRISON:  I'm going to object and
10  instruct the witness not to answer.
11       MR. BAKER:  I'm just asking him to look at it
12  right now --
13       MR. HARRISON:  Understood.
14       MR. BAKER:  -- and asking him if he can tell
15  whether the minimums are set forth for the renewal term.
16       MR. HARRISON:  Understood.  Same instruction
17  on the basis of attorney work product.
18    Q.  (BY MR. BAKER)  Are you going to take that
19  instruction?
20    A.  Yes.  Yes.
21    Q.  Even though I've asked you to do the exercise
22  right here as a witness.
23    A.  Yes.
24    Q.  And you are the secretary of the corporation,
25  correct?

---

HUGHES SOUTHWEST COURT REPORTERS
110 2nd Street, SW, Suite 602

505-843-8211
Albuquerque, New Mexico 87102

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

---

Page 122

1       A.  And the general counsel.
2       Q.  And you are a Board of Directors member?
3       A.  Yes.
4       Q.  All right.
5       You are secretary, correct?
6       A.  Yes.
7       Q.  And you are the chief administrative officer,
8    correct?
9       A.  Yes.
10      Q.  All right.
11      And you refuse based on attorney-client
12   privilege to answer that?
13      A.  Yes.
14      MR. HARRISON:  The objection was work product.
15      Q.  (BY MR. BAKER) You object on work product
16   basis?
17      A.  I'm following my attorney's advice.
18      Q.  All right.  Whatever the instruction is,
19   you're following it?
20      A.  I think he delineated what the objection was.
21      Q.  Right.
22      A.  I don't know if you're playing with the words,
23   but it was attorney-client privilege and work product.
24      Q.  Oh, okay.
25      Looking at page 9, at the top.

---

Page 123

1       And I will tell you that this is under
2    paragraph 6 which starts on page 7.
3       A.  Okay.
4       Q.  Subpart A, the very end of subpart A, and
5    there may be a sub subpart A there.
6       But it says "The Payments to be applicable
7    during the Renewal Term shall be subject to
8    renegotiation by the parties, provided that in no event
9    shall the Payment be lower during the Renewal Period
10   than it is on the date the Renewal Period begins, and
11   the rate shall be escalated each January 1st based
12   on" -- it doesn't say.
13      A.  Okay.
14      Q.  It's been whited out.
15      Is that a normal term?
16      MR. HARRISON:  Object to form.
17      Q.  (BY MR. BAKER) From your understanding, a
18   normal business term of an agreement?
19      A.  I guess outside of what I've done in a legal
20   capacity, I don't recall ever seeing a term like this
21   before in the Fisher contracts.
22      Q.  But if Fisher agreed to such a term, would you
23   have any reason to think that it's an improper term,
24   based on your business understanding?
25      A.  No.

---

Page 124

1       Q.  Looking at page 21, paragraph 17 of the
2    Exclusive Supply Agreement, looking at the second
3    sentence that begins with the term -- the word
4    "Customer."
5       Are you with me?
6       A.  Yes.
7       Q.  "Customer acknowledges that any information of
8    any type which Customer has received or may receive from
9    Supplier is furnished on the express condition that the
10   customer shall make an independent verification of the
11   accuracy of such information, all such information being
12   furnished without any warranty whatsoever, except as
13   expressly set forth in this Agreement."
14      Is there anything about that sentence that you
15   do not understand?
16      MR. HARRISON:  Object to the form, instruct
17   the witness not to answer on the basis of the attorney
18   work product doctrine.
19      Q.  (BY MR. BAKER) Are you going to answer?
20      A.  No.
21      Q.  So you're not going to tell me, reading it
22   here today, if there's anything you don't understand.
23   And I'm asking you in your capacity as secretary, chief
24   administrative officer and Board of Directors member.
25      Is there anything you don't understand in this

---

Page 125

1    sentence?
2       MR. HARRISON:  Same objection, same
3    instruction.
4       Q.  (BY MR. BAKER) Are you going to take --
5       A.  I'm heeding his advice because I don't know
6    how in reading this I cannot differentiate my attorney
7    role.
8       Q.  I'm just asking you is there anything you
9    don't understand about it.  I'm not asking you anything
10   you've thought of in the past, anything you've done in
11   the past.
12      I'm asking you as the secretary of the
13   corporation, the chief administrative officer and the --
14   and a board member, is there anything you don't
15   understand about that sentence?
16      MR. HARRISON:  Same objection, same
17   instruction.
18      Q.  (BY MR. BAKER) Are you going to take that
19   instruction?
20      A.  Yes.
21      Q.  All right.
22      Looking at paragraph 35 -- I mean page 35,
23   paragraph 24.
24      A.  Okay.
25      Q.  And I want you to focus on B.  That starts on

