IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BAR J SAND & GRAVEL, INC.,
a New Mexico corporation,

    Plaintiff,

v.                                                                                                                                              No. Civ. 15-228 SCY/KK

FISHER SAND & GRAVEL CO.,
a North Dakota corporation, doing business
in New Mexico through its division
SOUTHWEST ASPHALT & PAVING,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff Bar J Sand & Gravel, Inc's ("Bar J") Motion to Dismiss and for Partial Summary Judgment on Defendant Fisher Sand & Gravel Co.'s ("Fisher") Claims. Doc. 105. In this motion, Bar J seeks dismissal or the grant of summary judgment in its favor on Fisher's counterclaims that "some other contract beside the ESA governed the parties' relationship after June 28, 2012 or that the ESA was modified." *Id*. at 1. For the reasons set forth below, the Court grants the motion.

## I.    Background

    *a. Fisher's Amended Counterclaims*

On July 22, 2015, Fisher filed amended counterclaims for intentional or negligent misrepresentation (Count I), violation of the New Mexico Unfair Practices Act (Count II), breach of contract (Counts III, IV, VII), breach of the duty of good faith and fair dealing (Count V), declaratory judgment (Count VI) and fraudulent inducement (Count VIII). *See* Doc. 46 at 13-41. In the motion at issue before the Court, Bar J seeks dismissal or summary judgment on Fisher's breach of contract counterclaims. These claims (Counts III, IV, VII) are as follows:

1

Count III: Fisher alleges that it entered into an express or implied agreement with Bar J that was effective on June 29, 2012 – the day after the ESA expired. Doc. 46 at ¶ 155. This new agreement, Fisher alleges, obligated it to purchase only 150,000 tons of material each year from Bar J. *Id*. Fisher further states that, despite purchasing more than 150,000 tons in calendar years 2012-2014, Bar J sent invoices to Fisher each of these years seeking payment based on a minimum tonnage requirement above 150,000 tons even though Fisher had not agreed to a minimum tonnage requirement in excess of 150,000 tons. Doc. 46 ¶¶ 156-159. Fisher claims that Bar J acted in bad faith when it invoiced Fisher for minimum tonnages to which Fisher had not agreed. *Id*. ¶ 160. Fisher also alleges that Bar J failed to take reasonable steps to carry out the intent and provisions of the express or implied agreement between the parties by "causing, contributing to, or ratifying Bar J Trucking's failure to make royalty payments to the Pueblo." *Id*. ¶¶ 163-166. Fisher seeks monetary damages, including punitive damages, costs and attorneys' fees. *Id*. ¶¶ 161-162, 167-168.

Count IV: In this alternate breach of contract claim, Fisher alleges that it had an agreement with Bar J to "negotiate in good faith new mandatory minimum tonnage requirements applicable to Fisher's operation of the Mine." *Id*. ¶ 170. Fisher contends that Bar J failed to negotiate in good faith by first "agreeing that the minimum tonnage requirement had been reduced to 150,000 tons but later claiming that it had made no such agreement." *Id*. ¶ 171. Fisher further alleges that in attempting to collect mandatory minimum payments in 2012-2014 that were not due, Bar J breached an "implied contract regarding the operation of the Mine (the terms of which were that Fisher would be permitted to operate the Mine provided that it paid a royalty to Bar J for all Materials purchased) that was created when the parties agreed to negotiate the terms of a more permanent agreement." *Id*. ¶ 174. Fisher seeks damages for Bar J's alleged

breach of the agreement to negotiate in good faith regarding minimum tonnage requirements, for Bar J's "bad faith", and for Bar J's alleged "breach of the implied contract based on course of conduct that was created when the ESA expired and the parties failed to enter into a new agreement." *Id*. ¶¶ 175-177.

