IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BAR J SAND & GRAVEL, INC.,
a New Mexico corporation,

    Plaintiff,

v.  No. Civ. 15-228 SCY/KK

FISHER SAND & GRAVEL CO.,
a North Dakota corporation, doing business
in New Mexico through its division
SOUTHWEST ASPHALT & PAVING,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Plaintiff Bar J Sand & Gravel, Inc.'s ("Bar J") Motion for Partial Summary Judgment on Count I of Fisher's Amended Counterclaims. Doc. 104. In this motion, Bar J seeks summary judgment on Fisher's intentional or negligent misrepresentation counterclaim. Because the Court concludes that genuine disputes of material fact exist as to the elements of Fisher's counterclaim, summary judgment is improper and Bar J's motion is therefore **denied**.

**I. BACKGROUND**[1]

   A. <u>Fisher's Intentional or Negligent Misrepresentation Counterclaim (Count I)</u>

Fisher alleges that at an in-person meeting held on April 22, 2013, Bar J personnel represented to Fisher employees that the lease between the Pueblo and Bar J Trucking had been extended for an additional ten years. *Id*. ¶ 116. Fisher claims this was an intentional or negligent misrepresentation by Bar J because Bar J already knew at the time that the lease had not been

---

[1] The Court has provided the factual and procedural background of this case in its Memorandum Opinion and Order on Plaintiff Bar J's motion for partial declaratory summary judgment. Therefore, the Court will only provide the pertinent factual history relevant to the motion at issue.

1

extended because the BIA had cancelled it. *Id*. ¶ 117. Fisher alternatively asserts that Bar J knew at the time of the April 2013 meeting that the lease had not, or would not be, extended due to Bar J Trucking's failure to pay approximately $363,074.40 in royalties to the Pueblo. *Id*. ¶ 118. Fisher also asserts that Bar J's failure to notify Fisher of the lease cancellation or the Pueblo's concerns regarding the lease constitutes a misrepresentation by omission. *Id*. ¶ 127. Fisher claims it relied on Bar J's misrepresentation that the lease had been renewed and therefore continued to produce and stockpile inventory because it expected that it would be able to continue its mining operations beyond January 2015, when the lease was initially set to expire. *Id*. ¶ 121. Fisher claims that Bar J did not notify Fisher until over a year later, on August 29, 2014, that the lease had not been renewed. *Id*. ¶ 120. Fisher alleges that it was forced to abandon 300,000 tons of stockpiled material when the lease ended on January 17, 2015. *Id*. ¶ 130.

B. Relevant Facts[2]

The individuals present at the April 22, 2013 in-person meeting on behalf of Bar J were Ted Martinez and Frank Duran. Doc. 104-1. Tommy Fisher, Mike Moehn and Dave Olson attended on behalf of Fisher. *Id*. According to Fisher, the purpose of the meeting was to discuss "whether the royalty rate could be reduced and how best to reduce the parties' agreement into writing." *Id*. During the meeting, Fisher inquired as to the term of the proposed amendment it was going to draft because "if the Lease was to expire in January 2015, it may not be necessary to reduce anything to writing but that if the Lease was going to be extended, then the agreement that Fisher was to draft should reflect that additional term." *Id*. Fisher states that at that point, "Frank Duran emphatically stated that the Lease had been extended another ten years." *Id*. Fisher

---

[2] Except as otherwise noted, the following asserted facts are undisputed. Because this is summary judgment, the Court views the facts and all reasonable inferences therefrom in the light most favorable to Fisher, the non-moving party. *See S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (quotation omitted).

claims that Ted Martinez did not disagree with or correct Duran's statement, and that he did not make any statements contrary to Duran's representation that the lease had been renewed. *Id.*

Mike Moehn, who was present at the meeting, testified in his deposition that Frank Duran told Fisher personnel at the meeting that the Pueblo had extended the lease for an additional ten years. *See* Moehn Depo., Oct. 12, 2015, 110:19-112:3 (Doc. 104-3) ("I just remember him saying we have it for ten more years"; "he was emphatic that they had the lease for ten more years"; "I took it as they had the lease secured for ten more years, and that's how he portrayed it"). Moehn did not, however, recall the exact words used by Duran. *Id.*

