**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

BAR J SAND & GRAVEL, INC.,
a New Mexico corporation,

      Plaintiff,

v.                                               No. Civ. 15-228 SCY/KK

FISHER SAND & GRAVEL CO.,
a North Dakota corporation, doing business
in New Mexico through its division
SOUTHWEST ASPHALT & PAVING,

      Defendant.

**AMENDED[1] MEMORANDUM OPINION AND ORDER**

      **THIS MATTER** is before the Court on Plaintiff Bar J Sand & Gravel, Inc.'s ("Bar J")

Motion for Partial Declaratory Summary Judgment. Doc. 103. In this motion, Bar J asks the

Court to find as a matter of law that the Exclusive Supply Agreement ("ESA") entered into

between Bar J and Defendant Fisher Sand & Gravel Co. ("Fisher") on June 28, 2007 was

renewed for a second five-year term in 2012. Having considered the motion, the briefing,

accompanying evidence, and the relevant law, the Court concludes that the ESA was not

renewed and therefore expired on June 28, 2012. Accordingly, Bar J's Motion (Doc. 103) is

denied.

**I.    BACKGROUND**

      **1.   The Exclusive Supply Agreement (ESA)**

---

[1] This Memorandum Opinion and Order amends the Court's September 29, 2017 Memorandum Opinion and Order (Doc. 180) by removing the language dismissing Counts I and VI of Bar J's amended complaint. *See* Doc. 238 (Order).

In 1996, Plaintiff Bar J acquired an exclusive right to excavate, remove and sell aggregate earth products, remove asphalt, and to process material on land located within the Pueblo of San Felipe. *See* ESA at 1 (Doc. 6-1). In 2007, Bar J entered into the ESA with Defendant Fisher that forms the basis of this lawsuit. *Id.* Under the ESA, Bar J agreed to sell materials removed from the Pueblo to Fisher on an exclusive basis and Fisher in turn agreed to purchase a minimum quantity of material from Bar J each year. ESA ¶ 1. The ESA further provided Fisher with the right "to use the [p]remises for the purpose of excavating, processing . . . and removing the specified minimums." ESA ¶ 5.

The initial term of the ESA was a period of five years commencing on June 28, 2007, the effective date of the ESA. ESA ¶ 4. As set forth in Section 1 of the ESA, the amount of material Fisher was required to purchase from Bar J incrementally increased each year, with the annual minimum tonnage requirement reaching 400,000 tons in 2012. ESA ¶ 1. Section 6 of the ESA, entitled "Payments", detailed the "rate" (i.e., the amount per ton of material) that Fisher was obligated to pay Bar J throughout the course of the ESA. *See* ESA ¶ 6.

The ESA further provided Fisher with the option to renew the ESA for an additional five years after the completion of the initial five-year term. ESA ¶ 4. As set forth in Section 4 of the ESA, this provision stated that in order to exercise the renewal option,

> on or before one hundred twenty (120) days before the expiration of the Term, [Fisher] shall deliver written notice of its intention to exercise the renewal option to [Bar J]. If [Fisher] does not exercise its renewal option within the prescribed time, this Agreement will terminate at the expiration of the Term. In all matters relating to renewal [Fisher] shall contact and negotiate exclusively with [Bar J], and not the Pueblo or governmental agencies. The terms and conditions of this Agreement for the Renewal Term shall remain the same except that all payments shall be subject to renegotiation.

*See* ESA ¶ 4. In the event Fisher exercised the renewal option, the ESA stated that minimum tonnage requirements during the renewal term would be as follows: 400,000 tons of material

annually from January 1, 2012 until December 31, 2013, and 500,000 tons of material annually

from January 1, 2014 until expiration of the renewal term. ESA ¶ 1. With regard to payments

during the renewal term, the ESA provided that the "[p]ayments to be applicable during the

[r]enewal [t]erm shall be subject to renegotiation by the parties, provided that in no event shall

the payments be lower during the [r]enewal [p]eriod than it is on the date the renewal period

begins." ESA ¶ 6.

Because the ESA provides that it shall be governed by and construed in accordance with

New Mexico law (ESA ¶ 29), the Court will apply New Mexico law.

## 2. Relevant Facts[2]

The events that led to the filing of this federal suit began in 2012, the final year of the

ESA's initial term, and bear on whether Fisher exercised the ESA's renewal option. Since the

initial term of the ESA was set to expire on June 28, 2012, Fisher was required under the ESA to

"deliver written notice of its intention to exercise the renewal option" to Bar J by February 28,

2012, which was 120 days prior to expiration of the initial term.[3] *See* ESA ¶ 4.

Fisher alleges that in late 2011 and early 2012, it began experiencing reduced sales

volumes in part due to a downturn in the market. *See* Tommy Fisher Depo., January 21, 2016,

49:21-52:25 (Doc. 138-1). Fisher alleges that its president, Tommy Fisher, met with Ted

Martinez, vice president of Bar J, in early 2012 to discuss these issues. *Id*. at 51:22-54:8. Mr.

Fisher testified that he told Mr. Martinez during this meeting that Fisher was "going to be way

---

[2] Except as otherwise noted, the following asserted facts are undisputed. Because this is summary judgment, the Court views the facts and all reasonable inferences therefrom in the light most favorable to Fisher, the non-moving party. *See S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (quotation omitted).

