# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

BAR J SAND & GRAVEL, INC.,
a New Mexico corporation,

      Plaintiff,

v.                                             Civ. No. 15-228 SCY/KK

FISHER SAND & GRAVEL CO.,
a North Dakota corporation, doing business
in New Mexico through its division
SOUTHWEST ASPHALT & PAVING,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff Bar J Sand & Gravel, Inc.'s (Bar J)

Motion to Dismiss or in the alternative for Summary Judgment on Counts I, II, V, VI and VIII of

Fisher's Amended Counterclaims. Doc. 197. Fisher has acknowledged that in light of the Court's

prior rulings, Counts V, VI, and VIII of its Amended Counterclaim are moot. Doc. 224 at n.1. As

a result, the Court dismisses those counts. Count I of Fisher's Amended Counterclaim alleges

that Bar J intentionally or negligently misrepresented that a lease between two separate entities

that had to be in place for Fisher to continue to do business with Bar J had been extended. Doc.

49 at 35. Because the Court rejects Bar J's arguments regarding duty and because genuine

disputes of material facts related to Fisher's claims exist, the Court denies Bar J's motion with

regard to Count I of Fisher's Amended Counterclaim. In Count II of its Amended Counterclaim,

Fisher asserts that Bar J's alleged misrepresentations regarding the lease extension support a

violation of New Mexico's Unfair Practices Act (NMUPA). Doc. 49 at 37. Because the Court

finds that a NMUPA violation can occur in the absence of a contract and that the alleged false or

misleading representation(s) were made "in connection with" the sale of goods to Fisher, the

1

Court also denies Bar J's motion with regard to Count II of Fisher's Amended Counterclaim.

Accordingly, Bar J's motion is granted in part and denied in part.

## I. APPLICABLE LEGAL STANDARDS

Rule 12(b)(6)[1]

Rule 12(b)(6) allows for the dismissal of a complaint where the plaintiff has failed to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006) (internal citation omitted). In considering dismissal under Rule 12(b)(6), the Court will "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). Generally, a district court can consider outside materials only by converting a 12(b)(6) motion to dismiss to a motion for summary judgment. *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253 (10th Cir. 2005). But conversion is unnecessary when the documents are referenced in the complaint and their authenticity is unchallenged. *Id.* at 1253-54.

A complaint will survive a Rule 12(b)(6) motion if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "In determining the plausibility of a claim, we look to the elements of the particular cause of action, keeping in mind that the Rule 12(b)(6) standard [does not] require a plaintiff to set forth a prima facie case for each element. The nature and specificity of the allegations required to state a plausible claim will vary based on context. But mere labels and conclusions

---

[1] Although Bar J failed to expressly state that it is seeking to dismiss Fisher's remaining counterclaims pursuant to Rule 12(b)(6), Bar J recited the legal standard for Rule 12(b)(6) motions and further indicated that this legal standard was "applicable" to its motion. Doc. 197 at 6.

and a formulaic recitation of the elements of a cause of action will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (internal quotation marks and citations omitted). "Thus, a claim is facially plausible if the plaintiff has pled factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Rule 56

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute as to any material fact unless the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (quotation omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

## II.    ANALYSIS

### a. Intentional or Negligent Misrepresentation Counterclaim (Count I)

"In New Mexico, misrepresentation can be by either commission or omission." *Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶ 20, 310 P.3d 611. Fisher alleges both types in this case. Specifically, Fisher claims that Bar J misrepresented to Fisher that the lease with the Pueblo had been extended for an additional ten years.[2] Fisher also alleges that Bar J had a duty to disclose problems with the lease, and that Bar J's failure to do so constituted a misrepresentation by omission.[3] Fisher claims it relied on Bar J's misrepresentation that the lease had been renewed and therefore continued to produce and stockpile inventory because it expected that it would be

---

[2] Fisher's specific allegations with regard to misrepresentation by commission are that:

> 116. On or around April 22, 2013, Bar J represented to Fisher that the Lease with the Pueblo had been extended for an additional ten years.

> 117. At the time that it represented that the Lease had been extended for an additional ten years, Bar J knew that the Lease had not been extended and Bar J knew that in fact the BIA had cancelled the Lease or that the Lease was in serious jeopardy of not being renewed due to Bar J Trucking's failure to pay approximately $363,074.40 in royalties to the Pueblo and/or other acts of Bar J Trucking.

> . . .

> 134. In misrepresenting to Fisher that the Lease with the Pueblo had been extended and in failing to correct the misrepresentation, Bar J acted willfully, wantonly, maliciously, recklessly, oppressively, or fraudulently.

Doc. 49 at 35, 37.

[3] With regard to misrepresentation by omission, Fisher makes the following allegations:

> 125. Per the terms of the agreement between the parties, Bar J had a duty to inform Fisher of the problems with the Lease.

> 126. Per the terms of the agreement between the parties, Bar J had a duty to inform Fisher of the concerns raised by the Pueblo regarding continued operations at the Mine.

> 127. Bar J's failure to inform Fisher about the problems with the Lease or the Pueblo's concerns constituted a misrepresentation by omission.

*See* Doc. 49 at 36.

able to continue its mining operations beyond January 2015, when the lease was initially set to expire. Doc. 49 at ¶ 121. Fisher further asserts that, because Bar J did not notify Fisher until August 29, 2014, that the lease would not been renewed, it was forced to abandon 300,000 tons of stockpiled material when the lease ended on January 17, 2015. *Id.* ¶¶ 120, 130.

This is Bar J's second motion seeking dismissal or the grant of summary judgment in its favor as to Fisher's intentional or negligent misrepresentation counterclaim. *See* Doc. 104 (Bar J's Motion for Partial Summary Judgment on Count I of Fisher's Amended Counterclaim – Intentional or Negligent Misrepresentation). The Court initially sets forth the following facts taken from its previous order (Doc. 183), that, unless otherwise noted, are undisputed. To the extent the facts are disputed, the Court views the facts and all reasonable inferences therefrom in the light most favorable to Fisher, the non-moving party. *See S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (quotation omitted).