---

HUGHES SOUTHWEST COURT REPORTERS
110 2nd Street, SW, Suite 602

505-843-8211
Albuquerque, New Mexico 87102

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

---

Page 126

1  the very bottom of the page and goes over to the top.
2       A.  Okay.
3       Q.  And I'll ask you the same question about that
4  paragraph.  Read it to yourself, if you would, and then
5  answer for me as secretary, Board of Directors member
6  and chief administrative officer if there's anything in
7  that provision you don't understand.
8       MR. HARRISON:  Same objection, same
9  instruction.
10      THE WITNESS:  Okay.
11      Q.  (BY MR. BAKER)  Are you --
12      A.  I will follow the instruction.  Yes.
13      Q.  All right.
14      Going back to paragraph 3.
15      A.  Page?
16      Q.  That's on page 4.
17      A.  Okay.
18      Q.  I'd like you to read that paragraph to
19  yourself -- or the two paragraphs that are contained as
20  3, and ask if there's anything there you don't
21  understand as secretary, chief administrative officer
22  and board member of Fisher Sand & Gravel.
23      MR. HARRISON:  Same objection, same
24  instruction.
25      Q.  (BY MR. BAKER)  Are you going to take that

---

Page 127

1  instruction?
2       A.  Yes.  Yes.
3       Q.  I won't make you read it, then.
4       MR. HARRISON:  I thought about making you
5  wait, but -- it's almost lunch.
6       MR. BAKER:  I -- I assure you, I'm not going
7  to use the eight hours.
8       Go ahead.
9       MR. HARRISON:  Four.
10      MR. BAKER:  Why four?
11      MR. HARRISON:  Limited by the Court.
12      MR. BAKER:  As to what?
13      MR. HARRISON:  As to depositions.  You only
14  get four hours.
15      MR. BAKER:  That's not true.
16      MR. HARRISON:  That is in the Court's
17  scheduling order.
18      MR. BAKER:  What does it say?
19      MR. HARRISON:  It says anyone other than a
20  party is four hours.
21      MR. BAKER:  Well, he's a party.
22      MR. HARRISON:  He isn't a party.
23      MR. BAKER:  He is the secretary.
24      MR. HARRISON:  Absolutely not.  This is a
25  four-hour deposition.

---

Page 128

1       MR. BAKER:  All right.  I disagree with you,
2  but we can take it to the Court if we need to.
3       MR. HARRISON:  Absolutely.
4       The parties are 30(b)(6) witnesses.  You had
5  eight with Mr. Moehn.  Everyone else is four.
6       Q.  (BY MR. BAKER)  Looking at Exhibit -- looking
7  at what's previously been marked as Exhibit 9.
8       A.  Okay.
9       MR. HARRISON:  Thank you.
10      Q.  (BY MR. BAKER)  Have you seen this before?
11      MR. HARRISON:  Same objections.  I'm going to
12  instruct the witness not to answer on the basis of the
13  attorney work product doctrine and instruct him not to
14  answer.
15      MR. BAKER:  It's work product, and you're
16  instructing him not to answer?
17      MR. HARRISON:  That's correct.  Whether he did
18  or did not review E-mails and letters is work product.
19      MR. BAKER:  I've asked if he's seen this
20  before.
21      MR. HARRISON:  Right.  And whether or not he
22  has seen it is work product.
23      Q.  (BY MR. BAKER)  Did you have any input into
24  the Amendment to Exclusive Supply Agreement that was
25  sent as a proposal, proposed amendment, back in May

---

Page 129

1  of 2013?
2       MR. HARRISON:  On that one, I'll object on the
3  basis of the attorney-client privilege and the attorney
4  work product doctrine and instruct Mr. Priebe to not
5  answer.
6       Q.  (BY MR. BAKER)  As secretary and Board of
7  Directors member, were you made aware of this proposed
8  amendment?
9       MR. HARRISON:  Same objections.
10      If you can answer without relying on what you
11  learned as general counsel, go ahead.
12      THE WITNESS:  I cannot answer without relying
13  on what I obtained as information as general counsel.
14  So I will take your instruction and not answer.
15      Q.  (BY MR. BAKER)  So you are refusing to answer
16  whether or not you looked at this before it was tendered
17  to Bar J Sand & Gravel and whether you had any input
18  into it; is that correct?
19      MR. HARRISON:  Object to the form.
20      THE WITNESS:  Taking my insurance -- my
21  attorney's advice and not answering.
22      MR. BAKER:  All right.
23      Q.  Looking at Exhibit -- what's previously been
24  marked as Exhibit 13.
25      Same -- same question.  Have you seen this