Count VII: In this additional alternate breach of contract claim, Fisher alleges that if the Court accepts Bar J's contention that the ESA was renewed, the ESA "was renewed with the modified term that only 150,000 tons of Material needed to be purchased by Fisher each year." *Id*. ¶¶ 201-202. Fisher further alleges that if the ESA was renewed -- whether it was with or without a modification -- Bar J breached the ESA's "Mutual Cooperation Lease" by misrepresenting to Fisher in April 2013 that the Pueblo had renewed the lease, by failing to correct this misrepresentation in August 2014, by failing to advise Fisher of Bar J Trucking's non-payment on the lease, and by causing, contributing to, or ratifying Bar J Trucking's failure to make royalty payments. *Id*. ¶¶ 203-208.

b. *Factual Background*[1]

Fisher alleges that in late 2011 and early 2012, it began experiencing reduced sales volumes in part due to a downturn in the market. *See* Tommy Fisher Depo., January 21, 2016, 49:21-52:25 (Doc. 138-1). Fisher alleges that its president, Tommy Fisher, met with Ted Martinez, vice president of Bar J, in early 2012 to discuss these issues. *Id*. at 51:22-54:8. Mr. Fisher testified that he told Mr. Martinez during this meeting that Fisher was "going to be way off in 2012" with regard to the minimum tonnage requirement, that Fisher expected to purchase "around 150,000 [tons]" in 2012, and that Mr. Martinez told him to "do the best you can." *Id*. at

---

[1] The Court has provided the factual and procedural background of this case in its Memorandum Opinion and Order on Plaintiff Bar J's motion for partial declaratory summary judgment, filed on the same day as the present Order. Therefore, the Court will only provide the pertinent factual history relevant to the motion at issue.

3

52:19-22, 53:13, 53:24-54:1, 160:25-161:2. Mr. Fisher testified that Mr. Martinez informed him that reducing the minimum tonnage requirement going forward would "not [be] an issue . . . because [Bar J] was not paying minimums" to the Pueblo, but that Bar J was unable to "do anything" with regard to royalty rate payments. *Id*. at 154:20-25; 202:24-203:1 (Doc. 136-1). Mr. Fisher testified that he believed Mr. Martinez had agreed to a reduction in the minimum tonnage requirements going forward. *Id*.

Although Mr. Martinez denies telling Mr. Fisher in 2012 that it would be okay to reduce the tonnage requirement to 150,000 tons annually going forward (Martinez Depo. 112:10-18), he testified in his deposition that he did not remember having any conversations regarding the minimums in 2012 (*Id*. 113:16-18), that he did not remember if Mr. Fisher told him in 2012 that Fisher would only continue its relationship with Bar J if the royalty or the mandatory minimums were reduced (*Id*. 110:8-15), did not remember if he told Mr. Fisher that Bar J would reduce the mandatory minimums going forward (*Id*. 110:21-111:23), and did not remember if he told Mr. Fisher that Bar J was not able to renegotiate the mandatory minimums (*Id*. 112:21-24). *See* Ted Martinez Depo., January 19, 2016, (Doc. 136-4).

The Court has now determined that the ESA was not renewed and thus, expired at the end of the initial term on June 28, 2012. The parties do not dispute that Fisher continued its operations on the premises after June 28, 2012. In early 2013, Fisher received an invoice from Bar J for unpaid minimum tonnages during 2012. *See* Fisher Depo. 209:22-210:12 (Doc. 136-1); *see also* Doc. 38-4. This invoice indicated that the minimum tonnage requirement was 400,000 tons, that Fisher removed and paid for approximately 183,764 tons, and that Fisher owed Bar J approximately $564,375 for the 216,235 tons that it was below the minimum. Doc. 38-4. Upon receipt of this invoice, Tommy Fisher reached out to Mr. Martinez. *See* Fisher Depo. 209:22-

210:12 (Doc. 136-1). Mr. Fisher testified that Mr. Martinez told him that the invoice was sent in error, that he would take care of it, and that he reconfirmed the parties had agreed to a reduced tonnage requirement of 150,000. *See* Fisher Depo. 228:8-230:24 (Doc. 136-1). Mr. Fisher testified that Mr. Martinez told him to send a letter to him following up on their conversation, which he proceeded to do on February 8, 2013. *Id*.; Doc. 6-2. In this letter, Mr. Fisher summarized the communications he believed Bar J and Fisher employees had the prior year regarding "adjustments to the terms" of the original ESA and expressed his "understanding that while [they] hadn't established a minimum requirement going forward, as long as [Fisher] did at least 150,000 Tons in 2012, there wouldn't be any additional royalty amounts sought." Doc. 6-2. Mr. Fisher also indicated in the letter that he hoped the bill for additional minimums was sent in error "as it didn't reflect our earlier conversations." *Id*.