Frank Duran's recollection of the April 2013 meeting differs from that of Moehn. In his affidavit, Duran states that although he does not recall what was specifically said at the meeting, he "would not have said definitely, or otherwise, that Bar J Trucking had 'secured' an additional ten-year lease with the Pueblo." Doc. 104-5 at ¶ 5. Duran denies that he would have made this representation because (1) he had no relationship with Bar J Trucking and (2) Bar J Trucking did not share its dealings with the Pueblo with him. *Id.* Duran further states that he would not have made a representation regarding lease renewal at the meeting because the lease "renewal or non-renewal decision did not have to be made by the Pueblo for more than a year and one-half." *Id.* Additionally, Duran states that he is not an employee or agent of Bar J or Bar J Trucking and has never had the authority to bind either of these entities. *Id.* ¶¶ 1-3. Duran indicates in his affidavit that he has always represented to Fisher that he works for MCT Industries. *Id.*

Following the April 2013 meeting, Fisher did not independently investigate Duran's alleged representation that the lease had been extended. Doc. 104-1. In May 2013, Moehn sent an email to Duran regarding a "Proposed Ammendment [sic] to Supply Agreement". Doc. 104-2. Attached to the email was a copy of the proposed amendment, which included in relevant part a

3

proposed term of five years with an option to renew for an additional five years. *Id*. It is undisputed that Bar J did not sign this proposed amendment. *See* Doc. 104 at 3, Doc. 105 at 9. Fisher nonetheless continued its mining operations through 2013 and into calendar year 2014.

On August 29, 2014, a Fisher employee learned from a newspaper article that the lease had not been renewed. Doc. 137-3 at 5; *See also* Moehn Depo. 295:5-7 (Doc. 104-3). Fisher then contacted Bar J, and Bar J confirmed that the Pueblo would not be renewing the lease. Doc. 137-3. At that point, Fisher stopped production of additional materials, but it had approximately 340,000 tons of stockpiled material.[3] Doc. 137-3 at 8; Doc. 104-4. Fisher did not remove its stockpiled material when the lease ended on January 17, 2015. Moehn testified that the reason Fisher did not remove the material is because the time frame was too prohibitive to secure and prepare a new site to store the stockpiled material and to transport the materials. Moehn Depo. 295:1-5 (Doc. 137-1). Fisher asserts that had Bar J informed Fisher of the issues surrounding the lease, including its cancellation, Fisher would have "converted its operations to an on-demand production model and would have sold most or all of the inventory that was in place as of April 22, 2013." Doc. 137 at 6.

During the course of discovery in this case, Fisher obtained documents from Bar J indicating that a month prior to the April 2013 meeting, Bar J, Bar J Trucking, Louis Jacques, and Ted Martinez "were notified by letter from Acting Superintendent of the Bureau of Indian Affairs and by letter from Insurance Company of the West that Bar J Trucking owed the Pueblo approximately $263,074.40 for unpaid royalties for royalty adjustments made under Bar J

---

[3] The parties have presented evidence with regard to Fisher's practice of stockpiling materials during the course of its operations. Moehn testified in his deposition that the decision to stockpile material was based on sales volume. Moehn Depo. 273:12-16 (Doc. 137-1). Fisher's need for stockpiled material varied with the type of job. Moehn Depo. 277:12-19 (Doc. 137-1). Once the market declined at the end of 2011, Fisher tried to keep its inventories as low as possible. Moehn Depo. 278:20-25, 281:5-9 (Doc. 137-1).

4

[Trucking's] lease with the Pueblo." Doc. 137-3 at 7. On or about April 25, 2013, Fisher asserts Bar J Trucking was informed that the BIA had decided to cancel the lease.[4] *Id*. Bar J Trucking appealed the decision and, on September 23, 2014, the BIA's Southwest Regional Director affirmed the decision. *Id*. The affirmance was appealed but later dismissed as moot on January 30, 2015. *Id*. at 7-8.

## II. ANALYSIS

Bar J raises two main arguments in its motion for summary judgment as to Fisher's intentional or negligent misrepresentation counterclaim. First, Bar J argues that the release provision of the Exclusive Supply Agreement (ESA) bars this counterclaim. Doc. 104 at 5-9. Second, Bar J argues that Fisher is unable to prove the elements of the intentional or negligent misrepresentation claim. Doc. 104 at 9-15.

With regard to Bar J's first argument concerning the ESA's release provision,[5] the Court has determined that the ESA was not renewed and therefore expired on June 28, 2012. Consequently, the ESA's release provision was no longer binding on the parties in 2013 when the alleged misrepresentation(s) occurred. The Court therefore rejects Bar J's argument that the

---

[4] The Court notes that Ted Martinez also testified in his deposition regarding a July 3, 2014 letter from the Pueblo that stated: "The tribal council has determined that, for the foreseeable time, the Pueblo will not seek to continue sand and gravel or gypsum mining operations with Bar J or any other entity." Martinez Depo. 156:6-15 (Doc. 137-4). Mr. Martinez testified that he did not tell Fisher about this letter because he was still "trying to negotiate with the Pueblo" to "reconsider its decision to cancel the lease." *Id*. 156:6-157:15.