[3] The Court notes that Fisher claims the 120-day deadline was February 29, 2012. Doc. 136 at 9, ¶ A. Whether the deadline was February 28th or 29th is not material to the Court's analysis.

off in 2012" with regard to the minimum tonnage requirement, that Fisher expected to purchase "around 150,000 [tons]" in 2012, and that Mr. Martinez told him to "do the best you can." *Id*. at 52:19-22, 53:13, 53:24-54:1, 160:25-161:2. Mr. Fisher testified that Mr. Martinez informed him that reducing the minimum tonnage requirement going forward would "not [be] an issue . . . because [Bar J] was not paying minimums" to the Pueblo, but that Bar J was unable to "do anything" with regard to royalty rate payments. *Id*. at 154:20-25; 202:24-203:1 (Doc. 136-1). Mr. Fisher testified that he believed Mr. Martinez had agreed to a reduction in the minimum tonnage requirements going forward. *Id*.

Although Mr. Martinez denies telling Mr. Fisher in 2012 that it would be okay to reduce the tonnage requirement to 150,000 tons annually going forward (Martinez Depo. 112:10-18), he testified in his deposition that he did not remember having any conversations regarding the minimums in 2012 (*Id*. 113:16-18), that he did not remember if Mr. Fisher told him in 2012 that Fisher would only continue its relationship with Bar J if the royalty or the mandatory minimums were reduced (*Id*. 110:8-15), did not remember if he told Mr. Fisher that Bar J would reduce the mandatory minimums going forward (*Id*. 110:21-111:23), and did not remember if he told Mr. Fisher that Bar J was not able to renegotiate the mandatory minimums (*Id*. 112:21-24). *See* Ted Martinez Depo., January 19, 2016, (Doc. 136-4).

On March 27, 2012, Michael Moehn, a vice president of Fisher, sent an email regarding renewal of the ESA to Tommy Fisher, Tim Priebe (Fisher's general counsel), and David Olson (vice president of Fisher's New Mexico operations). Doc. 103-3. He stated in the email:

Per the attached lease we are to send written notice to Bar J at least 120 days prior to expiration. Dave talked to Louie[4] a little bit ago and he said to get with Frank

---

[4] Moehn's email referred to a number of Bar J and Fisher employees: Dave Olson (Vice President of Fisher's New Mexico Operations); Louis Jacques (President of Bar J); Ted Martinez (Vice President of

> (Ted's CFO) on what to put in the notice. Dave just talked to Frank and he said he
> had to get with Louie and Ted to see if they wanted to renegotiate anything to do
> with Minimums and Royalty (those are both too high). Technically, both of those
> are still spelled out through 2015 in the lease. *Should we just send a notice over*
> *that we intend to renew anyway? They have never screwed with us before, so I*
> *don't think they will now, but technically we are only 90 days out from expiration.*

Doc. 103-3 (emphasis added); *see also* Louis Jacques Aff., Doc. 103-11 at ¶ 4 (stating that he

"spoke to someone from Fisher in late March 2012 who told [him] Fisher had questions about

having missed the technical 120 day renewal option deadline and whether Bar J [] was going to

enforce that provision."); *see also* Louis Jacques Depo., Jan. 18, 2016, 87:1-89:12 (Doc. 136-5)

(testifying that although he did not recall when this conversation occurred, Dave Olson spoke

with him about sending Bar J a letter "stating that they were going to continue.").

On Bar J's end — although it is not clear when this occurred — Louis Jacques, Bar J's

president, and Ted Martinez asked Frank Duran, Bar J's CFO, to "find out if Fisher intended to

renew the ESA for the renewal term and, if so, to ask Fisher to send Bar J [] the formal notice

required by the ESA." *See* Jacques Aff., Doc. 103-11 at ¶ 4; Ted Martinez Aff., Doc. 103-10 at ¶

4. It appears that Frank Duran reached out to Fisher on April 12, 2012 based on an email sent

from Mr. Moehn to Tommy Fisher and Tim Priebe, which stated:

> Frank Duran (CFO for Ted Martinez) called today and asked us if we could go
> ahead and send over the formal notice that we want to extend our agreement as
> required in the original document. Technically it is late. He did mention to state
> that we will continue to work on the particulars surrounding royalty and volumes.
> Tommy [Fisher] has been discussing those with Ted. So, I tried to write a notice
> that said "yes, we would like to extend" and also mention that we are both in
> agreement that we will work on the other two issues.

---

Bar J); Frank Duran (Bar J CFO). *See* Doc 103-2 at 16:18-25; Doc. 103-4; Doc. 103-10, ¶ 1; Doc. 103-11
¶ 1.

Doc. 103-4. A draft of the notice was attached to the email. *Id.* The next day, after having received approval to send the notice to Bar J, Mr. Moehn submitted a letter to Bar J with the subject: "Notice of intent to extend supply agreement". Doc. 103-5. In the letter, Moehn stated:

> Per earlier conversations between Fisher . . . and Bar J . . . personnel, Fisher has notified Bar J of its intent to extend the current supply agreement between Fisher and Bar J. This letter is to provide written documentation of Fisher's intent to extend the agreement as you have requested. Per earlier conversations regarding this notice, it is agreed that we will continue to try and best address the issues regarding royalty and volume as we move forward to the maximum benefit of both parties.