### 1. Background Facts

Fisher's intentional or negligent misrepresentation counterclaim arises in part from the April 22, 2013 meeting between Bar J and Fisher personnel. The individuals present at the April 22, 2013 in-person meeting on behalf of Bar J were Ted Martinez and Frank Duran. Doc. 104-1. Tommy Fisher, Mike Moehn and Dave Olson attended on behalf of Fisher. *Id.* According to Fisher, the purpose of the meeting was to discuss "whether the royalty rate could be reduced and how best to reduce the parties' agreement into writing." *Id.* During the meeting, Fisher inquired as to the term of the proposed amendment it was going to draft because "if the Lease was to expire in January 2015, it may not be necessary to reduce anything to writing but that if the Lease was going to be extended, then the agreement that Fisher was to draft should reflect that additional term." *Id.* Fisher states that at that point, "Frank Duran emphatically stated that the

Lease had been extended another ten years." *Id*. Fisher claims that Ted Martinez did not disagree with or correct Duran's statement, and that he did not make any statements contrary to Duran's representation that the lease had been renewed. *Id*.

Mike Moehn, who was present at the meeting, testified in his deposition that Frank Duran told Fisher personnel at the meeting that the Pueblo had extended the lease for an additional ten years. *See* Moehn Depo., Oct. 12, 2015, 110:19-112:3 (Doc. 104-3) ("I just remember him saying we have it for ten more years"; "he was emphatic that they had the lease for ten more years"; "I took it as they had the lease secured for ten more years, and that's how he portrayed it"). Moehn did not, however, recall the exact words used by Duran. *Id*.

Frank Duran's recollection of the April 2013 meeting differs from that of Moehn. In his affidavit, Duran states that although he does not recall what was specifically said at the meeting, he "would not have said definitely, or otherwise, that Bar J Trucking had 'secured' an additional ten-year lease with the Pueblo." Doc. 104-5 at ¶ 5. Duran denies that he would have made this representation because (1) he had no relationship with Bar J Trucking and (2) Bar J Trucking did not share its dealings with the Pueblo with him. *Id*. Duran further states that he would not have made a representation regarding lease renewal at the meeting because the lease "renewal or non-renewal decision did not have to be made by the Pueblo for more than a year and one-half." *Id*. Additionally, Duran states that he is not an employee or agent of Bar J or Bar J Trucking and has never had the authority to bind either of these entities. *Id*. ¶¶ 1-3. Duran indicates in his affidavit that he has always represented to Fisher that he works for MCT Industries. *Id*.

Following the April 2013 meeting, Fisher did not independently investigate Duran's alleged representation that the lease had been extended. Doc. 104-1. In May 2013, Moehn sent an email to Duran regarding a "Proposed Ammendment [sic] to Supply Agreement". Doc. 104-2.

Attached to the email was a copy of the proposed amendment, which included in relevant part a proposed term of five years with an option to renew for an additional five years. *Id*. It is undisputed that Bar J did not sign this proposed amendment. *See* Doc. 104 at 3, Doc. 105 at 9. Fisher nonetheless continued its mining operations through 2013 and into calendar year 2014.

On August 29, 2014, a Fisher employee learned from a newspaper article that the lease had not been renewed. Doc. 137-3 at 5; *See also* Moehn Depo. 295:5-7 (Doc. 104-3). Fisher then contacted Bar J, and Bar J confirmed that the Pueblo would not be renewing the lease. Doc. 137-3. At that point, Fisher stopped production of additional materials, but it had approximately 340,000 tons of stockpiled material.[4] Doc. 137-3 at 8; Doc. 104-4. Fisher did not remove its stockpiled material when the lease ended on January 17, 2015. Moehn testified that the reason Fisher did not remove the material is because the time frame was too prohibitive to secure and prepare a new site to store the stockpiled material and to transport the materials. Moehn Depo. 295:1-5 (Doc. 137-1). Fisher asserts that had Bar J informed Fisher of the issues surrounding the lease, including its cancellation, Fisher would have "converted its operations to an on-demand production model and would have sold most or all of the inventory that was in place as of April 22, 2013." Doc. 137 at 6.

During the course of discovery in this case, Fisher obtained documents from Bar J indicating that a month prior to the April 2013 meeting, Bar J, Bar J Trucking, Louis Jacques, and Ted Martinez "were notified by letter from Acting Superintendent of the Bureau of Indian Affairs and by letter from Insurance Company of the West that Bar J Trucking owed the Pueblo

---

[4] The parties have presented evidence with regard to Fisher's practice of stockpiling materials during the course of its operations. Moehn testified in his deposition that the decision to stockpile material was based on sales volume. Moehn Depo. 273:12-16 (Doc. 137-1). Fisher's need for stockpiled material varied with the type of job. Moehn Depo. 277:12-19 (Doc. 137-1). Once the market declined at the end of 2011, Fisher tried to keep its inventories as low as possible. Moehn Depo. 278:20-25, 281:5-9 (Doc. 137-1).

approximately $263,074.40 for unpaid royalties for royalty adjustments made under Bar J [Trucking's] lease with the Pueblo." Doc. 137-3 at 7. On or about April 25, 2013, Fisher asserts Bar J Trucking was informed that the BIA had decided to cancel the lease.[5] *Id.* Bar J Trucking appealed the decision and, on September 23, 2014, the BIA's Southwest Regional Director affirmed the decision. *Id.* The affirmance was appealed but later dismissed as moot on January 30, 2015. *Id.* at 7-8.

### 2. Additional Facts

The parties set forth the following additional facts in connection with the motion at issue. Doc. 197 at 5-6; Doc. 224 at 3-11; Doc. 234 at 4-7.

From June 28, 2012 until January 2015, Fisher sold 459,776 tons of material. *See* Schwarzkopf Report, Doc. 197-1, at 8. During this time period, Fisher produced 170,687 tons of material. *Id.* Fisher states that it paid Bar J $1.3 million in royalties for each ton of material it sold between June 28, 2012 and January 2015. *Id.* The parties dispute whether Fisher would have had to abandon 289,089 tons of stockpiled material had it ceased operations on June 28, 2012. *See* Doc. 197 at 5; Doc. 224 at 5.