---

33 (Pages 126 to 129)

Tim Priebe                                          Bar J Sand & Gravel vs.
5/8/2017                                                      Fisher Sand

Page 130

1  before?
2          MR. HARRISON:  Same objection.
3          Q.  (BY MR. BAKER)  Did you review it -- are
4  you going to take -- well, it's an objection.
5          Have you seen it before?
6          MR. HARRISON:  Same objection and instruction.
7          Q.  (BY MR. BAKER)  Are you going to take that
8  instruction?
9          A.  Yes.
10         Q.  All right.
11         Did you authorize this to be sent?
12         MR. HARRISON:  Same objection, same
13  instruction.
14         Q.  (BY MR. BAKER)  Are you going to take the
15  instruction?
16         A.  Yes.
17         Q.  Even as to whether you authorized it?
18         A.  Yes.
19         Q.  All right.
20         Is there anything in there -- in here that is
21  untruthful?
22         MR. HARRISON:  I'm going to instruct the
23  witness not to answer on the basis of the
24  attorney-client privilege and the attorney work product
25  doctrine.

Page 131

1          Q.  (BY MR. BAKER)  Are you going to take that
2  instruction?
3          A.  Yes.
4          (Exhibit 83 marked.)
5          Q.  (BY MR. BAKER)  Showing you what I've
6  marked -- it may be previously marked, but I don't
7  remember a number -- 83.
8          Have you ever seen this invoice before?
9          MR. HARRISON:  Same objection, same
10  instruction.
11         Q.  (BY MR. BAKER)  Were you provided it in -- are
12  you going to take that instruction?
13         A.  Yes.  Yes.
14         Q.  Were you ever provided in any capacity as --
15  at Fisher Sand & Gravel?
16         MR. HARRISON:  Same objection, same
17  instruction.
18         Q.  (BY MR. BAKER)  Are you going to take that --
19         A.  Yes.
20         Q.  -- instruction?
21         Did you have any understanding of whether this
22  should be paid or not --
23         MR. HARRISON:  Same --
24         Q.  (BY MR. BAKER)  -- at any point in time?
25         MR. HARRISON:  Same objection, same

Page 132

1  instruction.
2          Q.  (BY MR. BAKER)  Is it your position on the
3  Board of Directors or -- or as secretary or chief
4  administrative officer that Fisher should not pay bills
5  that it is -- it is billed in accordance with a supply
6  agreement?
7          MR. HARRISON:  Object, unless you can answer
8  that without knowledge you gained as general counsel.
9          Q.  (BY MR. BAKER)  Let me -- let me rephrase it.
10         A.  Okay.
11         Q.  As a secretary, chief administrative officer
12  or as Board of Directors member, would you tell anyone
13  in the corporation not to pay bills that are legally
14  owed under a supply agreement?
15         MR. HARRISON:  Object to form.
16         THE WITNESS:  It depends on the circumstances.
17  If they're truly legally owed, that would be a
18  determination I would make as general counsel and
19  provide that advice to the board.  So that would be
20  privileged.
21         In general, the corporation should pay bills
22  that it's obligated to pay.
23         THE VIDEOGRAPHER:  Mr. Harrison, can I have
24  you move your chair a little bit to your left?
25         MR. HARRISON:  Was I infringing on --

Page 133

1          MR. BAKER:  I am going to take a 10-minute
2  break.
3          MR. HARRISON:  Thank you.
4          THE VIDEOGRAPHER:  The time is 11:51.
5          MR. BAKER:  But I would like to continue with
6  the deposition, because I think we'll finish --
7          MR. HARRISON:  Okay.
8          THE VIDEOGRAPHER:  The time is 11:51.
9          MR. BAKER:  -- without taking a lunch.
10         THE VIDEOGRAPHER:  We are now off the record.
11         (Proceedings in recess.)
12         THE VIDEOGRAPHER:  We are now on the record.
13  The time is 12:00 p.m.
14         Q.  (BY MR. BAKER)  To the best of your knowledge,
15  was Mr. Moehn or Mr. Olson ever disciplined for their
16  conduct with regard to following or not following the
17  Exclusive Supply Agreement between Bar J Sand & Gravel
18  and Fisher Sand & Gravel?
19         MR. HARRISON:  Object and instruct the witness
20  not to answer on the basis of attorney-client privilege
21  and attorney work product doctrine.
22         Q.  (BY MR. BAKER)  As a board member, secretary
23  of the corporation or as chief administrative officer,
24  are you aware of whether or not Mr. Moehn and Mr. Olson
25  were disciplined by Fisher as it pertains to or relates