On February 20, 2013, Mr. Martinez responded to Mr. Fisher's letter and indicated that Bar J "agree[d] we should get together for an in person meeting to create a mutually beneficial agreement going forward." Doc. 6-3. This meeting was held on April 22, 2013. Doc. 136-3 at 9. Mr. Fisher testified that the purpose of this meeting was to "get together . . . [to] explore all possibilities if we can lower the royalty rates." Fisher Depo. 245:14-24 (Doc. 138-1). *Id*. Mr. Fisher further testified that neither the minimum tonnage requirement nor the 2012 invoice came up at this meeting, and that the reason for this was because he believed those issues had already been resolved. *Id*. 248:25-249:1-13. Following the April 2013 meeting, Mr. Moehn sent an email to Frank Duran of Bar J regarding a "Proposed Ammendment [sic] to Supply Agreement". Doc. 103-7. Mr. Moehn stated in the email:

> I've been working with Tommy over the past two weeks to try and come up with a proposed amendment to our supply agreement. I tried to keep it simple. It spells out lower minimums and also a flat royalty rate. I didn't adjust the royalty per the

> provisions in our original agreement. I simply held it at the current rates (less a penny).
>
> I tried to follow the format of the original agreement. This is a draft and doesn't include the necessary signature lines. I was mostly trying to iron out the particulars.

*Id*. Attached to the email was a copy of the proposed amendment. It is undisputed that Bar J did not sign this proposed amendment. *See* Doc. 105 at 9.

In early 2014, Fisher once again received an invoice from Bar J for alleged underpayments. Doc. 38-5. This invoice reflected a minimum tonnage requirement of 400,000 tons for 2013 and, in addition to the 161,211 tons Fisher actually purchased, billed Fisher approximately $637,566 in connection with difference between the asserted 400,000 minimum and the approximately 161,211 tons purchased. *Id*. Tommy Fisher testified that he contacted Ted Martinez regarding the 2013 invoice, and that Mr. Martinez once again stated the invoice was sent in mistake. Fisher Depo. 283:2-15 (Doc. 138-1).

## II. Standard of Review

In its motion, Bar J seeks dismissal or the entry of summary judgment on Fisher's breach of contract counterclaims. To the extent Bar J has moved for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute as to any material fact unless the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for

summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (quotation omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

"[T]o withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In ruling on a motion to dismiss, the Court "accept[s] the well-pled factual allegations in the complaint as true, resolve[s] all reasonable inferences in the plaintiff's favor, and ask[s] whether it is plausible that the plaintiff is entitled to relief." *Diversey v. Schmidly,* 738 F.3d 1196, 1199 (10th Cir. 2013) (internal citations and quotation marks omitted).

**III.    Analysis**

  A. *Count VII is dismissed with prejudice*

At the outset, the Court will dismiss with prejudice Count VII of Fisher's amended counterclaims. Count VII is premised on renewal of the ESA. The Court, however, has ruled that the ESA was not renewed and thus, expired at the end of the initial term on June 28, 2012.[2] *See*

---

[2] The Court notes that there are other counterclaims that may be premised on renewal of the ESA. *See, e.g.,* Doc. 46 ¶ 213 (fraudulent inducement claim (Count VIII) alleging in part that "if Fisher's April 12, 2012 letter to Bar J was sufficient to renew the ESA, the renewal of the ESA and the ESA itself is unenforceable as a result of Bar J's fraud in inducing Fisher to renew the ESA."). The Court does not address these claims in this Opinion because they were not raised in Bar J's motion (Doc. 105). The parties may, however, find it necessary to engage in further motions practice directed specifically to these claims.