[5] The release provision states:

> [Fisher] hereby releases [Bar J] from all responsibility and liability regarding the quality, quantity, present or future valuation, salability, or utility of the Material or the Premises, or its suitability for any purpose whatsoever. [Fisher] acknowledges that any information of any type which [Fisher] has received or may receive from [Bar J] is furnished on the express condition that [Fisher] shall make an independent verification of the accuracy of such information, all such information being furnished without any warranty whatsoever, except as expressly set forth in this Agreement.

ESA ¶ 17 (Doc. 6-1).

release bars Fisher's intentional or negligent misrepresentation counterclaim. Thus, the only issue before the Court is Bar J's argument that it is entitled to judgment as a matter of law because Fisher is unable to prove the elements of this counterclaim.

A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute as to any material fact unless the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (quotation omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48 (emphasis omitted). Rather, only disputes over facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Id.* at 248. Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

B. Applicable Law

New Mexico follows the Restatement (Second) of Torts with regard to what a plaintiff must prove to succeed on a negligent misrepresentation claim. *See First Interstate Bank of*

*Gallup v. Foutz*, 1988-NMSC-087, ¶ 8, 764 P.2d 1307. The Restatement describes the cause of action as follows:

> One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552 (1977). Under New Mexico law, to sufficiently state a claim for negligent misrepresentation, a plaintiff must establish that: "(1) Defendant[] made a material misrepresentation of fact to Plaintiff, (2) Plaintiff relied upon such representation, (3) Defendant[] knew the representation was false at the time it was made or made the representation recklessly, and (4) Defendant intended to induce Plaintiff to rely on such representation." *Healthsource Inc. v. X-Ray Assoc. of N.M.*, 2005-NMCA-097, ¶ 30, 116 P.3d 861; *see* UJI 13-1632 NMRA ("A material misrepresentation is an untrue statement which a party intends the other party to rely on and upon which the other party did in fact rely" and "negligent misrepresentation is one where the speaker has no reasonable ground for believing the statement made was true."). Additionally, a negligent misrepresentation claim can be established upon a showing of an untrue statement, or upon a showing of "information which, while true as it goes, is incomplete in a material respect and therefore misleading." *See* NM UJI 13-1632 (Committee Commentary).

In addition to its allegations of negligent misrepresentation(s) by Bar J, Fisher also alleges that Bar J's misrepresentation(s) were intentionally or fraudulently made. *See* Doc. 46 at ¶ 134 ("In misrepresenting to Fisher that the Lease with the Pueblo had been extended and in failing to correct that misrepresentation, Bar J acted willfully, wantonly, maliciously, recklessly, oppressively, or fraudulently."). An intentional or fraudulent misrepresentation claim, "to be

7

successful, requires that the injured party show that the other party: (1) made a misrepresentation of fact intentionally or with reckless disregard for the truth, (2) with the intent to deceive and to induce the injured party to act upon it, (3) and upon which the injured party actually and detrimentally relies." *Saylor v. Valles,* 2003-NMCA-037, ¶ 21, 63 P.3d 1152; *see also* UJI 13-1633 NMRA (setting forth the elements of fraudulent misrepresentation); *see also Bhandari v. VHA Sw. Cmty. Health Corp.*, 2011 WL 1336512, at *15-17 (D.N.M. Mar. 30, 2011) (Browning J.) (explaining differences between fraudulent and negligent misrepresentation claims).

"In an ordinary civil case, allegations of negligent misrepresentation need only be proven by a preponderance of the evidence, while intentional misrepresentations must be proven by clear and convincing evidence." *In Matter of Convisser*, 2010-NMSC-037, ¶ 19, 242 P.3d 299.

C. <u>Genuine Disputes of Material Fact Exist as to Fisher's Intentional or Negligent Misrepresentation Counterclaim</u>

Upon review of the evidence in the record, the Court finds that there are several genuine disputes of material fact with regard to Fisher's counterclaim. At the outset, the parties dispute whether any misrepresentation(s) were even made during the April 22, 2013 meeting. "A misrepresentation is an assertion that is not in accord with the facts." *Sisneros v. Citadel Broadcasting Co.*, 2006-NMCA-102, ¶ 20, 142 P.3d 34. As stated earlier, Fisher contends that although Bar J knew prior to the meeting that the lease was not going to be renewed, Frank Duran proceeded to make false statements during the meeting that the lease had been renewed for an additional ten years. *See* Moehn Depo., Oct. 12, 2015, 110:19-112:3 (Doc. 104-3). However, Duran directly disputes having made any statements regarding the lease during the meeting and further asserts in his affidavit that he had no knowledge of Bar J Trucking's dealings with the Pueblo. *See* Doc. 104-5. Bar J concedes in its briefing that a factual dispute exists as to whether the representation was ever made. Doc. 104 at 9.