Doc. 103-5. Both Mr. Jacques and Mr. Martinez stated in their affidavits that Bar J "accepted" this letter from Mr. Moehn as "complying with the notice of renewal requirement although technically late." *See* Jacques Aff., Doc. 103-11 at ¶ 5; Martinez Aff., Doc. 103-10 at ¶ 5.

On May 25, 2012, Mr. Moehn sent an email to Tommy Fisher stating that "Our lease is official up at the beginning of June. We sent them [Bar J] notice a while back that we would like to extend and continue discussions regarding royalty and minimums." Doc. 105-3.

The parties do not dispute that Fisher continued its operations on the premises after June 28, 2012. In early 2013, Fisher received an invoice from Bar J for unpaid minimum tonnages during 2012. *See* Fisher Depo. 209:22-210:12 (Doc. 136-1); *see also* Doc. 38-4. This invoice indicated that the minimum tonnage requirement was 400,000 tons, that Fisher removed and paid for approximately 183,764 tons, and that Fisher owed Bar J approximately $564,375 for the 216,235 tons that it was below the minimum. Doc. 38-4. Upon receipt of this invoice, Tommy Fisher reached out to Mr. Martinez. *See* Fisher Depo. 209:22-210:12 (Doc. 136-1). Mr. Fisher testified that Mr. Martinez told him that the invoice was sent in error, that he would take care of it, and that he reconfirmed the parties had agreed to a reduced tonnage requirement of 150,000. *See* Fisher Depo. 228:8-230:24 (Doc. 136-1). Mr. Fisher testified that Mr. Martinez told him to

send a letter to him following up on their conversation and, on February 8, 2013, he sent such a letter. *Id*.; Doc. 6-2. In this letter, Mr. Fisher summarized the communications he believed Bar J and Fisher employees had the prior year regarding "adjustments to the terms" of the original ESA and expressed his "understanding that while [they] hadn't established a minimum requirement going forward, as long as [Fisher] did at least 150,000 Tons in 2012, there wouldn't be any additional royalty amounts sought." Doc. 6-2. Mr. Fisher also indicated in the letter that he hoped the bill for additional minimums was sent in error "as it didn't reflect our earlier conversations." *Id*.

On February 20, 2013, Mr. Martinez responded to Mr. Fisher's letter and indicated that Bar J "agree[d] we should get together for an in person meeting to create a mutually beneficial agreement going forward." Doc. 6-3. This meeting was held on April 22, 2013. Doc. 136-3 at 9. Mr. Fisher testified that the purpose of this meeting was to "get together . . . [to] explore all possibilities if we can lower the royalty rates." Fisher Depo. 245:14-24 (Doc. 138-1). *Id*. Mr. Fisher further testified that neither the minimum tonnage requirement nor the 2012 invoice came up at this meeting, and that the reason for this was because he believed those issues had already been resolved. *Id*. 248:25-249:1-13. Following the April 2013 meeting, Mr. Moehn sent an email to Frank Duran of Bar J regarding a "Proposed Ammendment [sic] to Supply Agreement". Doc. 103-7. Mr. Moehn stated in the email:

> I've been working with Tommy over the past two weeks to try and come up with a proposed amendment to our supply agreement. I tried to keep it simple. It spells out lower minimums and also a flat royalty rate. I didn't adjust the royalty per the provisions in our original agreement. I simply held it at the current rates (less a penny).
> I tried to follow the format of the original agreement. This is a draft and doesn't include the necessary signature lines. I was mostly trying to iron out the particulars.

7

*Id.* Attached to the email was a copy of the proposed amendment. It is undisputed that Bar J did not sign this proposed amendment. *See* Doc. 105 at 9.

In early 2014, Fisher once again received an invoice from Bar J for alleged underpayments. Doc. 38-5. This invoice reflected a minimum tonnage requirement of 400,000 tons for 2013 and, in addition to the 161,211 tons Fisher actually purchased, billed Fisher approximately $637,566 in connection with difference between the asserted 400,000 minimum and the approximately 161,211 tons purchased. *Id.* Tommy Fisher testified that he contacted Ted Martinez regarding the 2013 invoice, and that Mr. Martinez once again stated the invoice was sent in mistake. Fisher Depo. 283:2-15 (Doc. 138-1).

Fisher continued its operations on the premises until January 2015, when Bar J Trucking's lease with the San Felipe Pueblo ended.

### 3. Procedural History

On March 19, 2015, Bar J initiated this lawsuit against Fisher alleging that Fisher renewed the ESA for an additional five years in 2012 and then breached it by failing to make minimum purchases of material in calendar years 2012, 2013, 2014. *See* First Am. Compl. ¶¶ 17-22, 30-35 (Doc. 38). Bar J further alleges that Fisher violated material terms of the ESA by contacting the Pueblo directly to pursue its own business relationship with the Pueblo (¶¶ 36-40), refusing to perform remediation and reclamation of the premises (¶¶ 41-47), using the premises for speculative purposes such as stockpiling material (¶¶ 48-56), and breaching the ESA's confidentiality provision (¶¶ 57-58). Based on these allegations, Bar J brings a number of breach of contract and declaratory judgment causes of action in its first amended complaint (Counts I to VI). In the alternative, Bar J asserts a claim for negligent and intentional misrepresentation (Count VII). *See* First Am. Compl., ¶¶ 104-108.