Fisher claims it continued its operations after June 28, 2012, with Bar J's "permission and consent." Doc. 224 at 4. During the entire time Fisher operated the pit, it paid Bar J $5,000 each month for a Bar J employee to operate a weigh station. *See* Doc. 224 at 6 (citing Ted Martinez Depo. 39:1-40:1, Doc. 224-1; Michael Moehn Depo. 256:3-23, Doc. 224-2). Tommy Fisher testified in his deposition that he never heard that Bar J had any problems with the royalty

---

[5] The Court notes that Ted Martinez also testified in his deposition regarding a July 3, 2014 letter from the Pueblo that stated: "The tribal council has determined that, for the foreseeable time, the Pueblo will not seek to continue sand and gravel or gypsum mining operations with Bar J or any other entity." Martinez Depo. 156:6-15 (Doc. 137-4). Mr. Martinez testified that he did not tell Fisher about this letter because he was still "trying to negotiate with the Pueblo" to "reconsider its decision to cancel the lease." *Id.* 156:6-157:15.

amounts Fisher paid from June 28, 2012 onwards. *See* Tommy Fisher Depo. 267:11-13 (Doc. 224-3).

In early 2013, Fisher received an invoice from Bar J for unpaid minimum tonnages during 2012. *See* Fisher Depo. 209:22-210:12 (Doc. 136-1); *see also* Doc. 38-4. This invoice indicated that the minimum tonnage requirement was 400,000 tons, that Fisher removed and paid for approximately 183,764 tons, and that Fisher owed Bar J approximately $564,375 for the 216,235 tons that it was below the minimum. Doc. 38-4. Upon receipt of this invoice, Tommy Fisher reached out to Mr. Martinez. *See* Fisher Depo. 209:22-210:12 (Doc. 136-1). Mr. Fisher testified that Mr. Martinez told him that the invoice was sent in error, that he would take care of it, and that he reconfirmed the parties had agreed to a reduced tonnage requirement of 150,000. *See* Fisher Depo. 228:8-230:24 (Doc. 136-1). Mr. Fisher testified that Mr. Martinez told him to send a letter to him following up on their conversation and, on February 8, 2013, he sent such a letter. *Id.*; Doc. 6-2. In this letter, Mr. Fisher summarized the communications he believed Bar J and Fisher employees had the prior year regarding "adjustments to the terms" of the original ESA and expressed his "understanding that while [they] hadn't established a minimum requirement going forward, as long as [Fisher] did at least 150,000 Tons in 2012, there wouldn't be any additional royalty amounts sought." Doc. 6-2. Mr. Fisher also indicated in the letter that he hoped the bill for additional minimums was sent in error "as it didn't reflect our earlier conversations." *Id.*

Mr. Fisher testified that Bar J did not send any further invoices for the 2012 minimums during the calendar year 2013, despite invoicing Fisher for other amounts that year. Fisher Depo. 277:2-19. In early 2014, Fisher once again received an invoice from Bar J for alleged underpayments. Doc. 38-5. This invoice did not include the 2012 minimums. *Id.* The invoice

reflected a minimum tonnage requirement of 400,000 tons for 2013 and, in addition to the 161,211 tons Fisher actually purchased, billed Fisher approximately $637,566 in connection with difference between the asserted 400,000 minimum and the approximately 161,211 tons purchased. *Id*. Tommy Fisher testified that he contacted Ted Martinez regarding the 2013 invoice, and that Mr. Martinez once again stated the invoice was sent in mistake. Fisher Depo. 283:2-15 (Doc. 138-1). The monthly invoices sent to Fisher during 2014 did not include the 2013 minimums. Fisher Depo. 277:2-19.

### 3. Analysis

Bar J argues that it had no duty to inform Fisher of the impending expiration of the lease between Bar J Trucking and the Pueblo and, therefore, Fisher's misrepresentation counterclaim fails. Bar J primarily argues that the Court determined no contractual relationship existed between the parties and that, in the absence of a contractual relationship in 2013 and 2014, Bar J had no duty to disclose any problems with the lease to Fisher. Essentially, Bar J argues that once the ESA expired, Fisher became a trespasser with no right to be on the property, much less with any right to be informed of whether a lease regarding the property had been extended. Analysis of Bar J's arguments begins with determining whether Fisher's misrepresentation counterclaim requires the existence of a duty. If a duty is required, the next question is whether that duty must be based on a contractual relationship. Once the Court defines these legal standards, it will apply them to the facts of this case.

#### (i) Legal Framework

Fisher acknowledges that negligent misrepresentation and intentional misrepresentation claims through omission require the existence of a duty. *See* June 11, 2018 Hearing Tr. at 140 (Doc. 256) ("[i]f you are making an intentional fraud claim based on a failure to disclose, you

have to show a duty. You have to show that the person had an obligation to tell you something."); Doc. 224 at 13 (discussing duty analysis for negligent misrepresentation claims). Thus, the only dispute concerns whether intentional misrepresentation through an affirmative statement requires the existence of a duty. The New Mexico Court of Appeals in *R.A. Peck, Inc. v. Liberty Fed. Sav. Bank* wrote, "[a]bsent fraud, negligent misrepresentation requires a duty on the part of the person furnishing information; the person receiving the information must have a right to rely on it." 1988-NMCA-111, ¶ 10; 766 P.2d 928. The caveat "absent fraud" indicates that, unlike other circumstances, when the person who furnishes information is committing fraud, no duty is required. Other cases, however, indicate that intentional misrepresentation also requires a duty. *See Delgado v. Costello*, 1978-NMCA-058, ¶ 9, 580 P.2d 500 (indicating that constructive fraud, fraud, and negligent misrepresentation claims "depend on a duty on the part of defendants" and discussing the duty to disclose in the context of these claims); *Bull v. BGK Holdings, LLC*, 859 F. Supp. 2d 1238, 1243 (D.N.M. 2012) ("Common law claims of negligent and intentional misrepresentation can be examples of claims which arise from an independent and recognized duty of care."). Rather than resolving this legal issue, the Court assumes that intentional misrepresentation by affirmative statement also requires the existence of a duty.