34  (Pages 130 to 133)

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

---

Page 134

```
 1    to the Bar J contract?
 2         MR. HARRISON:  Same objection, same
 3    instruction.
 4         Q.  (BY MR. BAKER)  Are you going to take those
 5    instructions?
 6         A.  Yes.
 7         Q.  Does Fisher Sand & Gravel acknowledge and
 8    recognize it has a reclamation obligation with regard to
 9    the San Felipe mine?
10         MR. HARRISON:  Same objection, same
11    instruction.
12         MR. BAKER:  What's the basis for that?
13         I'm asking him as a board member and secretary
14    of the corporation and chief administrative officer.
15         Q.  Do you recognize you have an obligation to
16    reclaim the property at the San Felipe Pueblo?
17         MR. HARRISON:  Same objection, same
18    instruction.
19         Q.  (BY MR. BAKER)  Are you going to take that
20    instruction?
21         A.  Yes.
22         Q.  Do you know what the statute of frauds is?
23         MR. HARRISON:  Same objection, same
24    instruction.  He's Fisher's general counsel.  You're
25    asking --
```

---

Page 135

```
 1         Q.  (BY MR. BAKER)  Are you going to take that --
 2    you're going to take that instruction?
 3         I -- I'm not asking for any attorney-client
 4    privilege or work product, I hope.
 5         A.  It's asking for a legal opinion, basically
 6    your -- my knowledge of statute of frauds.
 7         Q.  I'm asking you as a person who has gone
 8    through --
 9         A.  Generally, yes.
10         Q.  -- a law -- a law school, do you know what the
11    statute of frauds is?
12         A.  Yes.
13         Q.  And tell me what it is.
14         MR. HARRISON:  I'm going to object and
15    instruct the witness not to answer.  You're now asking
16    him to give his legal opinion as to what the statute of
17    frauds is.
18         MR. BAKER:  I'm asking him to give his
19    knowledge as a Board of Directors member and a secretary
20    of the corporation.
21         Q.  Can you do that?
22         MR. HARRISON:  Same objection.
23         Instruct you not to answer on the basis of
24    work product.
25         Q.  (BY MR. BAKER)  Are you going to take that
```

---

Page 136

```
 1    instruction?
 2         A.  Yes.
 3         Q.  Do you know what a waiver is?
 4         MR. HARRISON:  Same objection, same
 5    instruction.
 6         Q.  (BY MR. BAKER)  Are you going to take that
 7    instruction?
 8         A.  Yes.
 9         Q.  Did you ever learn in law school what a waiver
10    of a contractual right is?
11         A.  I assume I did.
12         Q.  You assume it, or do you know?
13         A.  That's what they taught us.
14         Q.  All right.
15         Can you tell me what you learned?
16         MR. HARRISON:  I'm going to object and
17    instruct the witness not to answer on the basis of the
18    attorney work product doctrine.
19         Q.  (BY MR. BAKER)  Do you have any knowledge of
20    whether a contract can be renewed by holding over?
21         MR. HARRISON:  Same objection, same
22    instruction.
23         Q.  (BY MR. BAKER)  Are you going to take that
24    instruction?
25         A.  Yes.
```

---

Page 137

```
 1         Q.  Is Fisher relying on any advice of counsel
 2    with regard to any position it's taking in this case?
 3         MR. HARRISON:  Same objection, same
 4    instruction.
 5         Q.  (BY MR. BAKER)  I'm asking you now clearly not
 6    as legal counsel.
 7         As a Board of Directors member and secretary,
 8    are you taking -- are you relying on advice of counsel
 9    for any position you're taking?
10         MR. HARRISON:  Same objection, same
11    instruction.
12         Q.  (BY MR. BAKER)  Are you going to take that --
13         A.  Yes.
14         Q.  -- instruction?
15         Well, then, let me ask you, what advice --
16    what positions is Fisher relying on advice of counsel on
17    in this litigation?
18         MR. HARRISON:  Object to form, same objection,
19    same instruction.
20         Q.  (BY MR. BAKER)  Are you going to take that
21    instruction?
22         A.  Yes.
23         Q.  So as a board member and secretary, are you
24    aware of any position that Fisher is taking that it is
25    relying on the advice of counsel?
```