Mem. Op. and Order on Bar J's Mot. for Partial Declaratory Summary Judgment. Therefore, dismissal of Count VII is warranted.[3]

   B. *Counts III and IV*

Bar J argues that dismissal or the entry of summary judgment in its favor is appropriate on Counts III and IV for a number of reasons. First, it argues that Fisher's pleading of alternate breach of contract claims violates the alternate pleading requirements set forth in Rule 8(d) of the Federal Rules of Civil Procedure. *See* Doc. 105 at 3-5. Second, Bar J contends that Fisher's implied contract claims are subject to dismissal because the parties had an express agreement -- the ESA -- which governed their relationship after June 28, 2012. *See* Doc. 105 at 5-6. Third, Bar J argues that Fisher's breach of contract claims fail due to a lack of consideration and mutual assent. *See* Doc. 105 at 9-12. Fourth, with regard to Count IV specifically, Bar J argues that agreements to negotiate in good faith or to enter into a future contract are unenforceable under New Mexico law. *See* Doc. 105 at 13-14. Bar J also claims that Count IV should be dismissed because it is duplicative of Count III. *See* Doc. 105 at 14. Lastly, Bar J contends that Fisher's breach of contract counterclaims fail to satisfy the statute of frauds. *See* Doc. 105 at 14-16. Because Bar J's argument concerning the lack of mutual assent is dispositive, the Court does not address Bar J's remaining arguments.

   1. <u>Mutual Assent</u>

In order to be legally enforceable, "a contract must be factually supported by an offer, an acceptance, consideration, and mutual assent." *See Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶ 9, 918 P.2d 7. "For there to be [] mutual assent, the parties must have had the same understanding of the material terms of the agreement." UJI 13-816 NMRA. "For an

---
[3] In light of this dismissal, the Court does not address Bar J's argument that any modifications to the ESA had to be in writing. *See* Doc. 105 at 16-17.

offer and acceptance to create a binding contract, there must be an objective manifestation of mutual assent by the parties to the material terms of the contract." *Pope v. Gap, Inc.*, 1998-NMCA-103, ¶ 11, 961 P.2d 1283. Thus, "[m]utual assent is based on objective evidence, not the private, undisclosed thoughts of the parties." *Id*. ¶ 13; *see also id*. ("what is operative is the objective manifestations of mutual assent by the parties, not their secret intentions"). "To determine what each party understood, [one] should look at the parties' intentions, words, and actions, and at the surrounding circumstances." UJI 13-816 NMRA. "Where one party meant one thing and the other party meant another, the difference going to the essence of the supposed contract, the court will find no contract in law or equity unless the court should find that one party knew or had reason to know what the other party meant or understood." *Trujillo v. Glen Falls Ins. Co.*, 1975-NMSC-046, ¶ 10, 540 P.2d 209.

With these well-settled principles in mind, the Court turns to consider Bar J's argument that the contracts Fisher alleges exist (in Counts III and IV) fail as a matter of law due to the lack of mutual assent. Doc. 105 at 11-12. Specifically, Bar J asserts that there is no objective evidence that the parties assented to a new supply agreement with a reduced minimum tonnage requirement of 150,000. *Id*. at 11. Bar J points to written communications from Mr. Moehn in April 2012 stating that the parties would "continue discussions" on modifying royalty and minimum tonnage requirements followed by his May 2013 email regarding "proposals" for reduced tonnage requirements. *Id*. Bar J asserts that these communications are objective evidence that there was a lack of mutual assent to reduce the tonnage requirement. Bar J further argues that there is no evidence of mutual assent to all terms of the new agreement remaining the same with the exception of the lowered tonnage requirement. *Id*. at 12.