However, Bar J argues that the counterclaim still fails based on the "context" of the alleged misrepresentation. *Id*. at 9-10. As the Court understands its argument, Bar J maintains that Fisher relied on the alleged misrepresentation solely for the purpose of preparing a proposed amendment to the supply agreement. Since Bar J never signed the proposed amendment, it argues, Fisher suffered no damages. *Id*. at 10 ("Fisher was not damaged by the alleged representation since the amendment never occurred and thus, the sole basis the alleged representation was purportedly obtained by Fisher (to induce Fisher to enter a new agreement) never occurred"). Bar J's argument, however, ignores Fisher's other factual allegations that go beyond its assertion that it prepared a proposed amendment with two 5-year terms based on Duran's representation. Fisher also specifically alleges that it relied on Duran's representation to continue conducting "business as usual" by producing and stockpiling inventory with the expectation that it would continue its mining operations on the premises beyond January 2015. The Court therefore rejects Bar J's argument that Fisher's counterclaim must fail because the proposed amendment was not executed. The Court concludes that summary judgment is improper due to a factual dispute that even Bar J concedes exists as to whether any misrepresentations were made during the April meeting.

Similarly, the Court rejects Bar J's argument that Fisher is unable to prove the intent element of its intentional or negligent misrepresentation counterclaim and finds instead that genuine issues of material fact exist with regard to the intent element. "[I]ssues involving intent or knowledge generally involve questions of fact." *Durham v. Sw. Developers Joint Venture*, 2000-NMCA-010, ¶ 44, 996 P.2d 911. Intentional or "[f]raudulent misrepresentation requires an intent to deceive, while negligent misrepresentation only requires an intent that the plaintiff receive and be influenced by the statement where it is reasonably foreseeable that the plaintiff

9

would be harmed if the information conveyed was incorrect or misleading." *See Eckhardt v. Charter Hosp. of Albuquerque, Inc.*, 1998-NMCA-017, ¶ 55, 953 P.2d 722. "The intent for the two causes of action are very different. Intent for fraud must be specific; for negligent misrepresentation, the plaintiff must only plead and prove that the defendant intended the plaintiff to receive and rely on the representation." *See Bhandari v. VHA Sw. Cmty. Health Corp.*, 2011 WL 1336512, at *34 (D.N.M. Mar. 30, 2011) (Browning, J.). The parties have raised questions regarding what Bar J knew regarding the cancellation of Bar J Trucking's lease with the Pueblo and when it knew it. Fisher contends that Bar J was aware of concerns related to the lease, including Bar J Trucking's purported failure to make royalty payments to the Pueblo, in advance of the April 22, 2013 meeting. Doc. 137-3. In its supplemental interrogatory responses, Fisher further points to documentary evidence that prior to cancelling Bar J Trucking's lease with the Pueblo on April 25, 2013, the BIA sent at least eleven non-compliance letters to Bar J Trucking, dating back to May 27, 2011. *Id*. Fisher alleges that Bar J had actual and constructive knowledge of these non-compliance notices, but that it failed to relay this information to Fisher. *Id*. Rather than relaying this information, Fisher claims that Bar J intentionally proceeded to misrepresent that the lease had been renewed, and that it did so with the intent to deceive Fisher into stockpiling inventory. *Id*.

Although Bar J does not directly address the documentary evidence Fisher cites, Bar J generally disputes Fisher's assertion that it intended to cause Fisher to continue stockpiling. Doc. 145 at 9. It instead claims that Fisher made no changes to its business practices before and after the April 2013 meeting; in other words, Bar J asserts that Fisher's practice of stockpiling inventory remained unchanged and, therefore, any misrepresentations made during the meeting had no impact on Fisher's operations. Thus, it argues, Fisher cannot show that it detrimentally

relied on any alleged misrepresentations made by Bar J regarding the lease renewal. Whether Fisher would or would not have continued to stockpile inventory had it known that Bar J Trucking's lease had been cancelled, however, is a question of fact to be decided at trial.

Because several issues of material fact exist with regard to the intentional and negligent misrepresentation counterclaim that a fact-finder must resolve, summary judgment is improper.

## III. CONCLUSION

Based on the foregoing, Bar J's motion for summary judgment (Doc. 104) is **DENIED**.

**IT IS SO ORDERED**.

_____
UNITED STATES MAGISTRATE JUDGE
**Sitting by Consent**