Fisher alleges in its answer that the ESA, and all of Fisher's obligations under the ESA, terminated on June 28, 2012—the expiration date of the initial five year term—because it did not exercise its renewal option. Doc. 46, ¶ 7. In addition, Fisher has asserted several counter-claims against Bar J for intentional or negligent misrepresentation, violation of the New Mexico Unfair Practices Act, breach of contract, breach of the duty of good faith and fair dealing, declaratory judgment, and fraudulent inducement. *Id*. at 13-41.

In Bar J's Motion for Partial Declaratory Summary Judgment (Doc. 103), Bar J asks the Court to find as a matter of law that Fisher exercised its renewal option in 2012. Bar J also argues that Fisher's representations and conduct in the months leading up to, and after June 28, 2012, undisputedly show that Fisher intended to renew, and did renew, the ESA. Doc. 103 at 6-8, 18-19. Alternatively, Bar J contends that, even if Fisher did not renew the ESA, its terms continued to apply after June 28, 2012 because Fisher was a holdover user of the premises. Doc. 103 at 17-18.

Neither party contends that the ESA's renewal provision is ambiguous. *See LensCrafters, Inc. v. Kehoe*, 2012-NMSC-020, ¶ 18, 282 P.3d 758 (recognizing that a contract is "deemed ambiguous only if it is reasonably and fairly susceptible of different constructions."). Therefore, the Court will ascertain the purpose, meaning, and intent of the parties regarding the renewal option from its language. *See id*.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute as to any material fact unless the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (quotation omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

## III. ANALYSIS

The Court begins its analysis by setting forth the applicable law governing its analysis of the ESA's renewal provision. Because the plain language of this provision identifies renewal of the ESA as an "option" available to Fisher, the law of option contracts applies to the ESA's renewal provision. *See* ESA ¶ 4 (Fisher, "at its *option*, shall have the right to renew the [ESA] for an additional term of five years . . . . To exercise the renewal *option*, . . . [Fisher] shall deliver written notice of its intention to exercise the renewal option to [Bar J]. If [Fisher] does not exercise its renewal *option*, . . ." (emphasis added)). The Court's view of the renewal provision as an option is consistent with Bar J's treatment of the ESA's renewal provision as an 'option' throughout its briefing. *See* Doc. 103 at 1 ("Fisher had the option to renew or not to renew and it clearly exercised the option to renew."); *see id.* at 2 ("The ESA contained a five-year initial term and an option for a five-year renewal term at Fisher's option. . .").

"Defined at its most basic level, an option is simply a contract to keep an offer open."

*Garcia v. Sonoma Ranch East II, LLC*, 2013-NMCA-042, ¶ 14, 293 P.3d 510 (internal citation

omitted). "An option contract is unilateral in its character [because] [i]t is an irrevocable offer on

the part of the optionor, which the optionee has the right to exercise in accordance with the terms

of the option." *Id*. (alteration added, internal citations omitted). "When the option is exercised,

the contract becomes bilateral and binds both parties and is enforceable at the instant of either

party." *See Master Builders, Inc. v. Cabbell*, 1980-NMCA-178, ¶ 30, 622 P.2d 976  (Sutin, J.,

concurring). The failure to exercise an option results in the loss of the option. *Id*. ¶ 13.

Generally speaking, "[a]n option must be exercised strictly according to its terms." *Id*. ¶

12; *see also* 1 Richard A. Lord, Williston on Contracts, § 5:18 (4th ed.) (stating that the exercise

of an option must be done "unconditionally and according to the terms of the option"). Hence, an

"unequivocal and unqualified expression of intention to exercise an option and [the] affirmative

performance of the expressed method of exercising [an option]" is required by the optionee. *See*

*Master Builders*, 1980-NMCA-178, ¶ 30 (internal citation omitted). New Mexico courts have

indicated a preference for strict enforcement of the terms required for exercising an option

because "if the terms for exercise of the option are not strictly enforced, the optionor will be

subject to greater burdens than were the subject of the bargain." *See Garcia*, 2013-NMCA-042, ¶

27; *See United Properties Ltd. Co. v. Walgreen Properties, Inc.*, 2003-NMCA-140, ¶ 16, 82 P.3d

535 ("[T]he exercise of an option in the manner spelled out in the contract is a condition

precedent to enforcing the option.").

In this case, the terms set forth in Section 4 of the ESA pertaining to Fisher's exercise of

the renewal option were that: (i) Fisher "shall deliver" written notice of its intent to exercise the

renewal option on/before 120 days prior to June 28, 2012 -- the expiration date for the initial

term; (ii) Fisher "shall contact and negotiate exclusively with [Bar J], and not the Pueblo or governmental agencies" in "all matters relating to renewal"; and (iii) that "all payments shall be subject to renegotiation", but that all other terms and conditions of the ESA "shall remain the same" during the renewal term. ESA ¶ 4.

Although there is evidence of communications between Bar J and Fisher employees in early 2012 regarding renewal of the ESA, it is undisputed that Fisher did not provide a written notice regarding renewal until April 12, 2012.