Next, the Court considers whether the duty required must arise from a contractual relationship. Bar J argues that, in the absence of a contract between the parties in 2013 and 2014, the Court must necessarily find as a matter of law that Bar J had no duty to disclose problems with the lease to Fisher during this time period. *See* Doc. 197 at 9 ("Fisher's claim of misrepresentation assumes that Fisher and Bar J S&G had a contractual relationship from which a duty could arise. . . Without a contractual relationship giving Fisher that right [to continue selling existing stockpiled inventory in 2013-2014], no duty was or could have been owed by Bar

J S&G to Fisher."). The Court disagrees with this argument and concludes that a duty to disclose can arise even in the absence of a contractual relationship between the parties. Bar J does not point to any New Mexico cases that have hinged the duty to disclose *solely* based on whether there is a binding contract between the parties. The cases the Court has come across indicate that while a contractual relationship can give rise to a duty to disclose, such a duty may arise in other ways. In *Krupiak v. Payton*, 1977-NMSC-024, ¶ 3, 561 P.2d 1345, the New Mexico Supreme Court provided the following general guidance as to when a duty to disclose may arise in fraudulent misrepresentation claims:

> A duty to disclose may arise if there is knowledge that the other party to a contemplated transaction is acting under a mistaken belief. A duty to disclose may also arise if one has superior knowledge that is not within the reach of the other party or could not have been discovered by the exercise of reasonable diligence.

*Id*. In *R.A. Peck, Inc.*, the court stated that:

> [I]n instances where concealment or failure to disclose is alleged, such as in claims of fraudulent or negligent misrepresentation, the relationship existing between the parties that gives rise to the duty falls into three distinct classes:
>
> 1.   Where there is a previous definite fiduciary relation between the parties[;]
>
> 2.   Where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other[;]
>
> 3.   Where the contract or transaction is intrinsically fiduciary and calls for perfect good faith. The contract of insurance is an example of this last class.

1988-NMCA-111, ¶ 17. Further, in *Azar v. Prudential Ins. Co. of Am.*, 2003-NMCA-062, ¶ 61, 68 P.3d 909, 928, the court relied on the Restatement for "when a party to a business transaction is under a duty to disclose material information *prior* to the consummation of [a] transaction." (emphasis added). The court relied on Section 551(2)(e), which provides that a party:

> is under a duty to exercise reasonable care to disclose to the other ... facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the

customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

*Id*. at ¶ 61. The *Azar* court concluded that "courts typically consider a number of factors, including the relationship between the parties, the relative knowledge of the parties, the reasonable expectations of the plaintiff, the practices or customs of the trade, and other relevant circumstances, in determining whether there is a duty to disclose material facts." *Id.* at ¶ 61. These cases make clear that while the existence of a contract may be a circumstance favoring the finding of a duty to disclose, a duty may nevertheless arise based on other factors.

Further supporting the Court's conclusion is the New Mexico Supreme Court's holding that an action for negligent misrepresentation can be brought even where a contract between the parties is found to be void and unenforceable. *See Sims v. Craig*, 1981-NMSC-046, 627 P.2d 875 (holding that the plaintiff could bring an action for negligent misrepresentation although the plaintiff could not sue for breach of option contract because the contract was void). In *Leon v. Kelly*, 2008 WL 5978926, at *7 (D.N.M. 2008), Judge Browning likewise held that "[n]egligent misrepresentation is a tort, and while it requires a professional or business relationship to a certain degree, it does not require an actual contract or partnership." In so holding, Judge Browning relied upon the Restatement (Second) of Torts § 552, which New Mexico has adopted, and which discusses negligent misrepresentation claims not in terms of a contractual relationship, but in terms of a transaction in the course of business in which a party has a pecuniary interest:

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552. Emphasizing that New Mexico cases setting forth the elements of a negligent misrepresentation claim "do not require the existence of a contract," 2008 WL 5978926 at *7, Judge Browning concluded in *Leon* that the lack of a partnership or contract between the parties would not defeat a negligent misrepresentation claim. Judge Browning also noted his belief that intentional misrepresentation claims also are not dependent on the existence of a contract. *Id*. n.1. This makes sense: the liability of an intentional fraudster should not require a more formal relationship than that required of one who misrepresents merely through negligence. *Cf. R.A. Peck, Inc.*, 1988-NMCA-111, ¶ 10 ("[a]bsent fraud, negligent misrepresentation requires a duty on the part of the person furnishing information; the person receiving the information must have a right to rely on it."). Thus, the Court agrees with Judge Browning that the existence of a contract is neither a requirement of negligent nor intentional misrepresentation claims. Therefore, even if the Court ultimately finds there was no contractual relationship between the parties during 2013 - 2014, Fisher is not precluded from bringing its intentional or negligent misrepresentation counterclaim.

Even if a contractual relationship is not required, however, Bar J argues that Fisher is limited to a contractual theory of duty because its misrepresentation by omission claim is premised on an "agreement between the parties." *See* Doc. 49, ¶¶ 125-126. If Fisher's misrepresentation by omission claim were only premised on paragraphs 125 and 126 of Fisher's counterclaim, the Court would agree that Fisher would be limited to the claim it pled – a representation by omission claim premised on an "agreement between the parties." Fisher, however, also makes the general allegation that "Bar J's failure to inform Fisher about the problems with the Lease or the Pueblo's concerns constituted a misrepresentation by omission." *Id*. at ¶ 127. Thus, Fisher's misrepresentation by omission claim is not dependent on an

agreement between the parties. Therefore, even assuming Bar J is correct that paragraphs 125 and 126 reference Fisher's contract counterclaims the Court has dismissed, Fisher has also pled misrepresentation by omission that does not depend on the existence of a contract.