---

35 (Pages 134 to 137)

Tim Priebe
5/8/2017

Bar J Sand & Gravel vs.
Fisher Sand

---

Page 138

1    MR. HARRISON:  Same objection, same
2 instruction.
3    Q.  (BY MR. BAKER) Are you going to take that
4 instruction?
5    A.  Yes.
6    Q.  Have you discussed your testimony today with
7 anyone?
8    MR. HARRISON:  Object to form.
9    THE WITNESS:  I visited with --
10    MR. HARRISON:  Object to the extent this calls
11 for attorney-client communications.
12    Q.  (BY MR. BAKER) Other than lawyers.
13    A.  No.
14    Q.  What did you do to prepare for this
15 deposition?
16    A.  Met with Mr. Harrison.
17    Q.  How long?
18    A.  Hour-and-a-half maybe.
19    Q.  Okay.
20    Anything else?
21    A.  I glanced at some of Moehn and Tommy Fisher's
22 depositions.
23    Q.  What was the purpose of that?
24    A.  Just to refresh my recollection a little bit
25 on some of the things I might be asked.

---

Page 139

1    Q.  When did you do that review?
2    A.  On the airplane ride down.
3    Q.  And -- and when did you come down?
4    A.  Yesterday.
5    Q.  Was there anything in particular you were
6 looking for --
7    A.  No.
8    Q.  -- in those depositions?
9    A.  No.
10    Q.  You were present at Mr. Fisher's deposition?
11    A.  Yes.
12    Q.  Were you present at Mr. Moehn's deposition?
13    A.  No.
14    Q.  Okay.
15    Had you reviewed Mr. Moehn's deposition
16 prior -- previously?
17    A.  I may have reviewed parts of it.  I don't
18 recall.
19    Q.  Is Fisher taking the position in this lawsuit
20 that it did not renew and exercise its option?
21    MR. HARRISON:  I'm going to object and
22 instruct the witness not to answer on the basis of the
23 attorney work product doctrine.
24    Q.  (BY MR. BAKER) I'm asking you as a Board of
25 Directors member, secretary of the corporation and chief

---

Page 140

1 administrative officer, is Fisher taking the position
2 that it did not renew the Exclusive Supply Agreement,
3 exercising its option in 2012?
4    MR. HARRISON:  Same objection, same
5 instruction.
6    Q.  (BY MR. BAKER) Are you going to take that?
7    A.  Yes.
8    MR. BAKER:  I'm done.
9    MR. HARRISON:  We will read and sign.
10    MR. BAKER:  Okay.
11    THE WITNESS:  Okay.
12    THE VIDEOGRAPHER:  The time is 12:06 p.m.  We
13 are now off the record.
14    (Proceedings adjourned at 12:06 p.m.)
15
16
17
18
19
20
21
22
23
24
25

---

Page 141

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF NEW MEXICO
2
3    No. CV-2015-00228-SCY/KK
  BAR J SAND & GRAVEL, INC.,
4 a New Mexico corporation,
5    Plaintiff,
6
7    vs.
8 FISHER SAND & GRAVEL CO.,
  a North Dakota corporation, doing business
  in New Mexico through its division
9 SOUTHWEST ASPHALT & PAVING,
10    Defendant.
11    REPORTER'S CERTIFICATE
12    I, CHERYL ARREGUIN, RPR, New Mexico CCR No. 21, DO
13 HEREBY CERTIFY that on May 8, 2017, the deposition of
14 TIM PRIEBE was taken before me at the request of, and
15 sealed original thereof retained by:
16    For the Plaintiff:
        DOUGLAS A. BAKER
17    ATKINSON, BAKER & RODRIGUEZ, PC
        Attorneys at Law
18    201 Third Street, Northwest
        Suite 1850
19    Albuquerque, New Mexico  87102
20    I FURTHER CERTIFY that copies of this certificate
21 have been mailed or delivered to all counsel and parties
22 to the proceedings not represented by counsel appearing
23 at the taking of the deposition.
24    I FURTHER CERTIFY that examination of this
25 transcript and signature of the witness were required by

---

36  (Pages 138 to 141)