In response, Fisher points to the following as objective evidence of mutual assent: (1) Tommy Fisher and Ted Martinez's meeting in early 2012 during which they allegedly agreed to a lowered tonnage requirement of 150,000 tons; (2) Bar J's continued acceptance of Fisher's monthly royalty payments after the ESA expired in June 2012; and (3) Bar J's lack of efforts to collect on the alleged underpayments it invoiced Fisher for in 2012 and 2013. Doc. 138 at 20. Fisher asserts that this conduct by Bar J establishes that the parties reached an agreement that Fisher needed to only sell 150,000 tons per year. *Id*.

The Court agrees with Bar J that there was a lack of mutual assent by the parties to a new supply agreement with a reduced minimum tonnage requirement of 150,000 tons. Fisher has failed to point to any evidence that establishes that the parties mutually assented to a lowered tonnage requirement. While Fisher contends that Mr. Martinez, on behalf of Bar J, agreed specifically to lower the tonnage requirements to 150,000 in his meeting with Mr. Fisher in early 2012, Mr. Fisher's deposition testimony regarding the meeting does not establish a "meeting of the minds" regarding a specific agreement to reduce the tonnage requirement to 150,000. *See supra* at 3-4 (testifying that Mr. Martinez told Fisher to "do the best you can" and that reducing the minimum tonnage requirement going forward "would not be an issue."). Likewise, Mr. Moehn's written communications in April 2012 on behalf of Fisher further indicate that the parties had not yet reached a specific agreement to lower the tonnage requirement to 150,000. *See* Doc. 103-5 ("Per earlier conversations regarding this notice, it is agreed that we will continue to try and best address the issues regarding royalty and volume"). Thus, the parties' words, actions, and the surrounding circumstances in early 2012 do not indicate that they mutually assented to a new supply agreement with a lowered 150,000 tonnage requirement prior to the expiration of the ESA.

The communications between Fisher and Bar J regarding the invoices also fail to establish that the parties had mutually agreed to a 150,000 tonnage requirement. *See supra* at 4. If anything, the fact that Bar J sent invoices for a larger tonnage requirement is objective evidence of its belief that the parties had not agreed to a lower tonnage requirement. The lack of a meeting of minds is further reflected in the February 2013 communications between the parties regarding the invoices. In his February 8, 2013 letter to Bar J, Mr. Fisher wrote:

> In further phone conversations, it was my understanding that there wasn't anything you could do with the royalty rate. However, it was my understanding that while we hadn't established a minimum requirement going forward, as long as we did at least 150,000 Tons in 2012, there wouldn't be any additional royalty amounts sought. We went forward with that understanding and were able to sell in excess of that amount.
>
> Based on the above, I assumed we had a mutual understanding for moving forward. That is why I reached out to you when we received the bill last month for additional minimums. That bill was for quantities that had not been taken up to 400,000 Tons. I'm hoping that this bill was simply sent in error, as it didn't reflect our earlier conversations.

Doc. 6-2. While this letter serves as objective evidence of the meaning Fisher attached to the parties' agreement – i.e., that there was mutual understanding regarding a minimum of 150,000 – the response from Mr. Martinez to this letter does not corroborate this understanding. Mr. Martinez stated in his response on February 20, 2013 that:

> In response to your emailed letter received February 15, 2013, we write this letter to respond to your concerns. As you stated in the letter, we agree we should get together for an in person meeting to create a mutually beneficial agreement going forward.

Doc. 6-3.

In sum, there is a lack of clarity regarding what, if any, contractual agreement the parties had upon expiration of the ESA. The lack of objective manifestations of mutual assent indicates no offer and acceptance to a new supply agreement with reduced tonnage requirements. As New

Mexico courts have cautioned, a lack of clarity is an "indication of a lack of mutual assent that cannot, and should not, be cured through strained or outcome-determinative application of judicial maxims." *See Farmington Police Officers Ass'n Comm. Workers v. City of Farmington*, 2006-NMCA-077, ¶ 24, 137 P.3d 1204. For these reasons, Fisher's breach of contract counterclaims are subject to dismissal.

## IV.     Conclusion

Based on the foregoing, Fisher's breach of contract counterclaims (Counts III, IV, and VII) are hereby dismissed with prejudice.

**IT IS SO ORDERED**.

_____
UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**