1. Waiver of the ESA's 120-Day Deadline for Written Notice of Renewal

The Court first addresses the question of whether Fisher's April 12, 2012 letter, which indisputably occurred after the 120-day deadline for written notice of renewal, could nonetheless effect renewal. Bar J argues that it "clearly and unequivocally" waived the 120-day written notice requirement and, therefore, the lateness of the letter is irrelevant. Doc. 103 at 8-15. Fisher disagrees and argues that the Court should strictly enforce the ESA's 120-day requirement for written notice. Specifically, Fisher contends that its failure to "timely exercise its renewal option resulted in the ESA, and all of its obligations [ . . .], terminating on June 28, 2012" as a matter of law. *See* Doc. 136 at 12.

Although the terms of option contracts, including those setting time limits, are strictly enforced as a general rule, *see Garcia*, 2013-NMCA-042, ¶ 27, Bar J is correct that an optionor may waive one or more of the terms of an option. *See* 25 Williston § 67:84 (stating that "[a]s in other contracts, fulfillment of a condition imposed by the optionor may be excused or waived either expressly or impliedly."); *see also* 1 Williston § 5:18 (stating that "[n]othing less than an unconditional and precise acceptance [of the option by the optionee] will suffice unless the optionor waivers one or more terms of the option"). Thus, the Court rejects Fisher's contention

that the doctrine of waiver is available only as an affirmative defense. *See* Doc. 136 at 13-14.

Generally speaking, New Mexico courts have found that waiver may be used by any party to a contract so long as the term being waived "is intended for the waivor's sole benefit and does not infringe on the rights of others." *Brannock v. Brannock*, 1986-NMSC-042, ¶ 4, 722 P.2d 636 ("Any privilege or right which a person has [ ] by contract . . . can be waived by him 'provided it is intended for his sole benefit, and does not infringe upon the rights of others, and such waiver is not against public policy.'").

The Court likewise disagrees with Fisher's contention that Bar J cannot waive the 120-day notice requirement because this term was for the benefit of both parties, rather than for the sole benefit of Bar J. *See* Doc. 136 at 15 (citing *Brannock*, 1986-NMSC-042, ¶ 4 (stating that a valid waiver occurs when the legal right being waived is intended for the waivor's sole benefit)). Fisher asserts that the 120-day deadline also benefitted it because, "by providing a date certain for Fisher to renew, the renewal deadline provided Fisher with certainty regarding the date on which the terms of the ESA (most importantly, the mandatory minimum tonnage requirement) could no longer be automatically incorporated into any future relationship between the parties." Doc. 136 at 15. Fisher's assertion appears to be premised on the idea that its negotiating position with regard to terms of the ESA, including mandatory minimum tonnage requirements, improved after the 120-day deadline passed. This premise is incorrect. Prior to the expiration of the 120-day deadline, Fisher could have informed Bar J that it did not intend to renew the ESA. It could have then attempted to negotiate an entirely new contract with different tonnage requirements.[5] Similarly, Fisher could have tried to negotiate an entirely new contract after the expiration of the

---

[5] The Court recognizes that the ESA's renewal provision prohibited the parties from renegotiating the minimum tonnage requirement. ESA ¶ 4. While this provision would preclude the parties from renegotiating new minimum tonnage requirements within a renewed ESA, it would not prevent the parties from creating a brand new supply agreement with different tonnage requirements.

120-day deadline. While Fisher could exercise its option and automatically impose terms of the ESA on Bar J, no default mechanism existed by which terms of the ESA, including minimum tonnage requirements, would "automatically" be imposed on Fisher. Fisher could avoid these requirements by simply choosing not to renew the ESA. Thus, Fisher fails to support its position that the 120-day deadline provided a benefit to Fisher. To the contrary, because Fisher solely possessed the ability to exercise the renewal option, the 120-day written notice requirement served solely to protect Bar J by providing it with an adequate time period to prepare for the termination of the ESA if Fisher elected not to renew. *See Garcia*, 2013-NMCA-042, ¶ 14 (quoting 1 Williston § 5:15) ("an option binds the optionor, but leaves the optionee free to either accept or not, at his or her whim.").

Having established that Bar J had the ability to waive the 120-day written notice requirement, the Court next considers whether Bar J actually did so. New Mexico courts have defined waiver as the "intentional relinquishment or abandonment of a known right." *J.R. Hale Contracting Co., Inc. v. United New Mexico Bank*, 1990-NMSC-089, ¶ 11, 799 P.2d 581. In the context of contractual agreements, the New Mexico Supreme Court has recognized various situations giving rise to the waiver of a contractual term or obligation – the first and clearest being "an express declaration of waiver" by a contracting party. *Id*.; *see also id*. ¶ 13. A waiver may also be "implied in fact" in situations where the "intent to waive contractual obligations or conditions may be implied from a party's representations that fall short of an express declaration of waiver, or from his conduct." *Id*. ¶ 11. Both express and implied in fact waivers concern "a voluntary act whose effect [i.e., to waive] is *intended*." *Id*. (emphasis added). Waiver has also been recognized to occur in what has been termed "contract modification" – that is, where there

is "mutual agreement" between the parties "to waive certain obligations or conditions" coupled with "the exchange of consideration." *Id.* ¶ 13.[6]

"Unless the facts are undisputed or clearly established, the question regarding whether a party intended to waive a right is ordinarily a question of fact." *Palenick v. City of Rio Rancho*, 2013-NMSC-029, ¶ 8, 306 P.3d 447; *see also Easterling v. Peterson*, 1988-NMSC-030, ¶ 7, 753 P.2d 902 (stating that "the existence of waiver is a factual issue"). Where the facts are not in dispute, "the issue of waiver is a question of law." *Palenick*, 2013-NMSC-029, ¶ 9.