### (ii)  Application of Legal Framework to Facts Presented

Having determined that Fisher's misrepresentation claim can only prevail if Fisher establishes the existence of a duty, the Court next determines whether Fisher has presented sufficient evidence to survive Bar J's motion for summary judgment. The Court engages in this analysis even though the question of whether a duty exists is generally a question of law for the Court to decide. *See R.A. Peck, Inc.*, 1988-NMCA-111, ¶ 12 (stating that duty in context of fraudulent omission is generally a question of law). This is because "where the facts and circumstances of the relationship between the parties are at issue, . . . existence of a duty may become a mixed question of law and fact under which the fact issue must be submitted to the jury for resolution." *Id.* at ¶ 16.

Bar J argues that Fisher was a trespasser and, therefore, it indisputably did not owe Fisher a duty. Specifically, Bar J asserts:

> The legal effect of the [Court's] two rulings [Doc. 180 and Doc. 182] is that after June 28, 2012, there was no contract between the parties; Bar J S&G had no obligation or duty to Fisher; Fisher had no right to be on the property; Fisher had no right to take or stockpile materials; Bar J S&G had not given Fisher permission to be on the property absent a renewal (which Bar J S&G thought had occurred); and Fisher had no license to be on the property. Given the Court's rulings, there is no legal rubric that correctly describes any relationship that would allow Fisher to continue to take aggregate from the stockpiles on the property or to mine after June 28, 2012. The undisputed facts establish that Fisher continued to take aggregate from the property for two and a half years after the agreement (ESA) terminated --- with no contract, right or permission to do so.

Doc. 197 at 2; *see also* Tr. at 107 (limiting the possibilities to "trick or trespass."); Tr. at 6 ("Fisher did continue to operate even though its only choice was to renew or leave the premises.").

The Court rejects Bar J's contention that, absent the ESA, Fisher necessarily became a trespasser. Fisher has presented evidence that Bar J permitted it to remain on the property after June 28, 2012. Doc. 224 at 6 (Fisher's Additional Fact F that throughout the entire time Fisher operated the pit, Fisher paid Bar J $5,000 per month to have a Bar J employee operate the weigh station; Fisher's Additional Fact G that Bar J sent monthly invoices to Fisher, including during the time period from June 28, 2012 to January 2015, that Fisher paid each of these invoices, and that Bar J never once declined payment; Fisher's Additional Fact G that Bar J never told Fisher to get off the property). This evidence undercuts Bar J's argument that Fisher remained on the property without Bar J's permission. *See Duke v. Garcia*, 2014 WL 1318646, at *1 (D.N.M. 2014) ("Trespassing, both at common law and by statute, is the entry onto another's property without permission of the owner." (internal citation omitted)). The Court asked Bar J during the hearing on this motion whether it was possible that each party proceeded under the mistaken belief that the ESA had been renewed, albeit with different minimum tonnage requirements in mind. Tr. at 122. Bar J responded that it was not possible because the ESA only provided two options: renew the ESA or leave – "[i]t did not give them a third choice, 'Oh, stay on the property and see if we get kicked off by unilaterally believing we had an agreement for 150,000 tons." Tr. at 123. To the extent Bar J argues that the ESA did not contemplate the possibility of a misunderstanding and, therefore, a misunderstanding could not have occurred, the Court rejects this contention as a logical fallacy – Bar J's conclusion does not necessarily follow its premise.

Bar J further argues, however, that the possibilities are limited to "trick or trespass" because Fisher cannot "unilaterally determine and decide it can do whatever it wants to do" after the original ESA expired. Tr. at 5; *see also*, 26, 123. Of course contracts would be meaningless if a party to a contract could escape the terms of the contract by simply unilaterally deciding that some term of the contract is no longer favorable. Bar J's argument, however, presumes the party acting unilaterally is trying to get out of an existing contract. In this case, the Court has ruled that the ESA expired without being renewed. Therefore, to the extent Fisher made a "unilateral" decision that a 400,000 minimum tonnage requirement was too much, that decision related to whether it would choose to form a new contract with that minimum tonnage requirement, not to whether it could escape an existing contract with that minimum tonnage requirement.[6]

The Court also rejects the argument that the ESA's minimum tonnage requirements necessarily prevented the parties from later agreeing to do business with a reduced minimum tonnage requirement. As the Court stated in a previous order,

> [t]he Court recognizes that the ESA's renewal provision prohibited the parties from renegotiating the minimum tonnage requirement. ESA ¶ 4. While this provision would preclude the parties from renegotiating new minimum tonnage requirements within a renewed ESA, it would not prevent the parties from creating a brand new supply agreement with different tonnage requirements.

Doc. 240 at 13 n. 5. Thus, in rejecting Fisher's contention that its negotiating position improved after the 120-day deadline to renew the ESA passed, the Court noted, "[p]rior to the expiration of the 120-day deadline, Fisher could have informed Bar J that it did not intend to renew the ESA. It could have then attempted to negotiate an entirely new contract with different tonnage requirements." Doc. 240 at 13. Similarly, the parties could have, at any other time, negotiated an

---

[6] Of course, neither party could form a contract by unilaterally agreeing to a material term. Indeed, the Court granted Bar J's motion for summary judgment and dismissed Counts III and IV of Fisher's counterclaim based on its determination that the parties did not assent to a 150,000 minimum tonnage requirement. Doc. 182 at 8.

entirely new ESA with different minimum tonnage requirements that would come into effect after the original ESA expired.

The universe of other possibilities does not end here. For example, it could be that Bar J tricked Fisher, as Fisher alleges. The parties could have also agreed to continue to do business while they attempted to negotiate the terms of a new ESA (Fisher claims that it is a normal custom and practice in the mining industry for parties to continue operations i.e., maintain the status quo, while negotiating a new supply agreement). Or, the parties could have continued to do business thinking they had an agreement, even though it was later determined no such agreement ever existed due to confusion and, therefore, lack of mutual assent as to a material term. Addressing the universe of possibilities and whether one theory might have better traction than another, however, is not the task before the Court. Instead, the Court is limited to addressing the issues placed before it – whether a particular motion has merit and later, at trial, whether a party has proven the particular claims that party has pled.