Bar J did not expressly waive the 120-day written notice requirement. Relevant to the question of whether it impliedly waived this requirement, however, is the undisputed fact that Fisher contacted Bar J about having missed the 120-day deadline for submission of the written notice and that Bar J's responses indicated its intent to allow Fisher to submit a late written notice. Bar J's intent to waive the 120-day notice requirement is specifically reflected in (1) Bar J President Louis Jacques' directive to Fisher to "get with Frank (Ted's CFO) on what to put in the notice" (Doc. 103-3); (2) Frank Duran's subsequent call asking Fisher to "go ahead and send over the formal notice that we want to extend our agreement . . . [although] [t]echnically it is late" (Doc. 103-4); and (3) the April 12, 2012 letter wherein Mr. Moehn stated that Fisher was sending written notice of its intent to renew at Bar J's "request" (Doc. 103-5). These acts and communications by Bar J all serve to support the conclusion that Bar J intended to waive the 120-day requirement. Indeed, had Bar J not intended to waive the 120-day requirement, Bar J

---

[6] The Supreme Court in *J.R. Hale* illustrated this type of waiver in the context of a land conveyance:

> If the vendor offers to eliminate the condition in exchange for a requested consideration, and the purchaser gives that consideration, the case can still be described as a "waiver"; but it is also a modification by mutual agreement—by a substituted contract—a modification that is not subject to retraction by the waiver.

*Id.* ¶ 10 (*quoting* 3A A.L. Corbin, *Corbin on Contracts* § 752 (1960)).

would not have communicated to Fisher that it should prepare and submit a notice despite the 120-day deadline having already passed. Based on the foregoing undisputed documentary evidence, the Court finds as a matter of law that Bar J impliedly waived the 120-day written notice requirement.[7]

 2.  Legal  Effect of Fisher's April 12, 2012 Letter

The Court now considers the legal effect of Fisher's April 12, 2012 letter. Bar J argues that Fisher exercised the renewal option through this letter. *See* Doc. 103 at 21 (arguing that Fisher "explicitly renewed the ESA in th[e] April 12, 2012 letter . . ."). The Court rejects this argument and concludes that Bar J and Fisher did not reach an agreement to renew the ESA prior to the expiration of the initial term because Fisher conditioned its intent to exercise the option to renew on further negotiation of material terms and the undisputed facts show that the parties did not agree to a modification of the material terms of the ESA prior to expiration of the initial term on June 28, 2012.

The ESA's renewal provision clearly and unambiguously provided that the terms and conditions of the ESA were to remain the same during the renewal term with the exception of "payments" which "shall be subject to renegotiation." *See* ESA ¶ 4. Payments, as set forth in Section 6 of the ESA, concerned the "rate" (i.e., the amount per ton of material) that Fisher was obligated to pay Bar J throughout the course of the ESA. *See* ESA ¶ 6. Of importance here, the ESA separately included a provision concerning minimum tonnage requirements during the initial and renewal terms. *See* ESA ¶ 1. It is undisputed that the royalty rate payments and the

---

[7] In light of the Court's conclusion, the Court need not address Bar J's argument under the principle of waiver by estoppel. The Court notes, however, that a premise of Bar J's waiver by estoppel argument is that there was a waiver by *Fisher*. Doc. 103 at 15-16. As the Court discussed *supra*, Fisher as the optionee could not have waived the 120-day notice requirement or any of the other terms required to exercise the renewal option.

minimum volume requirements were material terms of the ESA, and that the minimum tonnage requirement was not subject to renegotiation under the plain language of the ESA's renewal provision. Thus, the Court must determine whether Fisher's April 12, 2012 letter communicated Fisher's decision to renew the ESA, despite the minimum tonnage requirements it did not like, or, instead, conditioned renewal on renegotiating a material term not contemplated in the renewal provision.

As stated earlier, it is well-established that the exercise of an option must be unconditional and unqualified in order to be binding on the parties. *See* 1 Williston § 5:18; *see also Skarda v. Davis*, 1971-NMSC-125, ¶ 7, 491 P.2d 1153 ("An unequivocal and unqualified expression of intention to exercise an option and the affirmative performance of the expressed method of exercising it are well-established legal principles in New Mexico."). In its letter, Fisher wrote:

> This letter is to provide written documentation of Fisher's intent to extend the agreement as you have requested. Per earlier conversations regarding this notice, it is agreed that we will continue to try and best address the issues regarding royalty and volume as we move forward to the maximum benefit of both parties.

Doc. 103-5. Notably, even in the first sentence, Fisher did not make clear that the letter constituted its exercise of its option to renew the ESA. It did not, for instance, say, "through this letter, Fisher is hereby exercising its option to renew the ESA." One interpretation of the first sentence is that, instead of saying what it was doing, Fisher was stating what it intended to later do. This interpretation becomes more credible when one reads the remainder of the letter. That portion of the letter can be interpreted as Fisher indicating that it wanted to continue doing business with Bar J, but only if the royalty and volume requirements were modified. Thus, rather than communicating a decision to exercise the renewal option, the April 12th letter can be interpreted as expressing that Fisher wanted to continue doing business with Bar J and enter into

another supply agreement that allowed for modification of the previous royalty and volume requirements.