Bar J's assertion of an all or nothing scenario ("it's either trick or trespass") misapprehends the nature of the Court's previous rulings. Bar J claims the Court has determined that no contract between the parties could exist after expiration of the ESA. To the contrary, the Court has only determined that certain contract theories pled by the parties do not survive summary judgment. That is not the same as finding that no contract could have existed between the parties upon expiration of the ESA. *See* Tr. at 12 (Court did not "try to opine what I think the parties agreed to or what the meeting of the minds was."), Tr. at 137-38 (discussion about whether it is possible that an implied contract that did not include a minimum tonnage requirement could have been formed).

Indeed, despite asserting here that "the legal effect of the [Court's] two rulings [Doc. 180 and Doc. 182] is that after June 28, 2012, there was no contract between the parties", Bar J is elsewhere arguing that its First Amended Complaint alleges that an implied contract between the party exists and is seeking to amend this complaint to specifically allege that the parties formed an implied contract. *See* Doc. 242 at 1 (Bar J's motion for leave to file second amended complaint in order to "clarif[y] that the contract Fisher breached was either the ESA or a new express or implied contract with the same terms as the ESA"); s*ee also*, Tr. at 81-82 ("[W]e continue to think that the First Amended Complaint as it stands would cover these three things. . .One, that a breach of express contract includes by nature the parties' ability to prove an implied contract if the express contract does not come to fruition for some reason."); Tr. at 83 ("if for some reason in the proof, the Court comes to the conclusion that there was not an express contract, we still get to ask the Court to consider an implied theory."). Thus, Bar J itself acknowledges that there are more than two options even if the ESA was not renewed – for instance, Bar J asserts, the parties may have been operating under an implied contract.[7]

In addition to arguing that Fisher was a trespasser, Bar J makes a less-developed argument that "the necessary duty element and the representation becomes immaterial . . . since Fisher had no contractual right to be on the property." Doc. 197 at 10. At oral argument Bar J asserted that because it could have excluded Fisher from the property at any time after the ESA expired, Fisher had no justifiable reliance. Tr. at 125. Read broadly, this argument could go to the question of duty. Because Bar J could exclude Fisher from the property at any point before the lease between Bar J Trucking and the Pueblo ended in January 2015, the argument goes,

---

[7] Whether Bar J may proceed on its implied contract theory is the subject of Fisher's motion to dismiss or for summary judgment (Doc. 241) and Bar J's motion for leave to file a second amended complaint (Doc. 242). The Court will further address Bar J's implied contract theory when it issues its Orders on these separately pending motions.

Fisher could have no expectation that it would be allowed to stay on the property regardless of whether the lease between Bar J Trucking and the Pueblo was renewed. If Fisher had no right to stay on the property, the argument continues, Bar J had no duty to inform Fisher whether the lease would be renewed and, to the extent Fisher chose to stockpile material, it did so at its own risk. To the extent this argument is viable, a question exists as to whether Bar J developed it sufficiently to preserve it.

Assuming Bar J did preserve the argument, however, the existence of material questions of fact prevent the argument from being successful at the summary judgment stage. As the New Mexico Court of Appeals stated in *Azar*, "[i]f there are disputed facts bearing upon the existence of the duty, as for example the defendant's knowledge of the fact, the other's ignorance of it or his opportunity to ascertain it, the customs of the particular trade, or the defendant's knowledge that the plaintiff reasonably expects him to make the disclosure, they are to be determined by the jury under appropriate instructions as to the existence of the duty." *Azar*, 2003-NMCA-062, ¶ 71. The Court has already indicated in its prior Opinion (Doc. 183) that there are numerous issues of fact concerning Fisher's misrepresentation claim. The same is true as to the duty question. All of the factors the Court should consider in determining whether a duty to disclose exists are either disputed or not yet factually developed. Thus, the Court determines that material disputes of fact similar to those set forth in *Azar* preclude the granting of Bar J's motion for summary judgment with regard to Fisher's misrepresentation claims.

**b. New Mexico Unfair Practices Act (NMUPA) Counterclaim (Count II)**

The New Mexico Unfair Practices Act (NMUPA) prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." NMSA 1978, § 57-12-3 (1971). The NMUPA defines an "unconscionable trade practice" as "an act or

practice in connection with the sale . . . or in connection with the offering for sale . . . of any goods or services . . . that to a person's detriment . . . takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree." Section 57-12-2(E). The NMUPA defines an "unfair or deceptive trade practice" as

> an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person.

Section 57-12-2(D). The statute also enumerates eighteen types of conduct that constitute an unfair or deceptive trade practice. *Id.* Relevant to this case is: "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive." Section 57-12-2(D)(14). New Mexico courts have found that there are three essential elements to a NMUPA claim. *See Hicks v. Eller*, 2012-NMCA-061, ¶ 17, 280 P.3d 304. To prevail on a NMUPA claim, a plaintiff must prove:

> (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading;
>
> (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and
>
> (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

*Id.* (internal citation omitted); *see Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, ¶ 17, 965 P.2d 332 ("The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services.").