Alternatively, the words "Fisher's intent to extend the agreement" could, as Bar J suggests, evidence a present intent to exercise the renewal option. Read in isolation, this language lends itself more naturally to such an interpretation. Moreover, the renewal option provision of the ESA contemplated that Fisher effect renewal by delivering written notice of its "*intention to exercise* the renewal option." ESA ¶ 4. (emphasis added). Thus, standing alone, Fisher's written "intent to extend the agreement" would suffice to exercise its renewal option and bind the parties to a new term of the ESA.

Fisher did not, however, simply express its intention to exercise the renewal option. Instead, it conditioned renewal on Bar J's agreement to re-negotiate material terms of the ESA regarding royalty and volume. At a minimum, Fisher's statement that "it is agreed that we will continue to try and best address the issues regarding royalty and volume" prevent the Court from concluding that Fisher through this letter unequivocally expressed its intent to bind itself to the royalty and volume requirements contained in the original ESA. *See Cillessen v. Kona Co.*, 1964-NMSC-001, ¶ 16, 387 P.2d 867 (stating that the terms of an option contract must be "fully and completely accepted in all its parts" before becoming an executory contract); *see also Master Builders*, 1980-NMCA-178, ¶ 31 (Sutin, J. concurring) ("It is elementary that where one party gives an option to another, the acceptance, to be valid so as to conclude an agreement or contract between the parties, must, in every respect, meet and correspond with the offer, neither falling short of, nor going beyond, the terms proposed but exactly meeting them at all points and closing with them just as they stand." (internal citation omitted)); *see id.* ¶ 13 (affirming trial court's determination that optionee "never agreed to exercise [the option agreement] according to its

terms", thereby resulting in the loss of the option, where the optionee, at the time of attempting to exercise the option insisted on modifying the terms of the option agreement to include an additional term for payment of a brokerage commission by the optionor).

Although Bar J focuses on the first part of the April 12th letter, it is unable to adequately address the effect of Fisher's statement that "it is agreed that we will continue to try and best address the issues regarding royalty and volume as we move forward to the maximum benefit of both parties." What is the legal meaning of this language? If it is a counter-offer from Fisher, then Fisher did not unequivocally exercise its option and the ESA is not renewed. Similarly, if it is an agreement to continue to negotiate material terms, Fisher did not unequivocally exercise its option and the ESA is not renewed. Indeed, Bar J itself has asserted that "agreements to negotiate in good faith are not enforceable as a matter of law." Doc. 105 at 13. So, what is to be done with Fisher's statement that "it is agreed that we will continue to try and best address the issues regarding royalty and volume as we move forward to the maximum benefit of both parties"? Given the stringent requirements that an optionee unequivocally accept an option "as is", the Court cannot simply ignore this sentence and go forward as if it did not exist. Instead, the Court concludes that the April 12th letter did not result in the renewal of the ESA.

Aside from the April 12th letter, Bar J does not point to any other written document Fisher sent prior to June 28, 2012 that could serve to exercise the ESA's renewal option. Thus, the Court concludes that, although Bar J waived the 120-day notice requirement, Fisher did not then exercise the renewal option prior to the June 28, 2012 expiration of the initial term.

3.   Whether Fisher's Conduct After June 28, 2012 Indicates Intent to Renew the ESA

Bar J argues that Fisher's conduct and representations after the June 28, 2012 expiration of the original ESA undisputedly show that Fisher intended to renew the ESA and that the ESA

19

was in fact renewed. Doc. 103 at 6-8, 18-19. Bar J relies specifically on the following conduct by Fisher: 1) failing to provide a verification of termination or removing its equipment and reclaiming the property, as required if the ESA was not renewed; 2) continuing to use the premises, operate the mine, and purchase materials until January 2015; and 3) referring to an "existing agreement" in its written communications with Bar J in 2013 - 2014 and the Pueblo in 2014.

Drawing all factual inferences in favor of Fisher, however, Fisher also repeatedly expressed reservations about going forward with the ESA with the same minimum tonnage requirements. This included Mr. Fisher's conversation with Mr. Martinez in early 2012 that Fisher anticipated it would not be able to meet the minimum tonnage requirement going forward; Mr. Fisher's communications with Mr. Martinez regarding the invoices for calendar years 2012 and 2013; the April 2013 meeting to discuss lowering royalty rates; and Mr. Moehn's 2013 email of a proposed amendment to "our supply agreement . . . [that] spells out lower minimums and also a flat royalty rate" (Doc. 38-2). This conduct by Fisher undermines Bar J's contention that Fisher, through its conduct and representations, renewed the ESA with its existing minimum tonnage requirements. Stated differently, there is no indication that the parties reached a meeting of the minds with regard to the material terms of a renewed ESA.[8] Thus, the Court is unable to conclude as a matter of law that the ESA was renewed based on Fisher's conduct.

      4.   Whether Fisher was a Holdover User

---

[8] If both parties thought a renewed ESA governed their relationship after June 28, 2012, which may have been the case, it is clear that the parties had no meeting of the minds with regard to the material terms of the ESA thought to be governing their relationship. Bar J's conduct in invoicing Fisher for minimum tonnage requirements indicates it believed those requirements continued to exist (although Ted Martinez's alleged statements to Fisher belies this notion) while Fisher believed they did not. Had the parties agreed to material terms such as what, if any, minimum tonnage requirement existed, they would not have continued to have had conversations into April 2013 about what minimum tonnage requirement they were operating under.