For purposes of its NMUPA claim, Fisher alleges that the relationship between the parties was that Bar J would sell, and Fisher would purchase, material that Fisher mined from a sand and

gravel mine located on the Pueblo. Doc. 49 (Amended Counterclaims) ¶ 140. A material aspect of this relationship was the continued existence of a lease for the mine that non-party Bar J Trucking held with the Pueblo. *Id*. ¶ 142. Fisher alleges that, at an April 22, 2013 meeting between the parties, Bar J advised Fisher that the lease had been renewed for an additional ten years. *Id*. ¶ 79. Fisher claims that Bar J, however, had actual and/or constructive knowledge before this meeting that the lease was in jeopardy of being cancelled and/or not renewed due to Bar J Trucking's failure to make royalty payments to the Pueblo. *Id*. ¶¶ 92-93, 143. Bar J also knew, according to Fisher, that the BIA ultimately cancelled the lease, and that the Pueblo was concerned mining operations were ongoing even after the decision to cancel the lease had been made. *Id*. ¶¶ 143-44. Fisher alleges that Bar J withheld this information from Fisher. *Id*. ¶¶ 145-46. Unaware of the issues surrounding the lease, Fisher continued to mine, process and stockpile material at the mine and had approximately 300,000 tons of stockpiled material by August 2014 when it discovered through a news article that the lease had been cancelled. *Id*. ¶ 80. Fisher claims that Bar J violated the UPA because:

> 147.  Bar J did not inform Fisher that the BIA had cancelled the Lease.
>
> 148.  Bar J did not inform Fisher that Bar J Trucking had failed to make royalty payments to the Pueblo.
>
> 149.  Bar J did not inform Fisher about the Pueblo's concerns that mining operations were continuing after the cancellation of the Lease.
>
> 150.  Bar J took advantage of Fisher's lack of knowledge to a grossly unfair degree when it allowed Fisher to continue mining operations when the Lease was in jeopardy of cancellation and/or non-renewal.

*See* Doc. 49. Fisher claims it suffered actual damages due to the loss of the stockpiled material, which it estimates was worth approximately $2.5 to 3 million dollars. *Id*. ¶¶ 86, 151.

In its motion, Bar J argues that Fisher's NMUPA claim must fail because the relationship between the parties has to be premised on the existence of a contract, and the Court has already ruled that neither the ESA nor any other contract Fisher alleges existed was in effect during the relevant time period. Doc. 197 at 12. Stated differently, Bar J's first argument appears to be that Fisher's NMUPA claim must be dependent on the existence of a contract between the parties and that without a contract Bar J had no obligation to disclose any information regarding lease issues to Fisher. *Id.*; *see also* Doc. 234 at 13-14. The Court disagrees that the existence of a contract is a prerequisite to a successful NMUPA claim.

First, the plain language of the NMUPA does not support Bar J's argument that a contract must exist for the sale of goods or services before a NMUPA claim can be brought. "Since the UPA constitutes remedial legislation," the Court interprets its statutory provisions "liberally to facilitate and accomplish its purposes and intent." *Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 30, 227 P.3d 73; *State ex rel. King v. B & B Inv. Group, Inc.*, 2014-NMSC-024, ¶ 48, 329 P.3d 658 ("It is the task of the courts to ensure that the Unfair Practices Act lends the protection of its broad application to innocent consumers."). The relevant statutory provisions do not require a contract for the sale of goods or services. Rather, the statute broadly prohibits misrepresentations made "*in connection with* the sale . . . of goods or services." Section 57-12-2(D)-(E) (emphasis added); *see also Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 21, 166 P.3d 1091 (indicating that use of the conjunctive phrase 'in connection with" signifies that the NMUPA is "designed to encompass a broad array of commercial relationships.").

Further, New Mexico cases have not held that a contractual relationship between the parties is a required element of a NMUPA claim. *See, e.g.*, *Hicks*, 2012-NMCA-061, ¶ 17 (setting forth elements of NMUPA claim); *Stevenson v. Louis Dreyfus Corp.*, 1991-NMSC-051,

¶ 13, 112 N.M. 97 (same); *Carl Kelley Constr. L.L.C. v. Danco Techs.*, 656 F. Supp. 2d 1323, 1339 (D.N.M. 2009) (indicating that a NMUPA claim "is more like a tort claim than a contract claim" and that although conduct giving rise to a breach-of-contract claim can be relevant to a NMUPA claim, the latter is not "a suit on the contract but a suit under a cause of action that New Mexico's legislature has enacted for allegedly unfair trade practices."); *see also Walker v. Emergency Staffing Sols., Inc.*, 2017 WL 3206641, at *7-8 (D.N.M. 2017) (discussing the elements of a NMUPA claim and concluding that "[t]o be sure, the UPA is not limited to misrepresentations that occur at the time the parties enter into a contract.").

The New Mexico Court of Appeals' decision in *Lohman* further supports the Court's interpretation of the NMUPA. The court in *Lohman* held that the plaintiff could bring an action under the NMUPA even though no commercial transaction between the parties existed. 2007-NMCA-100, ¶ 33. The case involved the sale of vehicles equipped with allegedly defective seatbelts. The plaintiff alleged that defendants – a vehicle manufacturer and a testing company – made misrepresentations regarding the safety of the seatbelts, including issuing fraudulent safety certifications, in order to enable the downstream sale of vehicles by dealers/distributors in the United States, and that consumers were deceived into purchasing these vehicles. *Id*. ¶ 6. However, the plaintiff's complaint did not contain any allegations concerning transactions between the parties; rather, the misrepresentations at issue impacted downstream sales by and between third parties. *Id*. ¶¶ 29-30. Defendants sought to dismiss the NMUPA claims on this basis, arguing that, in the absence of such a transaction, the plaintiff could not "establish that any representation [was] made in connection with the sale of goods." *Id*. ¶ 28.

The court rejected this argument, holding that "the plain language of the act and the underlying policies suggest that a commercial transaction between a claimant and a defendant

need not be alleged in order to sustain a UPA claim." *Id.* ¶ 33. Based on *Lohman*, New Mexico

courts have described the relationship between the parties for purposes of a NMUPA claim as:

> While we agree that *Lohman* does not require a transaction between a claimant
> and a defendant, *Lohman* does stand for the proposition that the plaintiff must
> have sought or acquired goods or services and the defendant must have provided
> goods or services. *Id.* We understand this to mean that the plaintiff does not
> necessarily have to purchase the product from the defendant, but that somewhere
> along the purchasing chain, the claimant did purchase an item that was at some
> point sold by the defendant.