Lastly, Bar J contends that, even if Fisher did not renew the ESA, its terms continued to apply after June 28, 2012 because Fisher was a holdover user of the premises. Doc. 103 at 17-18. Bar J asks the Court to treat Fisher as a "tenant (premises user)" and find, under New Mexico law, that Fisher's continued use of the premises and purchase of material "was under the same terms as the original ESA." *Id*.

Initially, the Court observes that the cases cited by Bar J in support of its holdover argument all concern the application of holdover principles in the area of landlord/tenant law. This is consistent with the Court's observation that the weight of New Mexico authority regarding holdover is in the area of lease agreements. *See, e.g.*, *Otero v. City of Albuquerque*, 1916-NMSC-043, 158 P. 978 (tenant holding over with the assent of the landlord following the expiration of a lease agreement); *Shirley v. Venaglia*, 1974-NMSC-074, ¶¶ 10, 13, 527 P.2d 316 (lease agreement containing an express holdover provision allowing for a month to month holdover tenancy subsequent to the initial term); *State ex rel. State Highway Comm'n v. Gray*, 1970-NMSC-059, 467 P.2d 725 (lease with express holdover provision); *Burke v. Permian Ford-Lincoln-Mercury*, 1981-NMSC-001, 621 P.2d 1119 (stating the general rule that "[a] tenant holding over after expiration of a lease without the landlord's assent holds on the same terms as those of the original lease, including all covenants thereof, unless made inapplicable by changed conditions.").

The primary New Mexico case Bar J relies on, *Otero v. City of Albuquerque*, involved a lease agreement where the tenant held over after the agreement expired with the consent of the landlord. The particular issue before the New Mexico Supreme Court was whether all of the terms of the lease agreement remained in effect during the holding over period. 1916-NMSC-043, ¶ 6. Contrary to Bar J's reading of the case, the case did not address the circumstances

under which a holdover relationship may arise, but rather what terms of the lease agreement applied once a holdover tenancy is in place. *Id*. The Supreme Court concluded that "all parts of the lease survive the holding over unless shown to be inapplicable by reason of changed conditions." *Id*. at ¶ 7.

Similarly, *Fun Prods. Distrib., Inc. v. Martens*, 559 P.2d 1054 (Ala. 1977), another case Bar J relies on in support of its holdover argument, did not consider holdover principles. Instead, it concerned the waiver of defects in a written lease renewal notice. As a result, it also fails to support Bar J's argument.

In addition to a dearth of case support, given the nature of the contracts at issue in those cases, it is not readily apparent that holdover should be applied in this case where the contract at issue is plainly not a lease agreement. Nor are Bar J's attempts to characterize Fisher as a "tenant" or "premises user" persuasive. The relationship between the parties set forth in the ESA was that of "Supplier" and "Customer," not landlord and tenant (or lessor/lessee). In addition, the ESA reflected an agreement between the parties that it "is not a transfer or assignment of any rights in the Lease [between the Pueblo and Bar J Trucking], is not a sublease, and is not an operating agreement under the Lease." ESA ¶ 37. Further, the ESA included language that Fisher's use did not result in it retaining any interest in the premises. *See* ESA Recitals (Fisher "will acquire no right, title, or interest in the Lease or the Premises . . ."); ESA ¶ 2 (Fisher "does not have and does not hereby acquire any right, title or interest in the Lease, and therefore has no authority to alter or comment upon the terms of the Lease."). This language in the ESA demonstrates that at the time of its formation, the parties did not intend for the ESA to be construed as a lease agreement or as providing Fisher with rights or interests akin to those of tenants. To now construe the ESA as such would be contrary to the intention of the parties.

More importantly, the ESA does not contain any language from which the Court may discern that the parties intended, or contemplated, the formation of a holdover relationship. As Bar J readily acknowledges throughout its briefing, there is no express holdover provision in the ESA. *See* Doc. 103 at 10. Nor does Bar J point to any provision of the ESA showing that the parties contemplated the possibility of Fisher holding over. To the contrary, Bar J asserts that "the *only* two options the parties negotiated and included" in the ESA were to "renew or terminate." Doc. 103 at 2 (emphasis added). This is consistent with various provisions of the ESA – including the renewal option (¶ 4), the reclamation provision (¶ 14), and the default provisions (¶¶ 23 - 24) – which also indicate that the parties intended for there to be a firm end to the agreement. "When discerning the purpose, meaning, and intent of the parties to a contract, the court's duty is confined to interpreting the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new agreement for the parties." *See CC Hous. Corp. v. Ryder Truck Rental, Inc.*, 1987-NMSC-117, ¶ 6, 746 P.2d 1109. Because the ESA is not a lease and there is no language in the ESA contemplating Fisher holding over, the Court is unable to conclude that holdover occurred in this case.

## IV. CONCLUSION

Based on the foregoing, the Court concludes that the ESA was not renewed and therefore **DENIES** Bar J's motion for partial declaratory summary judgment (Doc. 103).

**IT IS SO ORDERED**.

UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**