*Hicks*, 2012-NMCA-061, ¶ 20; *see also Maese v. Garrett*, 2014-NMCA-072, ¶ 19, 329 P.3d 713

(holding that the NMUPA "does not require a showing that the defendant made a

misrepresentation in the course of selling a product or services to the plaintiff" and finding, in

that case, immaterial that the plaintiffs did not specifically compensate the defendants for

financial services rendered, where the defendants received compensation from third parties for

investment advice that led the plaintiffs to purchase their products).

These cases dictate that a contract between the parties is not a necessary precursor to a

NMUPA claim. Furthermore, Fisher has alleged a relationship between the parties that is

consistent with this case law -- i.e., that Bar J was the seller of aggregate material that Fisher

mined and then purchased. *See* Doc. 149, ¶ 140. Thus, based on the plain language of the

NMUPA and the foregoing case law, the Court rejects Bar J's argument that the expiration of the

ESA and the Court's dismissal of other contractual claims/counterclaims acts as an automatic bar

to Fisher's NMUPA claim.

In its reply brief, Bar J contends that Fisher's NMUPA claim also fails because the

alleged misrepresentations at issue concern Fisher's mining operations, and "mining operations

are not the sale of a good or service." *See* Doc. 234 at 14. The first problem with this argument is

its late appearance. *See Gutierrez v. Cobos*, 841 F.3d 895, 902 (10th Cir. 2016) ("a party waives

issues and arguments raised for the first time in a reply brief"); *See also Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 2012 WL 1132527, at *15 (D.N.M. Mar. 22, 2012) ("[R]eply briefs reply to arguments made in the response brief-they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.") (internal citation omitted). Moreover, this argument was not the focus of Bar J's reply brief. Instead, Bar J devoted less than three full lines to the argument in a section of its reply brief that primarily argued that a legally cognizable duty or relationship is required for a NMUPA claim. Doc. 234 at 13-14.

The second problem with this argument is that it fails to recognize the nature of the relationship between Bar J and Fisher. It is true that Fisher mined material. It is also true, however, that Fisher's sole purpose in mining the material was to purchase it. While it was incumbent on Fisher to obtain (mine) the material it bought, it was the buying and not the mining that defined the relationship between Bar J and Fisher. Fisher had no financial incentive to mine any material that it did not intend to purchase. In other words, the relationship between Bar J and Fisher was that of supplier and customer. *See* Doc. 240 at 22. As a result, the Court concludes that if Bar J made the false statement(s) Fisher alleges Bar J made, Bar J made the statement(s) "in connection with" the sale of goods. *See Lohman*, 2007-NMCA-100, ¶ 30 (the NMUPA does not "require a misrepresentation *in the course of* a sale between plaintiff and defendant; it merely requires that a misrepresentation be 'made *in connection with* the sale . . . of goods' generally." (omission in original)).

Lastly, Bar J summarily raises a materiality argument, contending that the alleged representations at issue were not material to Fisher's relationship with Bar J during the relevant time period. Doc. 197 at 12. As stated earlier, Section 57-12-2(D)(14) of the NMUPA provides

that unfair or deceptive trade practices include "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive." New Mexico courts have relied upon this provision to find that the NMUPA imposes an affirmative duty "to disclose material facts reasonably necessary to prevent any statements from being misleading." *Dollens v. Wells Fargo Bank, N.A.*, 2015-NMCA-096, ¶ 14, 356 P.3d 531 (quoting *Smoot v. Physicians Life Ins. Co.*, 2004–NMCA–027, ¶ 15, 87 P.3d 545); *see also Azar v. Prudential Ins. Co. of Am.*, 2003-NMCA-062, ¶¶ 65, 71, 68 P.3d 909. Fisher's NMUPA claim expressly relies on Section 57-12-2(D)(14) and further alleges that the status of the lease was a material aspect of its relationship with Bar J. Doc. 49, ¶¶ 138, 142.

Thus, in response to Bar J's materiality argument, Fisher alleges that Bar J had a duty to disclose material information regarding the status of the lease. Bar J disagrees that such a duty existed, arguing that information regarding the lease was immaterial because there was no contract between the parties in 2013 and 2014. "The existence of a duty is dependent on the materiality of the facts." *Smoot*, 2004-NMCA-027, ¶ 15. "Ordinarily, the question of materiality is one of fact." *Azar*, 2003-NMCA-062, ¶ 73. Therefore, "summary judgment is not appropriate if the underlying facts giving rise to the duty are in dispute." *Id.* ¶ 71. "If there are disputed facts bearing upon the existence of the duty, as for example the defendant's knowledge of the fact, the other's ignorance of it or his opportunity to ascertain it, the customs of the particular trade, or the defendant's knowledge that the plaintiff reasonably expects him to make the disclosure, they are to be determined by the jury under appropriate instructions as to the existence of the duty." *Id*. That is the case here. There is no question that parties dispute what transpired during the April 22, 2013 meeting. Because there are issues of fact regarding the materiality of the undisclosed

information regarding the lease, it is inappropriate to grant summary judgment to Bar J as a matter of law on this aspect of Fisher's NMUPA claim.

**c. Breach of Implied Covenant of Good Faith and Fair Dealing (Count V)**
   **Declaratory Judgment (Count VI)**
   **Fraudulent Inducement (Count VIII)**

Bar J lastly moves for summary judgment or dismissal of Fisher's counterclaims for breach of the implied covenant of good faith and fair dealing (Count V), declaratory judgment (Count VI), and fraudulent inducement (Count VIII). In its response, Fisher concedes that the Court's prior rulings have rendered these claims moot and that it will therefore not pursue them.[8] Doc. 224 at n.1. The Court therefore dismisses these claims with prejudice.

**III.    CONCLUSION**

Based on the foregoing, Bar J's Motion (Doc. 197) is granted in part and denied in part. Counts V, VI, and VIII of Fisher's counterclaims are hereby dismissed with prejudice.

UNITED STATES MAGISTRATE JUDGE
Presiding by Consent

---

[8] As Fisher confirmed at the hearing (Tr. at 136), it mistakenly referred to Count VII instead of Count VIII in its response brief. The Court dismissed Count VII in a prior ruling. *See* Doc. 182.